UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**05 1021**

-------------------------------------------------------------------x

JUDITH B. MEMBLATT,

Plaintiff,

-against-

JAIME A. RIOS, Associate Justice, Appellate Term,
Supreme Court, State of New York, 2nd and 11th
Judicial Districts, STEVEN W. FISHER, Associate
Justice, Appellate Division, Supreme Court, State of
New York, 2nd Department, JONATHAN LIPPMAN,
Chief Administrative Judge of the Courts of the State
of New York, LAUREN DeSOLE, Director of the
Division of Human Resources, New York State
Unified Court System, Office of Court Administration,
ANTHONY D'ANGELIS, Chief Clerk, Supreme
Court, State of New York, Queens County,
ROBERT W. GARDNER, Major of Court Officers,
Supreme Court, State of New York, SANDRA
NEWSOME, Secretary to Judge, Supreme Court,
State of New York, HEIDI HIGGINS, Secretary to
Judge, Supreme Court, State of New York,
KAREN KOSLOWITZ, Deputy Borough President,
County of Queens, City of New York,
THOMAS J. MANTON, GERARD J. SWEENEY and
MICHAEL H. REICH,

Defendants.

--------------------------------------------------------------------

**Civil Action No.:_____
COMPLAINT**
Pro Se

Jury Trial Demanded

GLASSER, J.

BLOOM, M.J.

ORIGINAL

RECEIVED

FEB 2 4 2005

**PRO SE OFFICE**

Plaintiff Judith B. Memblatt alleges as follows for her Complaint:

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which plaintiff seeks relief for
defendants' violations of her rights secured by 42 U.S.C. § 1983, the First and
Fourteenth Amendments to the United States Constitution, and the laws and
Constitution of the State of New York. These claims arise from religious and racial
discrimination, retaliation for plaintiff's complaints about same, retaliation for plaintiff's
statements regarding acts of judicial misconduct and other matters of public concern,
retaliation for plaintiff's participation and/or lack of participation in certain political
campaigns and retaliation for the cessation of plaintiff's relations with the Continental



Regular Democratic Club and the Democratic Organization of Queens County, as well as from defamatory statements regarding plaintiff that have been published by defendants as set forth herein.  Plaintiff was subjected to such discrimination, retaliation and defamation by defendants during the period of time from January 1995 through May 5, 2004, while plaintiff was employed as the principal law clerk to New York State Supreme Court Justice Jaime A. Rios.  Said discrimination, retaliation and defamation culminated in adverse employment actions against plaintiff, including her wrongful discharge.  Such retaliation and discrimination have continued to the present. Additionally, defendants have continued to publish defamatory statements regarding plaintiff following her wrongful termination from employment.  Plaintiff seeks compensatory and punitive damages, attorney's fees, costs, interest and such other and further relief as the court deems just and proper.

## JURISDICTION & VENUE

2.      This action is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.  Jurisdiction is conferred upon this Court by 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

3.      Plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising under state law.

4.      Venue is properly in this district, pursuant to 28 U.S.C. § 1391(b), inasmuch as a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district.

## PARTIES

5.      Plaintiff is an attorney admitted to practice before the courts of the State of New York.  She is a United States citizen and a resident of the State of New York, County of Queens.  From January 3, 1993 through May 5, 2004, plaintiff was employed by the New York State Unified Court System, Office of Court Administration ("OCA").   Prior to the commencement of said employment, plaintiff was a part-time councilmanic aide to then-New York City Council member Karen Koslowitz and also was the Chairperson of the Board of the Continental Regular Democratic Club. From January 1994 through December 1994, plaintiff was employed by OCA as the

2

court attorney to defendant Rios, who was a Civil Court Judge at 🔴 time. From the commencement of defendant Rios' term as a Supreme Court Justice in January 1995, and continuing until May 5, 2004, plaintiff was employed by OCA as the principal law clerk to Justice Rios. Plaintiff was wrongfully discharged from said employment effective on the latter date. Plaintiff is Jewish and Caucasian.

6.      Defendant Jaime A. Rios is a Justice of the Supreme Court of the State of New York, Queens County. Since January 2001, defendant Rios also has been an Associate Justice of the Appellate Term, 2nd and 11th Judicial Districts. Justice Rios is Christian and Hispanic.

7.      Defendant Sandra Newsome has been employed by OCA as the clerical secretary to Justice Rios since January 1995. Defendant Newsome is Christian and African-American.

8.      Defendant Steven W. Fisher was the Administrative Judge of the Supreme Court, State of New York, 11th Judicial District from January 1998 until on or about May 3, 2004. He has been an Associate Justice of the Appellate Division, Second Department since on or about the latter date.

9.      Defendant Jonathan Lippman has been the Chief Administrative Judge of the Courts of the State of New York since 1996. From 1995 to 1996, he was the Deputy Chief Administrative Judge. From 1989 until 1995, defendant Lippman was the Deputy Chief Administrator for Management Support of the Courts of the State of New York.

10.     Defendant Lauren DeSole is an attorney who is employed by OCA as the Director of its Division of Human Resources. She has been so employed at all times relevant herein.

11.     Defendant Anthony D'Angelis is employed by OCA as the Chief Clerk of the Supreme Court in Queens. He has been so employed at all times relevant herein.

12.     Defendant Robert W. Gardner is employed by OCA as a major of court officers. He has been so employed at all times relevant herein.

13.     Defendant Heidi Higgins is the daughter of defendant Karen Koslowitz. She has been employed by OCA as the clerical secretary to Justice Mark H.

3

Spires since January 1995.

14.     Defendant Karen Koslowitz has been the Deputy President of the Borough of Queens since 2001. From 1991 through 2000, defendant Koslowitz was a New York City Council member. From 1986 through 2000, defendant Koslowitz was the female District Leader of the Democratic Party from the 28th Assembly District, Part A, State of New York, as well as an Executive Member of the Continental Regular Democratic Club, which is under the control of the Democratic Organization of Queens County.

15.     Defendant Thomas J. Manton, a former Congressman, has been the Chairman of the Executive Committee of the Democratic Organization of Queens County since September 1986. During his tenure in the latter position, Manton has possessed *de facto* control over the courts in Queens and has greatly influenced many of the employment decisions made therein, including those pertaining to plaintiff.

16.     Defendant Gerard J. Sweeney is the top political advisor to defendant Manton. Sweeney also is the counsel to the Public Administrator of Queens County.

17.     Defendant Michael H. Reich is the Executive Secretary of the Executive Committee of the Democratic Organization of Queens County.

18.     Defendants Manton, Sweeney and Reich are partners in the law firm of Manton Sweeney Gallo Reich & Bolz, L.L.P. That law firm has a symbiotic relationship with the Queens judiciary that was outlined in an editorial entitled, "*Queens under King Manton's thumb,*" published on July 7, 2003 in the New York Daily News. The editorial explained that,

> . . . Manton holds no public office. He's a lawyer in private practice. But as chairman of the Queens Democratic organization, he wields enormous clout.
> Through his law firm - Manton, Sweeney, Gallo, Reich & Bolz - he controls all of Queens politics and its judiciary. Manton single-handedly picks every elected judge in the county. Oh, yes, there are elections - but the results are preordained: the Democratic ballot line is all that's needed to ensure victory . . .
> Meanwhile, Manton's law firm - as the sole source of political power in Queens County - reaps huge legal fees from work doled out by his judges . . .

That level of control over the bench keeps Manton firmly in charge
. . . all the key players in the politics-courts nexus are partners in his
law firm.

Manton partner Michael Reich also runs the Queens Democratic
organization's daily affairs. Another Manton partner, Frank Bolz, the
party's longtime law chairman, often represents the party in ballot
challenges. It's a similar arrangement for the counsel to the public
administrator, the lawyer who handles cases for the Queens surrogate
judge. The counsel in Queens is Gerard Sweeney, yet another Manton
partner - his closest ally, in fact - who's a former party law chairman.
The fees Sweeney collects go straight to the firm.

Those fees are approved by Queens Surrogate Robert Nahman . . .
whom Manton installed on the bench in 1991 without a primary. The
incumbent stepped down just in time for Manton to pick Nahman as
the replacement candidate without any public input . . .

19. Defendants Rios, Fisher, Lippman, D'Angelis, Koslowitz and Reich
are members of the "Queens County Committee to Promote Public Trust and
Confidence in the Legal System" (originally known as the "Judicial Advisory Council of
Queens County"). Additional members of that committee include Frank Bolz, Mindy
Trepel (an attorney associated with Manton Sweeney Gallo Reich & Bolz, L.L.P., who
previously was the Public Administrator of Queens County - a post that she had been
appointed to by Queens Surrogate Robert Nahman), Surrogate Nahman, Queens
County Public Administrator Lois Rosenblatt, Amy Vance (Deputy Counsel, OCA) and
Albert F. Pennisi (defendant Manton's former law partner and a central figure in the
Queens political corruption scandals of the 1980's; he was suspended from the practice
of law for five years for paying kickbacks to Donald Manes and reportedly avoided
criminal charges by cooperating in the related federal prosecution). Defendants Rios,
Fisher, D'Angelis, Koslowitz and Reich have personally attended the meetings held by
said committee. Pennisi and Koslowitz are active members of its Public Relations
Subcommittee.

## STATEMENT OF FACTS

20. In mid-September 1986, Koslowitz was first elected as the female
District Leader of the Democratic Party, 28th Assembly District, Part A, State of New
York and became an Executive Member of the Continental Regular Democratic Club.

21. Approximately two weeks after defendant Koslowitz was elected to

5

her first term as a District Leader, Manton was elected as the Chairman of the
Executive Committee of the Democratic Organization of Queens County. He won that
election with the support of Koslowitz and her co-leader Michael Cohen. Koslowitz
informed plaintiff that Manton had agreed that Koslowitz's then-boyfriend, David
Goldstein (now deceased), would become a Civil Court Judge in exchange for her vote.
The prior commitments to vote for Manton that were made by Koslowitz and Cohen
swung the election in Manton's favor. Those occurrences resulted in a strong political
alliance between defendants Koslowitz, Manton, Sweeney and Reich that still exists.
The following year, David Goldstein (who later became a New York State Supreme
Court Justice) was elected as a Civil Court Judge with the support and assistance of
Manton, Reich and Sweeney. Koslowitz thereby gained a reputation as a power broker
in the Queens judiciary. On June 8, 1987, in an article by Dick Zander entitled, *"Very
Early Returns for Civil Court,"* New York Newsday reported that,

> If history is a guide, three Civil Court judges were elected without
> opposition Thursday night in the narrow second-floor room that serves
> as Queens Democratic Headquarters.
> The designation on Thursday of David Goldstein to run for a
> countywide Queens Civil Court seat is worthy of note . . .
> Goldstein appears to have become a special issue because of
> last year's fight for the countywide leadership, when Rep. Tom
> Manton defeated Councilman Morton Povman for the chairmanship.
> Goldstein was recommended for the judgeship by his local leaders,
> Michael Cohen and Karen Koslowitz. Povman and his coleader
> Elaine Weinstein control the other half of the 28[th] Assembly District.
> Cohen and Koslowitz broke with Povman and supported Manton for
> the chairmanship, a blow that was devastating to Povman. Manton's
> choice of Goldstein was seen by some as a payoff to Cohen and
> Koslowitz. That assertion, of course, was denied by Manton.

        22.     In 1989, while defendant Rios was a Housing Court Judge, he
attempted to run in the Democratic Party primary for Civil Court in Queens. The
Democratic Organization of Queens County instituted a challenge to his nominating
petitions. The Board of Elections in the City of New York found that only approximately
800 of the 5400 signatures contained in defendant Rios' petitions were valid - far less
than the requisite 5,000 valid signatures. His name was removed from the ballot for
that primary.

23.    In April 1991, defendant Koslowitz was elected without opposition, as a City Council member in a special election. In order to ensure that Cohen would support her in the Democratic Party primary, which was to be held that September, she agreed to his request to merge the Continental Regular Democratic Club with the political club that he led. Following her election, she ensured that her club voted for the merger. Cohen became an Executive Member of the new entity (initially known as the Continental-Town Hall Regular Democratic Club, but later renamed as the Continental Regular Democratic Club). Plaintiff, who had been the Chairperson of the Board of the club that Koslowitz led, became the first Chairperson of the Board of the newly merged club.

24.    On April 24, 1991, defendant Koslowitz hired plaintiff as a part-time councilmanic aide. Plaintiff also was employed on a full-time basis as an associate to a sole practitioner and, in conjunction with that employment, frequently appeared before Judge Rios in the Housing Court.

25.    Defendant Koslowitz won the Democratic Party primary in September 1991. She was elected to her first full term as a City Council member in November 1991.

26.    In 1993, the Judicial Advisory Council of Queens County ("Judicial Advisory Council") was created by New York State Chief Judge Judith S. Kaye and then-Chief Administrative Judge E. Leo Milonas, ostensibly to enable the courts to become more responsive to community needs. Then-Administrative Judge, 11th Judicial District, Alfred D. Lerner (currently an Associate Justice of the Appellate Division, First Department) initially chaired it. Koslowitz became a member. She told plaintiff that its actual purpose was to provide an excuse for the supreme court justices in Queens, who are barred from many political activities, to convene with the political insiders in the Democratic Organization of Queens County, including herself.

27.    In January 1993, plaintiff commenced her employment with OCA as a court attorney. As part of her duties, she conferenced cases for the judges of the Housing Court in Queens, including Judge Rios. As required due to said employment, plaintiff resigned from her positions with Koslowitz and the Continental Regular Democratic Club. Defendant Rios was aware that plaintiff had held those positions. He

7

also was aware that Koslowitz routinely socialized with plaintiff at ⬤ time.

28.    In 1993, Judge Rios received the endorsement of the Democratic Organization of Queens County as a candidate for the Civil Court. He told plaintiff that, if she wanted to become his court attorney, she should ask Koslowitz to secure the approval of the Democratic Organization of Queens County for him to hire her. Plaintiff did so. Koslowitz replied that she would speak to Reich in order to obtain that approval. Subsequently, she obtained the approval. Reich communicated it to Judge Rios.

29.    Judge Rios ran unopposed in the September 1993 Democratic Party primary for Civil Court judge. He was elected to the Civil Court in November 1993. He hired plaintiff as his court attorney.

30.    In February 1994, Michael Cohen lost the special election for the New York State Assembly seat that had become vacant due to the election of Alan Hevesi as Comptroller of the City of New York. He had received the support of Manton, Sweeney, Reich and Koslowitz. The seat was won by Melinda Katz, who was supported by Hevesi. In an article entitled, *"Dem's Pick Loses Hevesi's candidate, Katz, wins Queens vote,"* published in New York Newsday on February 16, 1994, Maurice Carroll reported that Cohen's loss was a "major political embarrassment" to Manton. The race for that seat began a long feud between the opposing sides.

31.    On March 3, 1994, the dismissal of a former principal law clerk's claim that he had been wrongfully discharged, in retaliation for his exercise of free speech in confronting Justice Leon A. Beerman about the judge's alleged misconduct, was reversed in *Sheppard v. Beerman,* 18 F.3d 147, 151 (2d Cir. 1994). In remanding the matter to the district court, the Second Circuit instructed that,

> A state may not discharge an employee for reasons which infringe on that employee's constitutionally protected interest in freedom of speech. *See Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).   If an employee is discharged for making statements concerning a matter of public concern, the employee's freedom of speech may have been violated. *See Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) . . .

32.    In a letter dated April 4, 1994, retired Justice Beerman wrote to

8

then-Justice Charles A. Kuffner, Jr., an officer of the Association and Justices of the
Supreme Court of the State of New York, regarding the decision in *Sheppard v.
Beerman, supra*. In his letter, Justice Beerman stated that,

> It may appear to be an incident of a personal nature but I truly
> believe that it affects every sitting Justice in the N.Y.S. Supreme
> Court. The opinion expressed in the Circuit Court is far reaching
> and has a drastic "chill" on the relationship with the personnel staff.

      33.    In a letter dated April 11, 1994, concerning the efforts that he was
undertaking in response to the Second Circuit's decision in *Sheppard v. Beerman,
supra*, Justice Kuffner informed retired Justice Beerman, that, on April 8, 1994, at a
meeting of the Association of the Justices of the Supreme Court of the State of New
York, he had offered the following proposal: ". . . that at the very least a coordinated
effort between OCA, the City Association and the State Association should be made to
present . . . if and when a motion for reargument is made, a comprehensive amicus
brief emphasizing the extremely unique position of a Judge and his relationship with his
Principal Law Clerk . . . the leading expert on the issue is presently working for OCA, a
Mr. Sullivan, and I will follow up for the State Association and the City Association with
Judge Milonas and Jonathan Lippman to bring about a coordinated effort." At a
deposition taken in September 1998, in connection with the same action, former Justice
Kuffner recalled that the aforementioned meeting was attended by then-Chief
Administrative Judge Milonas, members of his staff, other OCA personnel, and
representatives of every judges' association in New York State. Justice Kuffner also
testified that his proposal was unanimously approved, and, that the Chief Administrative
Judge adopted the recommendation to have his counsel, Michael Colodner, submit an
amicus brief, if and when a motion for reargument was filed. Justice Kuffner explained
that the coordination of OCA with the judges' associations was considered necessary
inasmuch as, unlike the associations, OCA possessed the resources to assign an
attorney to do the legal work pertaining to the action that had been commenced by the
discharged law clerk. He asserted that the position that he had espoused at the
meeting was that a judge should be able to discharge a law clerk regardless of whether
the motive for the termination was to punish the law clerk for statements involving a

matter of public concern, including judicial misconduct. 

34.     In a letter to Justice Kuffner dated "June 27[th] 1944," but obviously written in 1994, retired Justice Beerman opined that, "It seems that my former law secretary has no bounds in his obsession to continue with his hallucinations and delusions." The recently observed symptom of those "hallucinations and delusions," that served as the basis for that diagnosis was an application for a *writ of certiorari* that had been filed in the U.S. Supreme Court by the former law clerk, in which he had alleged that searches of his office, desk and files had violated his Fourth Amendment rights. Although Justice Beerman labeled his former law clerk as hallucinatory and delusional for advancing such contentions, he also maintained that those arguments were serious enough to warrant coordinated opposition. His letter stated that, "The outcome of this application is of great concern and import to the entire judiciary."

35.     After concluding that it was not feasible for him to run in the September 1994 Democratic Party primary for the Assembly seat that Melinda Katz had won, Michael Cohen sought Koslowitz's assistance in retaliating against those members of the Continental Regular Democratic Club targeted by him as having been insufficiently supportive of his campaign. As part of the ensuing political vendetta, in September 1994, Koslowitz fired Robert Silver, a member of the Continental Regular Democratic Club, who had been employed by her as a part-time councilmanic aide since May 1991. Additionally, Koslowitz and Cohen informed Sweeney, Reich and Manton that it was their desire to replace Cynthia Reiss, Esq., as the candidate for the position of Democratic State Committeewoman from the 28th Assembly District on the nominating petitions circulated by the Democratic Organization of Queens County. Reiss was a member of the Continental Regular Democratic Club, who had been elected to that party position for several terms with the support of Koslowitz, Cohen and the Democratic Organization of Queens County. Manton, Sweeney and Reich ensured that Reiss was replaced by Joyce Singerman, the substitute candidate proposed by Koslowitz and Cohen. Koslowitz explained to plaintiff that the actions against Silver and Reiss constituted retaliation for their failure to campaign for Cohen in the 1994 special election. Singerman initially was elected as the Democratic State Committeewoman from the 28th Assembly District in 1996 -- the first election for that party position that

10



was held after September 1994.

      36.    In or about September 1994, Reich visited the chambers of defendant Rios and told him that he would be nominated as a candidate for the Supreme Court at the upcoming judicial convention to be held by the Democratic Organization of Queens County. The only route onto the general ballot as a major party candidate for the New York State Supreme Court is through nomination at such a closed judicial convention, in which the votes are cast by delegates who are hand-picked by the parties' local leaders. Describing that system, in an article entitled, *"Where Parties Select Judges, Donor List Is a Court Roll Call: Judicial Politics in Queens, New York,"* published in the New York Times on August 18, 2003, Clifford J. Levy explained that,

> The dominant parties, whether Democratic in the city or Republican upstate, control State Supreme Court judgeships because of arcane state election rules in place for decades. Candidates earn spots on the ballot not through primaries, but through judicial conventions, over which party leaders exercise almost total control. As a result, in the overwhelmingly Democratic city, Democratic leaders in the boroughs can essentially name people to the bench because the Democratic nomination is tantamount to election.

      37.    Defendant Rios was nominated as a candidate for the Supreme Court at the judicial convention held by the Democratic Organization of Queens County in September 1994. He instructed plaintiff that, if she was interested in becoming his principal law clerk in the Supreme Court, she should ask Koslowitz to secure the approval of the Democratic Organization of Queens County for him to hire her upon his election to that court. Plaintiff did so. Koslowitz replied that she would speak to Reich in order to obtain such approval. Cohen attempted to prevent plaintiff from being hired for that position and to cause her to be terminated from her employment by OCA, as punishment for his loss in the special election. Koslowitz declined to support Cohen in that endeavor, due to her knowledge that plaintiff actually had spent a substantial amount of time campaigning for him in that election. Koslowitz obtained approval for Judge Rios to hire plaintiff as his principal law clerk. Reich advised Judge Rios of that approval, and also told him that Cohen had objected to it. Subsequently, Judge Rios directed plaintiff to thank Reich for securing the approval of the Democratic

Organization of Queens County for him to hire plaintiff as his principal law clerk.  When plaintiff did so, Reich told her that she should thank Koslowitz.

38.  Defendant Rios was elected to the Supreme Court in November 1994.  He hired plaintiff as his principal law clerk.  As a Supreme Court Justice, he also was entitled to hire a clerical secretary.  In accordance with the instructions of the Democratic Organization of Queens County, he hired defendant Newsome for that position.  Subsequently, Newsome remarked that she would write a letter to Reich to thank him for the job.

39.  In 1995, defendant Jonathan Lippman became the Deputy Chief Administrative Judge of the Courts of the State of New York.

40.  In January 1995, to ameliorate Cohen's anger over the fact that plaintiff had not been punished as part of his political vendetta, but rather had been hired as Justice Rios' principal law clerk, Koslowitz excluded plaintiff from the inner circle of the Continental Regular Democratic Club, and, also informed plaintiff that she would no longer socialize with plaintiff.  When plaintiff noted that she had spent many hours campaigning for Cohen, Koslowitz did not deny that fact, but instead ended the discussion of the matter by simply declaring that, "Michael doesn't see it that way." Plaintiff continued her membership in the Continental Regular Democratic Club for several years, but was ostracized from its inner circle.

41.  Commencing with the first day of his term as a Supreme Court Justice, in January 1995, behind the closed doors of chambers, defendant Rios' demeanor toward plaintiff became negative and hostile, in sharp contrast to the generally amiable and ostensibly appreciative manner in which he had treated her throughout the prior course of her employment by OCA.  Frequently, when visitors came to see him, he introduced them to Newsome but drew negative attention to plaintiff by acting as though she was not present.  For the first few weeks of his term in Supreme Court, he atypically began incorporating the word "Jewish" into many of the statements that he made to plaintiff.  While doing so, he angrily glared at plaintiff.  In the confines of chambers, defendants Rios and Newsome were ostentatiously cold to plaintiff, in a manner that evidenced the "us against her" atmosphere that was pervasive throughout her employment as defendant Rios' principal law clerk.

12

42.   Upon the commencement of her employment by Justice Rios,
Newsome often exhibited blatant hostility toward plaintiff. When Newsome typed work
that plaintiff drafted for defendant Rios, it routinely was replete with far more errors than
she appeared to make when she typed directly for him. After supposedly correcting the
errors, as marked by plaintiff, Newsome repeatedly returned the work to her with
additional typographical errors. She did not perform in that manner when typing Justice
Rios' work directly for him. Eventually, plaintiff began typing almost all of her own work
due to this situation. Similarly, when Newsome answered the telephone and the caller
sought to speak to plaintiff, Newsome frequently announced to her in a contemptuous
tone, "Someone's on the phone for you," without providing the name of the individual.
When a caller asked to speak to defendant Rios, Newsome invariably furnished the
relevant information to him, acting in a markedly different and professional manner. On
many occasions throughout the years that they worked together, Newsome also kept
office supplies under lock and key so that plaintiff would be unable to use them.
Additionally, Newsome engaged in other hostile and unprofessional conduct that was
directed against plaintiff.

43.   In late-May or early-June 1995, defendant Rios received a
telephone call, during which he learned the names of the candidates for Civil Court
judge that were to be included on the nominating petitions circulated by the Democratic
Organization of Queens County in connection with the primary to be held in September
1995. One such candidate was Martin Ritholtz (who currently is a New York State
Supreme Court Justice). Ritholtz was both a principal law clerk and a rabbi. In the
presence of plaintiff, Justice Rios suddenly became enraged and began repeatedly
shouting, "That rabbi is getting my vacancy!" When he did so, he pronounced the word
"rabbi" as though he considered it to be a vile obscenity. In the following months, he
repeatedly reenacted this anti-Semitic tantrum in front of plaintiff, frequently glaring at
her as he did so. In his rush to lash out at the Jewish candidate, he was unimpeded by
any desire to ascertain the facts - - Ritholtz actually was running in a municipal district,
not for the countywide vacancy that was created in the Civil Court by defendant Rios'
election to the Supreme Court. Defendant Rios' displays of anti-Semitism behind the
closed doors of chambers unambiguously evidenced that plaintiff was being subjected

13

to a hostile work environment due to his animosity toward her religion.

44.     In light of the symbiotic relationship that existed between defendants Rios, Koslowitz, Manton, Reich and Sweeney, in early-June 1995, plaintiff spoke to Koslowitz about the anti-Semitism to which she was being subjected by Justice Rios.  Plaintiff stated to her that, if defendant Rios discharged her due to his anti-Semitism, plaintiff would commence litigation against him.  Although Koslowitz initially replied that she would be supportive of plaintiff if those events transpired, approximately two weeks later, she informed plaintiff that she had changed her mind. She directed plaintiff to refrain from raising the issue of defendant Rios' anti-Semitism, and, represented that she could arrange for plaintiff to be transferred to another judge. Plaintiff responded that she did not believe that acquiescing to anti-Semitism was an acceptable solution.  In various telephone conversations that occurred during the following months, Koslowitz became increasingly adamant that plaintiff comply with her instructions to sweep defendant Rios' anti-Semitism under the rug and to accept a transfer, if he discharged her.  She also repeated her representation that she could arrange for an immediate transfer.  Plaintiff consistently responded that no one should be transferred from a job because of prejudice based upon religion or race, and, that to accept such discrimination could only encourage further acts of discrimination.  As those discussions replicated themselves, Koslowitz began angrily denouncing plaintiff as, "crazy."  She demanded that plaintiff follow her directions.  Plaintiff reiterated her position.  Eventually, this series of conversations simply ceased.

45.     In or about June 1995, within the confines of Justice Rios' chambers at the Jamaica courthouse, and in the presence of plaintiff, defendant Rios angrily shouted his prediction that then-City Comptroller Hevesi would be the next candidate for mayor to be nominated by the Democratic Party because, "It always goes to a Jew!"  In this blatant display of his anti-Semitism, he once again disregarded the facts - - in the two preceding mayoral elections, the nominee of the Democratic Party had not been Jewish.

46.     In July 1995, Justice Rios, plaintiff and Newsome moved to the Kew Gardens courthouse, where they remained until they returned to Jamaica in 2003.

47.     In the weeks preceding the "Million Man March," which was held on

14

Monday, October 16, 1995, in Washington, D.C., that event generated extensive media coverage. Much of the media's attention was focused on the controversy surrounding the march's organizer, Louis Farrakhan. He was well known for his anti-Semitic statements, including his famous declaration that, "Judaism is a gutter religion." During that month, Justice Rios approached Newsome, who was sitting at her desk, a few feet away from plaintiff. Looking toward plaintiff, and dramatically raising his voice, defendant Rios emphatically proclaimed that Farrakhan was "a great leader."

48.     On Friday, October 13, 1995, while Justice Rios and plaintiff were alone in chambers, he said that he had signed a decision that she had drafted, and, that he had left it on his desk for her, together with the court file. He then exited chambers. When plaintiff entered his office to retrieve the decision and the file, she found that he had left a note atop the decision. His handwritten note stated, "NOTICE Repent before it is too late." A copy of his note is annexed as Exhibit "A" hereto and is incorporated by reference as if fully set forth herein.

49.     In October 1995, while plaintiff and Newsome were alone in chambers, Newsome announced to her, "I have a problem with your religion because you don't accept Christ." In or about the same month, while protests were occurring in Harlem during which the Jewish Caucasian owner of "Freddy's Fashion Mart" was denounced as an "interloper," due to his religion and his race, Newsome told plaintiff that she considered the owner of the business to be an "interloper," who deserved the protests because he should not own a store in that neighborhood.

50.     On December 6, 1995, the defendant in *People v. Flavio Torres* (Queens Ind. No. N11860/95) sought to have the Legal Aid Society relieved as his attorney because he intended to call his Legal Aid counsel as a witness. In the presence of plaintiff, Justice Rios attempted to dissuade him from seeking the reassignment of counsel by telling him that, if the application was granted, his new attorney probably would be, "an American, not of Latin descent" (the assigned Legal Aid attorney was Sandra Cerna, an Hispanic female).

51.     On December 20, 1995, in a decision issued on remand in *Sheppard v. Beerman*, 911 F.Supp. 606 (E.D.N.Y.), the district court dismissed the former law clerk's claim that he had been wrongfully discharged in retaliation for his

15

exercise of free speech in confronting Justice Beerman about the judge's alleged misconduct. The court found that his speech involved a matter of public concern, and that he had demonstrated a prima facie case of unconstitutional discharge, but it also determined that Justice Beerman had qualified immunity from liability.

52.     In a letter to Justice Kuffner, dated January 16, 1996, regarding the decision on remand in *Sheppard v. Beerman, supra*, retired Justice Beerman wrote that,

> There is no doubt that an appeal will be taken from this decision
> . . . the association should consider joining the Attorney General as
> amicus curiae because of the drastic consequences a reversal will
> result on the authority of members of the judiciary. John Sullivan, of
> OCA, has been contacted and will discuss the matter with Mike
> Kolodner [sic], also with the thought of joining in the appeal . . .

53.     In 1996, defendant Jonathan Lippman became the Chief Administrative Judge of the Courts of the State of New York.

54.     In or about January 1996, then-Assistant District Attorney Meryl A. Lutsky initially was assigned to Justice Rios' part in the criminal term of the Supreme Court: Part K-22.  She was a member of the team of three prosecutors that was assigned to appear in that part on a daily basis.  Neither defendant Rios nor plaintiff previously had met her.  One evening, in or about the same month, while defendant Rios and plaintiff were alone in chambers, he suddenly insisted upon taking plaintiff to dinner that night, ostensibly to pay off a "bet" that he had lost to plaintiff months earlier. Until that night, he had not mentioned that "bet" since he had lost it.  Plaintiff told him that she had never thought that it was a "real bet," but he declared that she had to go to dinner with him that night.  He offered plaintiff a drink.  She declined that offer.  He picked up one of the bottles of alcohol that he kept in his office and poured himself a drink.  Moments later, he drove plaintiff to the restaurant that he selected - - The Parkside, in Corona.  When they entered the restaurant, Lutsky was seated at a table with other female prosecutors.  Justice Rios and plaintiff briefly exchanged greetings with them before sitting down at a table in a separate area.  Shortly thereafter, Lutsky, who was in her late-twenties, approached that table alone.  Justice Rios immediately held her hand and, staring into her eyes, commented that she was very "svelte."  For

several minutes, he continued to hold her hand and spoke to her in a similar vein, using the word "svelte" several times to describe her appearance. Afterwards, Lutsky returned to her table. Plaintiff did not see her again for the remainder of the evening.

55.    In the months following the occurrence at The Parkside, the manner in which Justice Rios and A.D.A. Lutsky interacted with each other in his courtroom was so suggestive of the existence of an inappropriate personal relationship between them that it frequently was discussed by court personnel. On numerous occasions, both Justice Rios and Lutsky separately absented themselves from the courtroom for lengthy periods of time without explanation, while the court otherwise would have been in session. They returned separately, but almost simultaneously. One day, in the courtroom, Justice Rios repeatedly instructed Lutsky that she should speak to him, "at some point during the day" about "an unrelated matter." He never called her up to the bench to discuss any such "unrelated matter," but instead kept repeating, "at some point during the day." On another occasion, while she was handling the cases on the calendar, he suddenly asked her how many bedrooms there were in her apartment. They both immediately began giggling. There were many similar incidents.

56.    In a letter, dated April 22, 1996, Justice Kuffner expressed his appreciation to OCA's counsel, Michael Colodner, for "the brief submitted on behalf of our Chief Administrative Judge," concerning the discharged principal law clerk's appeal of the decision in *Sheppard v. Beerman*, 911 F.Supp. 606.

57.    On May 13, 1996, *People v. Jeff Lange* (Queens Ind. No. N12086/95), was transferred from Part K-22 to Part K-15 of the Supreme Court in Kew Gardens. The following day, Justice Rios directed the clerk of his part, George Plunkett, to arrange for that case to be returned to Part K-22 inasmuch as it was assigned to A.D.A. Lutsky, and, she wanted to continue to handle the remainder of the cases on Justice Rios' calendar, as well as to have him preside over that trial. Plunkett complied with that instruction. (Later that day, the matter was transferred back to Part K-15 upon the application of the defendant's attorney, who represented that he was no longer ready for trial because he deemed it advisable to develop and present a psychological defense).

17

58.    A 1996 calendar made by Justice Rios included his
handwritten entry for May 16 that stated: "6 PM  County Dinner 2 Tickets @ 300." His
notation apparently referred to an annual dinner held by the Democratic Organization of
Queens County. He clearly was prohibited by the Rules Governing Judicial Conduct
(22 N.Y.C.R.R. § 100.5[A]) from soliciting funds for a political organization and from
purchasing tickets for a politically sponsored dinner. That calendar entry evidenced the
symbiotic relationship between Justice Rios and defendants Manton, Sweeney, Reich
and Koslowitz. A copy of said calendar is annexed as Exhibit "B" hereto and is
incorporated by reference as if fully set forth herein.

59.    On May 17, 1996, plaintiff observed that Newsome had left a
message for Justice Rios, which related that Virginia Schendler had telephoned
"Re: Bi-lingual [sic] job." Subsequently, plaintiff answered the telephone due to
Newsome's absence from chambers. The caller identified herself as "Virginia
Schendler." She stated that she was responding to the job listing that Justice Rios had
placed at Fordham University Law School for a bilingual position as an attorney. When
she realized that his ad must have referred to plaintiff's job, she expressed her
sympathy. Justice Rios was not in chambers when she called. The next time that he
arrived, plaintiff told him that he had received a telephone call regarding the job listing
that he had placed at Fordham University Law School for a bilingual attorney. Plaintiff
stated that there was a message on his desk about the call, but that Schendler had
called again and had spoken to her. He became very flustered, rushed to his desk and
returned the call. He loudly told Schendler that, although he had placed the ad, the job
had nothing to do with him. He represented to her that it actually pertained to an
opening with a private law firm. It more than strained credulity to maintain that a sitting
justice would place an ad for a job with a private law firm and specify in it that the
applicants should call him in chambers. His advertisement of a "bilingual job" for an
attorney clearly evidenced his discrimination against plaintiff upon the basis of her race.
The advertisement for a "bilingual job" as an attorney with Justice Rios obviously was
calculated to attract Hispanic applicants. Being bilingual was not a legitimate
requirement for a position as a law clerk. It also was not a requirement that he ever
imposed upon his clerical secretary, although one of her primary duties was to answer

18

the telephone in his chambers. Like plaintiff, Newsome was not bilingual. Defendant
Rios never advertised Newsome's position as a "bilingual job." A copy of the telephone
message written by Newsome is annexed as Exhibit "C" hereto and is incorporated by
reference as if fully set forth herein.

60.     In or about May 1996, plaintiff informed Koslowitz about defendant
Rios' posting of an ad for a "bilingual" attorney to replace plaintiff. Koslowitz again told
plaintiff to refrain from raising the issue of discrimination, and, represented that she
could arrange for plaintiff to be transferred to another judge. Plaintiff again asserted
that she did not believe that acquiescing to discrimination was an acceptable solution.

61.     Justice Rios documented his relationship with A.D.A. Lutsky in his
own handwriting. Although he had not met her until in or about January 1996, when
she was assigned to his part, in June of that year he wrote on his desk calendar, "Meryl
Monday." An undated, handwritten to-do list that he made stated, "Meryl 1 PM." That
entry still remains legible, although he crossed it out at some point. He also wrote
"Meryl " on top of the list. Copies of the calendar entry and the to-do list are annexed
as Exhibits "D" and "E" hereto. These documents are incorporated by reference as if
fully set forth herein.

62.     Defendant Rios wrote "M" next to two dates - July 12 and 13 - on a
1996 calendar kept by him. Next to the dates immediately preceding those entries, he
wrote "K." It appears that the "M's" stood for Meryl Lutsky and that the "K's" symbolized
Kathleen Pizarro (who currently is his wife). A copy of this calendar is annexed as
Exhibit "F" hereto and is incorporated by reference as if fully set forth herein.

63.     On September 6, 1996, in *Sheppard v. Beerman,* 94 F.3d 823, the
Second Circuit again reversed the dismissal of a former law clerk's claim that he had
been wrongfully discharged in retaliation for his exercise of free speech in confronting
Justice Beerman about the judge's alleged misconduct. In remanding the matter for a
second time, the Second Circuit held that the district court had erred in finding that
Justice Beerman's actual intent in discharging his law clerk was irrelevant, and, in not
allowing the law clerk to conduct discovery to support the claim of unconstitutional
motive. As detailed below, in an attempt to circumvent the effects of that ruling,
defendants herein later fabricated a pretext for plaintiff's predetermined discharge.

19

64.    The inappropriate relationship that obviously developed between Justice Rios and A.D.A. Lutsky was not disclosed to the defendants who appeared before him; they had no opportunity to request recusal. This situation so grossly compromised their rights that to ignore its existence would have been unethical. Accordingly, in or about late-1996, plaintiff telephoned Lutsky in an attempt to discreetly persuade her to seek a transfer to a different part. During that discussion, plaintiff stated that, if Lutsky was not willing to end the conflict of interest by so doing, then plaintiff would speak to Lutsky's supervisors abut the matter. Although, in a subsequent conversation, Lutsky clearly implied to plaintiff that she and Justice Rios were having an inappropriate relationship, and many earlier remarks made by her to plaintiff also appeared to acknowledge that fact, her immediate response during that telephone conversation was to deny it. Soon after that conversation ended, Lutsky entered the courtroom with her supervisor, A.D.A. Kenneth C. Holder, and another male employed by the Queens District Attorney's office. Although Holder and his co-worker could not have made any effort to investigate the matter, they quietly approached Justice Rios. He exited the courtroom with the two of them, so that they could speak in privacy. They informed him that plaintiff had told Lutsky that she should request a transfer to a different part because it was obvious that she had been engaging in an inappropriate relationship with him. After providing that information to Justice Rios, Holder and his co-worker returned to the courtroom, where plaintiff had remained. Other court personnel also were present. Instead of attempting to speak to plaintiff privately, Holder and his male co-worker stayed in the courtroom. As they stood alongside Lutsky, Holder loudly proclaimed that she had told them that plaintiff had accused Justice Rios and her of having an affair, and, that plaintiff had stated that she should stop appearing before him due to that relationship. He demanded to know whether plaintiff had made such statements to her. The demeanor of Holder and his male co-worker so blatantly revealed that they were intentionally jeopardizing plaintiff's employment in retaliation for her statements, that, after hesitating, plaintiff ultimately replied that there must have been a misunderstanding. In a subsequent telephone conversation with plaintiff that occurred in or about early-December 1996, Lutsky stated that she and Justice Rios had recently had "a long chat" in her car. Lutsky retained her

20



assignment in Justice Rios' part until early-January 1997.

65.    In early-February 1997, after a news story was widely disseminated regarding then-Secretary of State Madeleine Albright's Jewish ancestry, Justice Rios approached plaintiff in chambers and requested that she explain that situation. Plaintiff related that, according to the media accounts, numerous members of Albright's family had been killed in Nazi concentration camps and that, in an effort to protect her, her parents had raised her as a Christian, without telling her that she was born Jewish. Justice Rios erupted in laughter and walked away.

66.    Justice Rios apparently planned to take a trip to San Diego with A.D.A. Lutsky in February 1997. Two pages of handwritten notes that were made by him detailed the trips that he intended to take during that year. He wrote the name "Meryl" in the middle of the first page amidst car rental information. At the top of that page, he wrote, "2/12 - 2/17." On the second page, he indicated that the destination for that trip was San Diego. At the bottom of the second page, he referred to the relevant year: 1997. After February 17, 1997, without identifying any person he had intended to accompany, defendant Rios asserted to plaintiff that he ultimately had cancelled his trip to San Diego. Copies of his notes are annexed as Exhibit "G" hereto and are incorporated by reference as if fully set forth herein.

67.    In May 1997, A.D.A. Lutsky appeared before Justice Rios and commenced jury selection in the trial of *People v. Orlando Diaz, William Mendez & Juan Colon* (Queens Ind. No. 3164/96). Due to the death of her father, a mistrial was declared and the case was assigned to another prosecutor. She did not appear in Justice Rios' part thereafter.

68.    In January 1998, defendant Fisher became the Administrative Judge, 11th Judicial District, and, assumed the leadership of the Judicial Advisory Council.

69.    In or about January 1998, defendant Manton, defendant Koslowitz and Michael Cohen publicly professed that their political feud with then-City Comptroller Hevesi finally had ended. That supposed cessation of hostilities was due to a political deal: Manton, Koslowitz and Cohen endorsed Katz in the 1998 Congressional race for the seat that was open due to the election of Charles Schumer to the U.S. Senate, and,

also endorsed Hevesi's son for the State Senate seat that was vacant as a result of the retirement of Senator Emanuel Gold. Hevesi and Katz endorsed Cohen for the Assembly seat that she vacated to run for Congress. This declaration of peace was memorialized in an article entitled, *"Younger Hevesi's Senate Bid Unites Comptroller and Rival,"* that was published in the New York Times on January 25, 1998, in which Jonathan P. Hicks reported that,

> It was a feud that cast a long shadow over Queens politics for the last four years.
> But to hear Democratic officials tell it, not only has the chill substantially thawed between Alan G. Hevesi . . . and Thomas J. Manton, the Queens party leader, but the two are also working together on a number of political goals, not least of which is getting Mr. Hevesi's son elected to the State Senate.

70.    In or about early-May 1998, Koslowitz and plaintiff both attended the opening of Katz's Congressional campaign headquarters. They did not travel to it together, and, plaintiff did not have any prior discussions with Koslowitz related to that event. Subsequently, plaintiff volunteered for Katz's campaign. Despite the publicly pronounced cessation of the political feud, Koslowitz, Cohen, Manton, Sweeney and Reich soon took revenge against plaintiff for attending the opening of Katz's headquarters and volunteering for her campaign: they ensured that, on the petitions circulated by the Democratic Organization of Queens County in June 1998, plaintiff would not be named as a candidate for Delegate to the Judicial Convention to be held by the Democratic Party in the 11th Judicial District in September 1998. Until she attended that opening and volunteered for Katz's campaign, plaintiff had been named as a candidate for that position on such petitions each year for numerous years. Koslowitz and Cohen also removed plaintiff's name from the mailing list of the Continental Regular Democratic Club. Those acts of retaliation marked the end of plaintiff's association with the Continental Regular Democratic Club.

71.    Commencing in or about May 1998, defendant Heidi Higgins began characterizing plaintiff as "disloyal," in numerous statements that she regularly made to Supreme Court justices and employees of OCA in Queens. Inasmuch as Higgins' mother, defendant Koslowitz, had a symbiotic relationship with the Queens judiciary, and, Higgins openly served as her mother's eyes and ears in the Queens courts, the

22

frequent statements that he made disparaging plaintiff as "disloy☐early were calculated to cause plaintiff to be shunned by the Supreme Court justices in Queens, as well as plaintiff's colleagues and co-workers, in retaliation for plaintiff's involvement in Katz's congressional campaign and the cessation of plaintiff's relationship with the Continental Regular Democratic Club.

72.     In early-June 1998, defendant Rios told plaintiff to enter his office. After she did so, he closed the door and angrily asserted that members of the screening committee for the Appellate Division had instructed him to withdraw the application that he had submitted to them inasmuch as they believed that he had engaged in inappropriate "womanizing." The accusatory manner in which he related this occurrence appeared to reflect that the inappropriate "womanizing" consisted of his conflict of interest concerning A.D.A. Lutsky, and, to indicate that he blamed plaintiff for the screening committee's knowledge of that situation. In a letter dated June 5, 1998, he withdrew his application for the position of Associate Justice - Appellate Division, First Department. A copy of said letter is annexed as Exhibit "H" hereto and is incorporated by reference as if fully set forth herein.

73.     In or about September 1998, after Michael Cohen became the nominee of the Democratic Party for the aforementioned Assembly seat and Anthony Weiner defeated Katz in the primary for the Congressional seat, defendant Rios approached plaintiff as she was walking in the hallway between chambers and the courtroom. In a whispered voice, he tauntingly warned her that,

>     From now on, you'd better watch what you say. I know every word
>     you say here - - this place is wired. Try telling anyone and I'll tell them
>     they should ignore lunatics. Go ahead, prove it.

74.     In November 1998, Cohen was elected as the Member of the Assembly from the 28th Assembly District.

75.     On May 10, 1999 in Matter of O'Grady, 255 A.D.2d 91, the Appellate Division, Second Department suspended John O'Grady, the principal law clerk to Justice Joseph Rosenzweig, from the practice of law for a period of five years. He had been hired without the prior approval of the Democratic Organization of Queens County. Based upon that suspension, OCA determined that the termination of his

23

employment as a law clerk was mandatory.  He was not offered other employment by OCA.  Commenting on that matter, Justice Rios stated to plaintiff, "When OCA wants to get someone, they get them."  On several occasions in the months following O'Grady's discharge, defendant Rios repeated that declaration to plaintiff.

76.   Commencing in or about June 1999, on numerous occasions, defendant Rios instructed plaintiff that she "had better start going to" the fund-raising events held by the Democratic Organization of Queens County (plaintiff had ceased attending such events).

77.   On January 31, 2000, Chief Judge Kaye and defendant Lippman announced the appointment of Sherrill R. Spatz, Esq. as the Unified Court System's Special Inspector General for Fiduciary Appointments.  The press release announcing that designation noted that it was a response to "recent allegations that certain fiduciary appointments in New York City have been made on the basis of political party affiliation and service."  The "recent allegations" consisted of the firestorm of press coverage and criticism that had been ignited the previous month when Thomas Garry and Arnold Ludwig sent a letter announcing that they were resigning from their positions on the Law Committee of the Brooklyn Democratic Party.  In an article by Alan Feuer, entitled, *"2 Brooklyn Lawyers, Ex-Insiders, Outline a Court Patronage System,"* published on January 5, 2000, the New York Times had reported that, "In a rare display of candor . . . ," the letter "tacitly acknowledged that the legal patronage system was healthily in place, as the two men, both lawyers, complained about being frozen out of lucrative court work despite 'unquestioned loyalty' to the party."  In related coverage, on January 29, 2000, New York Newsday had published *"Dem Leader Profits From Court System / Judges steer assignments to Manton's firm,"* in which Dan Morrison reported that, "Since retiring from Congress on Jan. 1, 1999, Manton has been the lead partner in a law firm of heavy-hitters from the Queens Democratic organization who together have earned millions of dollars from guardianships, conservatorships and other jobs doled out through the Queens Surrogate Court and the State Supreme Court in Jamaica, records show."  On January 30, 2000, a report by Maggie Haberman, Jack Newfield and Allen Salkin entitled, *"Dirty Dozen Grab Patronage $$$,"* published in the New York Post had declared that, "A lion's share of Queens patronage goes to one

24

politically-wired law firm⬤. whose partners include Thomas Man⬤ Democratic county leader; Gerard Sweeney, counsel to the public administrator; Michael Reich, executive secretary of the Queens Democratic Party; and David Gallo, Housing Court Advisory Council appointee."

      78.    On March 27, 2000, defendant Lippman issued a memorandum to defendant Fisher, in which he requested that the "Judicial Advisory Council of Queens County " be renamed as the "Queens County Committee to Promote Public Trust and Confidence in the Legal System."

      79.    On May 15, 2000, the Judicial Advisory Council convened at the courthouse of the Supreme Court in Jamaica, and, adopted defendant Lippman's proposal to change its name to the "Queens County Committee to Promote Public Trust and Confidence in the Legal System."  The meeting was chaired by defendant Fisher. Defendants Reich, Rios, Koslowitz and D'Angelis attended the meeting, as did Frank Bolz (Law Chairman of the Democratic Organization of Queens County and law partner of defendants Manton, Sweeney and Reich), Amy Vance (Deputy Counsel, OCA) and Queens Surrogate Robert Nahman.  Copies of the attendance sheets pertaining to this meeting that were disclosed by OCA, pursuant to a Freedom of Information Law ("FOIL") request made by plaintiff, are annexed as Exhibit "I" hereto and are incorporated by reference as if fully set forth herein.

      80.    In September 2000, Congressman Eliot Engel, who was running for re-election, defeated State Senator Lawrence Seabrook in the Democratic Party primary.  Seabrook had run with the backing of then-Bronx County Democratic Chairman and Assemblyman Roberto Ramirez.  Subsequently, commenting to plaintiff about the fact that Ramirez had unsuccessfully attempted to oust a six-term incumbent Democratic Congressman solely because he was Jewish and Caucasian, defendant Rios stated that, instead of giving Engel a primary, Ramirez should have demanded that he agree to vacate his Congressional seat by some later date.  Those remarks constituted another demonstration of defendant Rios' hostility toward plaintiff's religion and her race.  The statements that he made conveyed to plaintiff that he believed that



those who are Jewish and Caucasian should be ousted from their positions due to their religion and their race. In view of his conduct toward plaintiff since the commencement of her employment as his principal law clerk, defendant Rios' comments strongly suggested to her that he wanted her to forfeit her position due to her religion and her race, and, that the motive for his remarks was to communicate that message to her.

81.     In January 2001, defendant Lippman appointed defendant Rios as an Associate Justice of the Appellate Term, even though Justice Rios previously had withdrawn his application for the position of Associate Justice of the Appellate Division at the behest of members of the screening committee, based upon what they had deemed his inappropriate "womanizing."

82.     In January 2001, defendant Koslowitz became the Deputy President of the Borough of Queens.

83.     On or about June 12, 2001, in the presence of plaintiff, during a calendar call pertaining to *People v. Adrian Vasquez* (Queens Ind. Nos. 2961/99 and 3432/00), Justice Rios remarked to a representative from the Treatment Alternatives to Street Crime program, "I'm glad they are hiring my paisanos, I'm Puerto Rican."

84.     On or about November 6, 2001, defendant Gerard Sweeney tauntingly asked plaintiff, "Didn't you used to be Judge Rios' law clerk?"

85.     In December 2001, Sherrill R. Spatz, who had been appointed as the Unified Court System's Special Inspector General for Fiduciary Appointments, approximately one year earlier, as detailed above, released her report. In that document, Spatz asserted that, "except when discussing certain matters that already have received 'extensive attention in the media', we have not identified individuals whose actions are described in the report." Although defendants Manton, Sweeney and Reich had received "extensive attention in the media" as the power brokers of the Democratic Organization of Queens County who had reaped millions of dollars from guardianships, conservatorships and other court appointments from the Queens Surrogate Court and the State Supreme Court in Jamaica, their names were not

26

mentioned in her report. In article by Joe Calderone and Thomas Zambito, entitled, "Ask Curb on Cash Cows," that was published by the New York Daily News on December 4, 2001, related that OCA spokesman David Bookstaver had declared that, "The inspector general's report was not designed to embarrass anyone, nor was it intended to get anyone in trouble."

86.     On February 7, 2002, in Sheppard v. Beerman, 190 F.Supp.2d 361 (E.D.N.Y.), the district court granted summary judgment dismissing the former principal law clerk's claim that he had been wrongfully discharged. The court found that, after conducting extensive discovery as directed by the Second Circuit in Sheppard v. Beerman, 94 F.3d 823, Sheppard had failed to adduce any evidence demonstrating that Justice Beerman was acting with an improper motive when he fired him. The dismissal was affirmed in Sheppard v. Beerman, 317 F.3d 351.

87.     In late-February 2002, City Council member David Weprin attempted to join the Council's Black and Latino Caucus. In an article entitled, "Mired in an Ethnic Swamp," published in New York Newsday on March 1, 2002, Ellis Henican reported that, although an Asian council member had just been welcomed into that caucus, and Weprin's mother was Cuban, his application, "sent some members into a not-for-attribution uproar," due to the fact that he was Jewish. Contemporaneously, Justice Rios initiated a conversation with plaintiff regarding that topic. He expressed outrage that Weprin considered himself qualified to be a member of the caucus. Plaintiff asked, "Why not, if his mother is Cuban? Can't a person be Hispanic and Jewish?" Defendant Rios replied by conceding that such a possibility existed, but nevertheless insisting that Weprin was not entitled to join the caucus inasmuch as he had not been active in any other Hispanic associations. In making those remarks to plaintiff, defendant Rios again demonstrated his hostility toward her religion and commenced a discussion with her regarding political events as a means for so doing.

88.     In a letter to Albert F. Pennisi, Esq., dated March 19, 2002, defendant Fisher wrote, "it gives me great pleasure to invite you to become a member of the Queens County Committee to Promote Public Trust and Confidence in the Legal

27

System." As described above, Pennisi (defendant Manton's former law partner) was a central figure in the Queens political corruption scandals of the 1980's; he was suspended from the practice of law for five years for paying kickbacks to Donald Manes and reportedly avoided criminal charges by cooperating in the related prosecution.

89.    During a telephone conversation with plaintiff on April 24, 2002, Justice Rios stated that, "Maybe we ought to write a novel." Plaintiff responded, "That might be worthwhile." He proclaimed, "I'll write it in German."

90.    On July 24, 2002, during jury selection in *People v. Andrew Brathwaite* (Queens Ind. No. 3851/00), in the presence of plaintiff, Justice Rios posed the question, "The shoemaker had a yarmulke, do you agree that he should be challenged for cause?"

91.    On or about August 15, 2002, defendant Reich appeared before defendant Rios in *Matter of Martha Taylor Butler v. Henrietta Fullard* (Queens Index No. 20559/02) and withdrew the objections that had been raised to Fullard's nominating petitions. The case had been scheduled for a hearing before Justice Rios. Immediately after the conclusion of the proceedings, at the behest of Justice Rios, Reich approached the bench. Justice Rios immediately asked Reich who he should contact in Senator Schumer's office to ask that "a favor" be done for his daughter. Reich whispered a response. As their conversation continued, plaintiff walked to the part clerk's desk, which was located behind Reich. Shortly thereafter, while still at the bench, Reich turned around and glared at plaintiff. He and defendant Rios exchanged hushed words, then both smirked and snickered while looking directly at her.

92.    On August 27, 2002, in the presence of Newsome, Justice Rios announced to plaintiff that, the previous day, he had discussed an Appellate Term case with Newsome, and that, inasmuch as he already had talked about it with her, he was willing to discuss it with plaintiff. He said that the case involved a tenant who had been able to elude both paying rent and being evicted for years. He suggested to plaintiff that the tenant might, "want to go into business with you."

93.    In or about September 2002, in the personal telephone

conversations that she regularly held during working hours with Rios and others, Newsome began routinely discussing their knowledge that plaintiff would be discharged from her employment. Newsome consistently did so in a raised voice, while plaintiff worked at her nearby desk.

94.     On September 10, 2002 at approximately 3:35 p.m., the part clerk, George Plunkett, came to chambers. He stopped at Newsome's desk and, laughing, asked her, "Is Judy still here?" Newsome giggled and said, "Yes." He was well aware that plaintiff was not in the habit of leaving early, and, frequently worked late. In view of the time of day that he posed that question, and the surrounding circumstances, it was evident that his question alluded to a situation that had become a subject of daily gossip - - that defendant Rios was planning to discharge plaintiff. After Plunkett and Newsome stopped laughing, he entered plaintiff's office and handed her a memo for Justice Rios. He left chambers immediately thereafter. Moments later, Newsome exited chambers for approximately ten minutes. Shortly after she returned, Justice Rios told her that he was going, "to the first floor." Newsome giggled, and, he left. At approximately 3:55 p.m., plaintiff went to the clerk's office on the first floor to pick up the paychecks for Justice Rios, herself and Newsome - a duty that she had performed at that time of day on Tuesdays, bimonthly, since 1995. As plaintiff approached the clerk's office, defendant Rios exited that location. Without saying a word to plaintiff, he turned and walked toward the main lobby. Plaintiff entered the clerk's office to retrieve the checks. After leaving that office, she went to the newspaper stand in the main lobby. Defendant Rios was sitting in a telephone booth near the Queens District Attorney's office. He was holding a paper directly in front of his face, as though he was hiding. He then suddenly emerged and told her that he had been, "trying to reach the international operator for Spain."

95.     On September 12, 2002, a hearing was scheduled to be heard by Justice Rios. He and plaintiff went to the courtroom. Newsome was alone in chambers when they left. Approximately fifteen minutes later, plaintiff returned. Newsome was present. Plaintiff noticed that the lock on the closet that she used to stored her pocketbook and other personal items had been broken. The damage was noticeable at



a glance. Earlier that morning, that lock had been intact.

96.     On September 19, 2002, at approximately 2:30 p.m., defendant Rios ran inside a telephone booth near the Queens District Attorney's office on the first floor of the courthouse immediately after he appeared to have noticed plaintiff nearby. He did not speak to plaintiff, or otherwise acknowledge her, before running inside the telephone booth.

97.     In or about late-September 2002, Justice Rios altered plaintiff's work duties by ceasing to have her review the assigned counsel plan vouchers submitted to him. This change in her duties constituted an adverse employment action.

98.     In or about October 2002, due to budgetary concerns, OCA denied applications for certification to remain on the bench submitted by one or more Supreme Court justices, who had reached the mandatory retirement age of 70. Previously, OCA had routinely granted such applications. That change in policy (which was officially announced in January 2003) reportedly caused law clerks to lose their jobs. The timing of plaintiff's predetermined discharge strongly suggested that this change in policy was a factor in her termination from employment.

99.     In November 2002, defendant Lippman's counsel, Michael Colodner, issued a memorandum that was addressed to "State-paid Judges and Nonjudicial Employees of the Unified Court System." The subject was "Lawsuits against judges and court employees for money damages." The memorandum stated that, "From time to time both judges and nonjudicial employees of the Unified Court System are named in lawsuits seeking money damages based upon acts performed in the course of their service with the courts . . . ," and advised them that, "When these lawsuits are brought, there are important steps that must be taken by judges and nonjudicial employees in order to secure indemnification and legal representation . . . please give notice of the lawsuit to Counsel's Office, Office of Court Administration, 25 Beaver Street . . . within five days of service of legal papers so that we can be of assistance to the Attorney General in every appropriate way." As shown above, although it is the Attorney General, not OCA, that is mandated by Section 17 of the

New York State Public Officers Law to provide representation to State employees in such lawsuits, Colodner was involved with the coordinated efforts of the judges' associations and OCA to provide additional resources, including the assignment of an attorney, to support Justice Beerman in the lawsuit that had been brought by his discharged law clerk. In that action, OCA had argued that a Supreme Court justice was entitled to terminate a law clerk, even if the motive for the discharge was to retaliate for statements regarding judicial misconduct. The Second Circuit rejected that argument, in *Sheppard v. Beerman*, 94 F.3d 823. After that ruling, OCA perceived a need to formulate and coordinate a legal strategy with a judge (e.g., defendant Rios) who intended to discharge a law clerk, in those instances when the motives of the judge were likely to become the subject of litigation. OCA's aim was to circumvent the effect of the ruling by ensuring that the judge could point to some supposed flaw in the employee's performance to justify the termination, even if it was a prefabricated pretext. Prior to plaintiff's predetermined discharge, Colodner's memorandum sent the message that OCA could choose to provide additional support to employees who were sued, and attempt to ensure that they would be indemnified, if they coordinated their efforts with OCA. A copy of said memorandum is annexed as Exhibit "J" hereto and is incorporated by reference as if fully set forth herein.

100.   In November 2002, the adoption of new rules for "Appointments by the Court," consisting of a new Part 36 of the Rules of the Chief Judge (22 N.Y.C.R.R.) was announced. In an editorial, entitled, *"King Manton feasts on Queens dead,"* that was published on July 28, 2003, the New York Daily News noted that those new rules permitted Manton, Sweeney and Reich to continue to share millions of dollars in fees that resulted from their control of the courts in Queens inasmuch as those rules were not made applicable to Sweeney's position as the counsel to the Public Administrator. On February 9, 2005, in an article by Larry Cohler-Esses, entitled, *"Where there's no will, a better way,"* the New York Daily News reported that a commission appointed by Chief Judge Kaye had just recommended controls regarding the position of counsel to the Public Administrator. That article stated that among those recommendations was the proposal that Surrogate Judges be prohibited from "appointing relatives, political

31

cronies, court employees and their relatives, and law partners of political cronies, among others, to be counsel for the public administrator." It related that defendant Lippman, "said many of the proposed reforms could be implemented through new rules and operational guidelines, and could be in place 'within six months to a year.'" The article did not reflect whether the aforementioned proposal would be included in any such rules and guidelines.

101.    On or about November 1, 2002, Eyewitness News broadcast a report by Sarah Wallace concerning allegations that, at the trial of *People v. Tyrone Johnson* (Queens Ind. No. 2002/00), which had been held before Justice Rios, the prosecution had deliberately withheld crucial evidence from the defense. The defendant had been convicted of murder in the second degree on June 5, 2002.

102.    By an order dated November 14, 2002, Tyrone Johnson's motion to vacate his conviction and for a new trial was granted by Justice Rios, "in light of the prosecution's consent to said application as set forth in the letter of the District Attorney of Queens County, dated November 12, 2002." In that letter, the District Attorney informed the Court and defense counsel that,

> . . . it has come to my attention that at trial our trial assistant stated, in response to the Court's inquiry, that he did not have any knowledge as to the whereabouts of Ms. (Shanise) Knight. In fact, however, four days earlier the assistant, together with two detectives from my office had met with Ms. Knight at her place of employment. That fact should have been disclosed . . .

103.    On December 12, 2002 at 2:50 p.m., A.D.A. Eugene Reibstein, who had been assigned to prosecute the retrial of *People v. Tyrone Johnson*, visited Justice Rios' chambers. The defense counsel was not present. Reibstein entered Justice Rios' office, and, they met alone. With the door to his office open, Justice Rios spoke so loudly that his part of the conversation was heard by plaintiff, as she worked in her nearby office.  During this *ex parte* discussion, Justice Rios coached the prosecutor by analyzing the testimony at the first trial and focusing on inconsistencies that he perceived in the evidence presented by the People. He expressed his opinion that

32

those inconsistencies were problematic to the prosecution's case. Reibstein left chambers at 3:10 p.m.

104.    On December 15, 2002, the New York Daily News published an editorial entitled, "*School for Scandal*," regarding the "*How to Become a Judge*," seminar that had been held that month by the Association of the Bar of the City of New York. Noting that Chief Judge Kaye spoke at that event, the editorial stated that her presence gave, "an undeserved imprimatur of probity to the day." It observed that New York State Court of Appeals Judge Carmen Beauchamp Ciparick also spoke at the session. The editorial recited that,

> "Today," Ciparick said in her welcoming remarks, "you will meet the people who can help make it happen for you. "It," of course, being a judgeship. The judge-makers being the city's Democratic political bosses: Brooklyn's Clarence Norman, Tom Manton of Queens and Staten Island's John Lavelle. They were joined by Manhattan and Bronx honchos and the chairmen of the mayor's and governor's judicial screening committees.

105.    The editorial pertaining to the "*How to Become a Judge*" seminar also recounted that Manton counseled the attendees that, "Membership in your local Democratic club is not hurtful at all," because that party's "nomination in Queens is tantamount to election."

106.    In late-December 2002, Justice Rios took plaintiff and Newsome out separately for holiday lunches. During his lunch with plaintiff, he raised the topic of the 2001 mayoral election by angrily declaring to her that instead of running in the general election, Mark Green, the nominee of the Democratic Party, should have dropped out of the race and supported Fernando Ferrer. Green had defeated Ferrer in the run-off election that year. Green was Jewish and Caucasian; Ferrer was Christian and Hispanic. Plaintiff asked him why he thought Green should have done so. In response, defendant Rios repeated his prior comment in a voice that seethed with rage. Throughout that lunch, defendant Rios treated plaintiff with hostility.

107.    In *Neilson v. D'Angelis et al.*, N.Y.L.J. Jan.10, 2003, p. 30, col. 3

33

(E.D.N.Y.), the district court denied a motion brought by Anthony D'Angelis (the Chief Clerk of the Supreme Court in Queens and a defendant herein), which had sought the dismissal of a court officer's claim that D'Angelis and the major in charge of court officers at the Kew Gardens courthouse both had violated his rights to equal protection of the laws under 42 U.S.C. 1983 and the Fourteenth Amendment to the United States Constitution as well as comparable provisions of the New York State Constitution, by singling him out for harsh treatment in retaliation for his commencement of a defamation action against a supervising court officer and his filing of a grievance.

108.    On January 13, 2003, Newsome asked plaintiff whether she intended to have the lock on her closet replaced. Plaintiff mentioned that the way in which it had become broken seemed peculiar. Newsome reacted by shouting that plaintiff was accusing her of breaking it. Plaintiff replied that she had not made that accusation. Newsome hollered that because she was alone in chambers on the morning that the lock was broken, plaintiff's statement implied that she had broken the lock. When plaintiff began to respond, Newsome screamed that she did not want to hear anything that plaintiff had to say about the matter. Newsome accused plaintiff of having broken the lock herself, so that plaintiff could blame Newsome for the damage (Newsome did not explain how - - if the lock had been broken before Newsome arrived - - plaintiff could have known that Newsome would not have immediately noticed the damage, thereby rendering it impossible to blame her and simply leaving plaintiff without the benefit of the use of the closet).

109.    On January 17, 2003, Justice Rios was on vacation. Newsome arrived in chambers at approximately 9:47 a.m. and left for the day before 2:00 p.m. Almost all of the time that she was present, she was engaged in personal telephone conversations, in which she loudly derided plaintiff and discussed a plan involving false accusations that she was to make against plaintiff. Newsome did not specify the details of those false claims loudly enough for plaintiff to hear them, but she raised her voice while more generally discussing that planned course of action. As Newsome was leaving for the day, she stopped in front of her own desk, turned around, stared directly at plaintiff and laughed raucously before exiting.

34

110.   On February 26, 2003, Koslowitz was scheduled to meet with defendant Fisher at the Kew Gardens courthouse.  The copy of Koslowitz's schedule that was disclosed by the Office of the President of the Borough of Queens, pursuant to a FOIL request made by plaintiff, is annexed as Exhibit "K" hereto and is incorporated by reference as if fully set forth herein.

111.   On March 5, 2003, the jury deliberated in the trial of *People v. Edgar Acencio and Angel Bonilla* (Queens Ind. No. 3161/02), which had been tried before Justice Rios.  *People v. Charles Blackstock and Darrell Hunter* (Queens Ind. No. 2/02) was sent to Justice Rios' part for trial.  The defendants therein entered pleas of guilty.  The same day, *People v. Philip Demas* (Queens Ind. No. N10097/02) also was sent to Justice Rios' part for trial (it was later adjourned for the commencement of jury selection).  That day, plaintiff performed work regarding all of those matters, prepared a sentencing script for defendant Rios to use the following day when he was scheduled to impose sentence in *People v. Humberto Moyaho* (Queens Ind. No. 2758/02), researched various matters and also worked on a motion to vacate the judgment of conviction in *People v. George Philips* (Queens Ind. No. 3251/97), in which the parties had submitted more than three thousand pages of transcripts, as well as voluminous papers.  While plaintiff was performing her duties, Higgins visited Newsome in the anteroom of the small chambers.  It was necessary to pass through that area to walk from plaintiff's office to Justice Rios' office.  Whenever plaintiff did so, in the course of discussing work-related matters with him, Higgins and Newsome stopped talking, turned toward plaintiff and giggled loudly.  Whenever plaintiff entered either defendant Rios' office or her own office, Higgins and Newsome spoke to each other in muted voices while continuing to giggle.  Repeatedly, defendant Rios witnessed their behavior while standing at or near the entrance to his office.  He made eye contact with them and joined in their laughter.  Later that day, Higgins and Newsome entered his office and spoke to him alone.  Loud laughter could be heard emanating from his office while they met with him.  Later that day, in a histrionic tone of voice, he disingenuously professed to plaintiff, "I'm concerned about you."   He absurdly asserted to plaintiff, "You make noises."  Plaintiff stated that - - as defendant Rios obviously knew - - there

35

was no basis whatsoever for the claim that she made "noises."  Plaintiff also noted - - as he obviously knew - - that she had been subjected to extreme hostility by Newsome and Higgins, who had been openly ridiculing her in chambers while she was working. Plaintiff recounted that they had continued to act in that manner while plaintiff was discussing pending cases with Justice Rios.  Plaintiff stated that it was impossible to avoid observing their behavior.  Justice Rios said that he agreed with plaintiff, and, that Higgins should not be spending her time in his chambers inasmuch as there was no work for her to perform there.  He represented that he would instruct Newsome to tell Higgins to refrain from doing so in the future.  Plaintiff related that, on numerous occasions, during the past several years, when plaintiff walked past the door to Justice Spires' nearby chambers, Higgins had raised her voice and commented that plaintiff was "disloyal."  Plaintiff noted that those comments clearly seemed to be related to the fact that plaintiff had left Koslowitz's political club.  Plaintiff stated that she had not responded to those remarks, but that, by entering into Justice Rios' chambers while plaintiff was working and childishly laughing at her, Higgins had become extremely disruptive.  Defendant Rios reiterated that he would direct Newsome to tell Higgins not to spend her time in his chambers.  Plaintiff informed defendant Rios that earlier that year, Newsome had screamed uncontrollably at plaintiff because she had mistakenly thought that plaintiff had accused her of breaking the lock on plaintiff's closet.  Plaintiff recalled that when she attempted to reply, Newsome yelled that she did not want to hear anything that plaintiff had to say about the matter.  She also noted that Newsome frequently arrived very late, took lunch breaks that lasted for hours and left early. Plaintiff observed that, as result of Newsome's frequent absences from chambers, plaintiff often assumed Newsome's duty of answering the telephone, while also performing her own work on motions, jury instructions and other matters related to pending cases.  He told plaintiff that she could avoid answering the telephone while Newsome was not in chambers by relying on the voice mail system.  Plaintiff responded that to do so might result in urgent messages not being received in a timely fashion, including telephone calls from his family members.  Defendant Rios repeated that he would speak to Newsome.  During the course of that conversation, defendant Rios expressed his satisfaction with the high quality of plaintiff's work.

36

112.   On March 6, 2003, Newsome arrived at chambers at approximately 10:00 a.m.  Soon thereafter, she spent approximately one hour in Justice Spires' chambers talking to Higgins.  During much of that time, defendant Rios was present in the same chambers, speaking to Justice Spires.  When plaintiff entered Justice Spires' chambers to deliver a message to Justice Rios, they all giggled as they continued to look at each other.  Before he left for the day, defendant Rios told plaintiff that he had not spoken to Newsome about the matters that he had discussed with plaintiff on the previous day.

113.   During the morning of March 7, 2003, Justice Rios told plaintiff that he was going to a meeting at OCA that afternoon, which was scheduled for 2:00 p.m. Newsome did not arrive in chambers until 12:40 p.m.  At approximately 2:33 p.m., defendant Rios telephoned Newsome in chambers.  They had a lengthy conversation. Throughout that discussion, Newsome was laughing while listening to him.  At approximately 5:00 p.m., he returned.  He told plaintiff that, on the previous day, he had not had any time to speak to Newsome regarding the matters that plaintiff had raised with him.  That claim was so blatantly false that it could only be interpreted as an intentional demonstration that, during his conversation with plaintiff two days earlier, he had been acting out a farce.  His conduct reflected an escalation of the hostile work environment to which he had subjected plaintiff throughout the course of her employment as his law clerk.  It established that any effort by plaintiff to raise complaints with him would not just be futile, but also would be likely to result in retaliation.  In light of surrounding circumstances, it appears that at his meeting that afternoon (and prior thereto), OCA had been coaching him regarding plaintiff's predetermined discharge, and, that both Newsome and Higgins were involved in those efforts.  Higgins' participation therein evidenced the additional participation of Koslowitz, Manton, Sweeney and Reich.

114.   On April 7, 2003, during a telephone conversation that he had with then-Suffolk County District Court Judge Sonia Veras, Justice Rios referred to plaintiff as his, "uh . . . law secretary that doesn't have that Latin flavor."

37

115.    On April 8, 2003, while standing a few feet away from plaintiff,

Justice Rios initiated a conversation with Newsome about *People v. Valdemar Wilson*,

303 A.D.2d 773, in which the Appellate Division, Second Department had vacated the

sentence that he had imposed and remitted the matter for resentencing by a different

justice. He angrily commented to Newsome that the court probably did so because,

during the sentencing, he had "said that Hitler had a mother." He stated to Newsome,

"Maybe I should have said Gengis Khan." She replied, "Yeah, probably."

116.    On April 10, 2003, plaintiff informed Justice Rios that Garnett

Sullivan, Esq. had been assigned to represent the defendant in *People v. Brandon*

*Rogers* (Queens Ind. No. 2771/02). Defendant Rios replied, "That's good - - at least

he'll have a black attorney."

117.    On April 22, 2003, while plaintiff was a few feet away from him,

Justice Rios loudly stated to Newsome that U.S. soldiers stole art work during the

Second World War, and, started laughing.

118.    On or about May 13, 2003, Richard Lazarus, the Queens Delegate

to the Citywide Association of Law Secretaries, e-mailed a memo to every law clerk in

Queens, in which he expressed his personal opinion that,

> Because of the unique political climate of this particular County,
> job security has not been an issue for Queens Law Secretaries
> Traditionally, upon the expiration of a Judge's term, that Judge's Law
> Secretary could be confident that a new Law Secretary position could
> be found.  This Queens job security was as a result of political party
> affiliation . . . One of the reasons that political influence has been so
> successful at providing job security is that there has, to the best of
> my recollection, never been a turnover of more than a few Law
> Secretaries at any one time.  This year might be different . . . OCA
> has now announced that because of budgetary shortfalls, certification
> of Judges may well be denied.
>  . . . you may well have more Law Secretaries than the usual political
> machinery can place . . .

A copy of said memorandum is annexed as Exhibit "L" hereto and is incorporated by

reference as if fully set forth herein.

38

119.    On May 19, 2003, plaintiff related to defendant Rios that George

Plunkett had inquired about Justice Rios' vacation schedule, so that he could plan his
own vacation. Justice Rios replied, "Okay," in an abrupt manner, ending the
conversation by turning his head away from plaintiff. Later that day, he provided the
answer to Plunkett in a note that he handed to Plunkett while plaintiff was present. He
did not advise plaintiff of his vacation schedule, and, his actions obviously showed that
he was deliberately withholding that information from her. In the past, when she had
made similar inquiries, he always had informed her of the dates during which he
intended to go on vacation. Additionally, when she began working as his court attorney
in the civil court, he instructed her that she should always take her vacations while he
was on vacation. Plaintiff always had done so. That practice was customary for law
clerks. In concealing his latest vacation schedule from plaintiff, Justice Rios ensured
that she would not have the ability to schedule a vacation in compliance with his own
directive. By not providing plaintiff with that information so that she could respond to
Plunkett's inquiry, he also placed her in a bad light to a co-worker.

120.    On May 19, 2003, defendant Rios asked court reporter Nancy

Samms to furnish him with a physical description of George Neilson, a court officer.
Less than a week earlier, in *Neilson v. D'Angelis et al.,* (E.D.N.Y. CV 00-6106 [CPS]), a
jury had returned a verdict in favor of Neilson regarding his claim that D'Angelis and the
major in charge of court officers at the Kew Gardens courthouse both had violated his
rights to equal protection of the laws.

121.    On or about May 27, 2003, defendant Newsome changed the

screen saver on her court-issued computer so that it displayed the statement, "On
Christ the solid rock I stand!!"

122.    On or about May 29, 2003, Justice Rios instructed plaintiff to

enter his office. Repeating his performance of March 5, 2003, in an affected tone of
voice, he claimed, "I'm concerned about you." As described above, in the days
following the prior conversation, his conduct revealed that his unwarranted expressions
of "concern" were part of an act staged for the purpose of setting up plaintiff to be

discharged. OCA had coached him regarding that performance. Plaintiff responded to his new claim of "concern" by raising the issue of discrimination. Plaintiff recounted that, during the year that Newsome began working for him, she had made the anti-Semitic comment to plaintiff that, "I have a problem with your religion because you don't accept Christ." Justice Rios angrily replied by shouting, "Everyone hates everyone!" Plaintiff also noted that, on a recent occasion, when Newsome entered chambers and saw that plaintiff had picked up a copy of the New York Law Journal, which another clerical secretary had placed on Newsome's desk, Newsome violently pulled it out of plaintiff's hands and screamed at plaintiff. Plaintiff stated that Newsome's religious bias clearly was the cause of the hostility that she had demonstrated toward plaintiff throughout the course of their working relationship. Defendant Rios defended Newsome, dismissing plaintiff's complaints out of hand. Without any explanation, he also reversed the position that he previously had announced to plaintiff regarding Higgins. He suddenly denied that plaintiff had raised any valid complaints about her behavior. Before leaving for the day, plaintiff reminded Justice Rios that when he learned that Martin Ritholtz was one of the candidates for Civil Court that the Queens Democratic organization was supporting in the election to be held the year after defendant Rios commenced his term as a Supreme Court Justice, he had shouted, "That rabbi is getting my vacancy!" in the presence of plaintiff.

123. On June 19, 2003 at approximately 1:00 p.m., A.D.A. Kenneth C. Holder accompanied Justice Rios to his chambers. They entered Justice Rios' office and remained there for several minutes. Holder did not have any pending cases before Justice Rios. A lengthy period of time had elapsed since he had been present in Justice Rios' part for any reason. As detailed above, in or about late-1996, after plaintiff had attempted to persuade then-A.D.A. Meryl Lutsky to transfer to a different part, Holder intentionally jeopardized plaintiff's employment in retaliation for her statements.

124. On June 20, 2003, notes in Justice Rios' handwriting in open view on his desk clearly evidenced his efforts to contrive a pretext to discharge plaintiff. Those notes indicated that the pretext, which he had discussed with officials of OCA, included the demonstrably false allegation that plaintiff wasted time, as well as specious

claims aimed at disparaging plaintiff's mental status. They also indicated that he intended to take notes regarding plaintiff, in furtherance of their fabrication of a pretext to terminate plaintiff's employment. The individuals at OCA that he had contacted and/or intended to contact included Lisa Flom, Diedre McKenzie and defendant Lauren DeSole, Esq. At some point, OCA assigned DeSole as defendant Rios' counsel to guide him through the process of orchestrating plaintiff's predetermined discharge.

125.   On June 27, 2003, defendant Rios met with Chief Administrative Judge Lippman. That highly unusual meeting occurred in defendant Lippman's chambers in White Plains. As shown above, defendant Lippman was personally involved with the coordinated efforts of the judges' associations and OCA to provide additional resources, including the assignment of an attorney, to support Justice Beerman in the lawsuit that had been brought by his discharged principal law clerk.

126.   Throughout the course of her employment by Justice Rios, Newsome habitually arrived late to work and left early. On many occasions, she took lunch breaks that lasted two hours or more. She routinely violated the Unified Court System's internet access policy by using her court-issued computer to access the internet for personal purposes. She also inappropriately used that computer to write resumes and cover letters for others, as well as to write material for her own commercial purposes. Many times she failed to answer the telephone while she was engaged in personal phone calls. Plaintiff's performance was precisely the opposite. Despite those and other serious shortcomings in Newsome's job performance, and plaintiff's outstanding job performance, defendant Rios treated Newsome in a manner that was vastly favorable to her (including but not limited to falsely praising her to others and encouraging her to waste time) while he attempted to destroy plaintiff's reputation and manufactured reasons to discharge plaintiff.

127.   On July 2, 2003, without any explanation, defendant Rios stated that he would like plaintiff to take two weeks of her annual leave before Labor Day. Inasmuch as he had declined to tell plaintiff when he would be taking his vacation, as recently as May 19, 2003, it was obvious that he was attempting to ensure that she

41

would be on vacation while he was in court. That effort appeared to be designed to place plaintiff in a negative light. Plaintiff had observed the notes that he had left on his desk on June 20, 2003 - - she was aware that he was setting her up to be fired, and that, toward that end, he was falsely disparaging her mental status to others. In an attempt to protect her reputation from additional statements of that nature that he might make about her, in the event that she took her vacation while he was not on vacation, plaintiff politely declined. He did not order her to go on vacation at that time.

128.    On July 7, 2003, the district court denied the motion to set aside the verdict in *Neilson v. D'Angelis et al.,* (E.D.N.Y. CV 00-6106 [CPS]).

129.    On July 17, 2003,Tyrone Johnson was convicted of murder in the second degree following his retrial. The next day, A.D.A. Eugene Reibstein appeared at Justice Rios' chambers. The defendant's attorney was not present. Reibstein entered Justice Rios' office and they met alone, as they had on December 12, 2002. The door to that office remained open. Justice Rios spoke so loudly that his part of the conversation could be heard by plaintiff in her office, as she worked. During this *ex parte* discussion, Justice Rios asserted that the new conviction would have to be reversed on appeal due to improprieties in Reibstein's summation. It is overwhelmingly likely that, if Justice Rios had shared such information with the defense counsel, a motion to vacate the verdict, pursuant to C.P.L. 330.30(1), would have been filed soon thereafter. If Justice Rios had ruled upon such a motion in accordance with the opinion that he had expressed in his *ex parte* conversation with the prosecutor, he would have vacated the verdict. In reality, no written motion for such relief was filed, any oral applications for vacatur of the verdict were denied and Tyrone Johnson was resentenced to an indeterminate term of incarceration of from 20 years to life.

130.    On July 18, 2003, a note in Justice Rios' handwriting that was on his desk stated, "Judy looking through recycling." That evening, he entered plaintiff's office and placed on her desk a sheet of paper upon which was typed the name, title and office address of Kay Ann Porter, OCA's Managing Inspector General for Bias. A telephone number was handwritten under that information. He asserted

42

that he had telephoned Porter and told her that plaintiff had complained of
discrimination. He also informed plaintiff that, based upon the version of plaintiff's
complaints that he had presented to Porter, she had supplied him with a brochure
regarding a mental health program, and, instructed him to give it to plaintiff. He gave
plaintiff such a brochure. He stated that, if plaintiff wanted to do so, she could call
Porter. He also told plaintiff that he was not concerned about Newsome's behavior,
and that he was solely interested in plaintiff's conduct. He made the patently false
assertion that Newsome always was at work at 9:30 a.m. and left at 4:30 p.m. He
smirked and proclaimed, "There's only the three of us here." He emphasized the latter
pronouncement by twice repeating it. In so doing, he clearly implied that he and
Newsome would support each other in lying with impunity about the conditions in the
workplace. Plaintiff asked, "So, you aren't concerned that she told me that she has a
problem with my religion because I don't accept Christ, you aren't concerned that she
sometimes acts like she thinks that she has a no show job and you aren't concerned
that she screamed at me and violently grabbed the New York Law Journal from my
hands?" At first, he did not respond. Moments later, he denied that Newsome ever
acted like she thought that she had a no show job. He said that she denied having
made the comment about plaintiff's religion (although, on a prior occasion, he had said
that Newsome claimed that plaintiff misunderstood the same comment). During the
course of the conversation he inquired, "Do you think I don't like you because you're
Jewish?" Plaintiff looked directly into his eyes to confirm that she was making that
complaint. He angrily remarked that plaintiff was, "treating him like shit." As the
conversation continued, plaintiff asked defendant Rios why he was taking notes about
her. Initially, he claimed that he did not understand why plaintiff had asked that
question. Plaintiff said, "I'll show you," and began walking toward his office. Defendant
Rios followed her. Plaintiff pointed to the note on his desk that he had written, which
stated, "Judy looking through recycling." He became extremely flustered, and,
maintained that he had written it because Newsome had made that statement to him
earlier in the day. Plaintiff asked him why Newsome was speaking to him about a
matter that was so innocuous - - all three of them occasionally had looked in the
recycling to determine whether they had inadvertently discarded something in it. He

43

agreed that they all had done that and professed that he did not know why Newsome had made the comment to him. He repeated his declaration that he had written that statement because it was a remark that Newsome had made to him. Plaintiff asked him if he was taking such notes because he was setting her up to be fired. He replied that plaintiff was, "paranoid." He told plaintiff, "you're loved." He represented that he did not intend to fire plaintiff. He stated, "Get any such idea out of your head - - just forget it!" Looking shaken, he ripped up the note and discarded it. As he did so, he instructed plaintiff to forget everything that he had said during the last thirty minutes. Inasmuch as that period of time clearly encompassed his assurance to plaintiff that he did not intend to fire her, she asked, "Everything?" He started to say something, then stopped himself. He told plaintiff to have a good weekend. His comments that evening demonstrated that, in addition to dismissing plaintiff's complaints out of hand, he was enlisting Newsome in his efforts to fabricate a pretext to discharge plaintiff and maliciously publishing defamatory statements about plaintiff in an effort to injure plaintiff in her profession.

        131.   During the morning of July 28, 2003, speaking to plaintiff in the histrionic manner that he had adopted in addressing her earlier that year, and for no apparent reason (other than the improper motives set forth herein), defendant Rios asked her numerous times, "Are you okay? How are you feeling?" Subsequently, he also asked plaintiff, "How was your weekend?" Plaintiff replied that it was, "great," and related that she had seen the movie classic, "Gaslight." He claimed that he had never seen that movie and asked plaintiff to describe it. Plaintiff said that it was about a psychotic man who had murdered a woman, married the victim's niece and unjustifiably attempted to depict his wife as mentally disturbed to others, as well to deceive her into believing that she actually was insane. Plaintiff stated that, ultimately, he was exposed and his wife confronted him with evidence that proved that she had been set up by him. Plaintiff concluded that, in the ending of the movie, the truth was borne out and that the villain got his just dessert. Later that day, a note in open view on defendant Rios' desk, in his handwriting, stated, "The truth will be borne out and they'll find out about him and he'll get his just dessert." That new note, in which he deliberately misquoted plaintiff

and presented her words entirely out of context, obviously was created in furtherance of his plan to destroy her reputation and create a pretext to discharge her.

132.     Throughout the last week of July 2003, a note in Justice Rios' handwriting, in open view on his desk, stated "Friday conf S + R." That note apparently referred to a meeting to be attended by Justice Rios, defendant Sandra Newsome and others at a location other than his chambers.

133.     Supreme Court Justice Frederick D. Schmidt passed away in July 2003. Subsequently, Justice Rios informed defendant Fisher that he would be amenable to transferring to the Jamaica courthouse and taking over Justice Schmidt's civil term part. When he informed plaintiff of the transfer, he stated that Justice Fisher had decided to keep Leonard Livote, the principal law clerk who had been assigned to Justice Schmidt, on OCA's payroll. Defendant Rios asserted to plaintiff that defendant Fisher had directed that Livote would be "available to us as resource." He added that Justice Fisher had stated that he "hoped that at the end of the year, the politicians would take care of," Livote (thereby demonstrating the continued control of defendants Manton, Sweeney and Reich over employment decisions regarding law clerks in Queens). Plaintiff asked defendant Rios where Livote would be situated physically until the end of the year. He gruffly retorted, "Not at your desk!" Although plaintiff had not raised the subject at that time, Justice Rios represented to her that, "You're not being fired." The transfer to Jamaica ultimately did not occur until November 2003.

134.     In or about August 2003, defendant Rios directed Newsome to create and maintain a file consisting of copies of the Appellate Division decisions that he received in connection with the appeals of matters over which he had presided. Previously, that task had been performed only by plaintiff. His instruction to Newsome to assume that duty constituted another adverse employment action against plaintiff.

135.     On August 7, 2003, a *pro se* motion for leave to reargue the defendant's fifth motion to vacate the judgment of conviction in *People v. Aaron Pino* (Queens Ind. No. 1578/98) was on Justice Rios' calendar. It previously had been adjourned for 30 days to that date by Justice Rios, who had told plaintiff that he desired

45

to do so because Pino obviously would file another redundant motion after that one was denied. Pursuant to his instructions, she waited until after that adjournment to draft the order. On July 16, 2003, plaintiff placed the draft and the file on his desk. Instead of signing it within a day or two, as his custom had been in the past, he placed it and the attached file on a stack of boxes in his office. Approximately two weeks later, although plaintiff had not raised the subject with him, he told her not to be worried that he put it there - - that he had done so because it was not yet due. On August 6, 2003, he so ordered the draft and gave it to plaintiff together with the file. The following day, when the case was called, Justice Rios proclaimed that the order had the wrong date on it and that the "error" would have to be fixed. Inasmuch as he had no prior practice of conforming the dates of his orders to the dates that they were distributed in the courtroom, and, he was aware that he had held onto that particular order from July 16 until August 6 before signing it, the only apparent explanation for his conduct was that he was attempting to cast plaintiff in a false light to damage her reputation, and, to convey to her that he was doing so.

136.   On August 11, 2003, Justice Rios referred a motion that had been filed in *People v. Brandon Rogers* (Queens Ind. No. 2771/02) to another part. Pursuant to his instructions, plaintiff drafted a short form order directing the transfer. After signing it, he proceeded in an unprecedented manner by giving the order to the part clerk rather than to plaintiff. He did not say anything to plaintiff regarding that matter.

137.   On August 12, 2003, Justice Rios asked plaintiff whether she recalled that one of Justice Roberta L. Dunlop's former principal law clerks had told Justice Dunlop that he was giving her his two weeks' notice and that Justice Dunlop had responded, "Leave immediately."

138.   On August 18, 2003, Anthony Deroche, a senior p.c.analyst employed by OCA, replaced Justice Rios' computer. Although Deroche remarked to plaintiff that the computer had been damaged due to the blackout that had occurred on August 14, 2003, no other computers in the court appeared to have required repair or replacement due to that event.

46

139. On August 19, 2003, defendant Rios asked the court reporter, who was assigned to his part, to talk to him about George Neilson.

140. On August 21, 2003, Justice Rios arrived in chambers at approximately 10:26 a.m. He was accompanied by Deroche. While Deroche was in his office, defendant Rios sang to Newsome, "I don't care what you heard about me, that girl's not getting any money out of me!" At approximately 11:20 a.m., he and Deroche left together. Justice Rios was holding the New York Law Journal in front of himself. He appeared to be concealing something between it and himself. As he passed Newsome's desk, he again sang to her, "I don't care what you heard about me, that girl's not getting any money out of me!" At approximately 11:33 a.m., he and Deroche returned together. Less than one hour later, Justice Rios entered plaintiff's office and removed files with pending motions that had been sent to the part during the previous week. That unprecedented measure constituted another adverse employment action.

141. Commencing in or about August 2003, defendant Rios began routinely closing the door to his office while he was inside of it and plaintiff was present in chambers. On numerous occasions, he deviated from that pattern when Newsome also was present. At the same time, he adopted the practice of locking the door to his office after he left chambers. In the following months, Newsome exhibited to plaintiff that his action was directed only at plaintiff. With plaintiff present, Newsome opened the locked door to his office with a key that he had provided only to Newsome.

142. On August 27, 2003, Justice Rios returned one of the pending motions that he had removed from plaintiff's office. The determination of that motion in *People v. Edward Levy a/k/a Ezro Leviyev* (Queens Ind. No. 736/03), a medicaid fraud action that had been commenced by the New York State Attorney General, required the review of more than 500 pages of Grand Jury minutes, as well as the affirmations and additional papers submitted by the parties. Plaintiff drafted a decision and an order in connection with that motion. The next day, she presented the drafts to defendant Rios. He signed them as written.

143. On September 22, 2003, defendant Rios met alone with Higgins.

47

144.   On September 29, 2003, as a witness for the prosecution took the stand in *People v. Stanley Varughese, Ashish Shah & Lenny Varughese* (Queens Ind. No. 1229/02), Justice Rios stated to the jury, "There are four lawyers in the courtroom, excluding the judge." Inasmuch as three defense attorneys, the prosecutor and plaintiff were present at that time, his statement clearly was intended to convey to the jury the false impression that plaintiff was not an attorney.

145.   On September 30, 2003, Justice Fisher visited Justice Rios' chambers. They met in Justice Rios' office with the door closed.

146.   In or about early-October 2003, referring to Hon. Dora L. Irizarry who had been nominated for her federal judgeship earlier in the year, Justice Rios asserted to plaintiff that, "She's not too bright, but I have to support her because she's Hispanic."

147.   On October 9, 2003, defendant Rios again met alone with Higgins.

148.   In or about October 2003, while plaintiff was walking with Justice Rios to his courtroom, he handed her a rubber band. He asked her whether his doing so reminded her of anything. Plaintiff replied that Judge Dankberg (a former Civil Court Judge, who failed to win re-election in 1996) handed out rubber bands when he dismissed cases. Defendant Rios said, "That's why I'm giving this to you. I'm dismissing you."

149.   On October 10, 2003, although the jury was deliberating in *People v. Stanley Varughese, Ashish Shah & Lenny Varughese* (Queens Ind. No. 1229/02), Justice Rios did not arrive in chambers until approximately noon. At 10:28 a.m., the jury issued a note. Plaintiff and George Plunkett both read the note in the courtroom immediately after it was delivered there by a court officer. Although he was aware that Justice Rios had not arrived, Plunkett placed a telephone call to Newsome, who was in chambers and told her about it. After that conversation ended, plaintiff asked him why he called the clerical secretary to discuss a jury note when the law clerk was present. Plunkett replied that Justice Rios had instructed him to call Newsome if a note was

48

issued by the jury. Plunkett said that Newsome knew where Justice Rios could be located. In so instructing Plunkett, defendant Rios obviously acted in a manner likely to damage plaintiff's reputation and to demean her by showing that he was informing only Newsome of his whereabouts while the jury deliberated, and, that he did not even want plaintiff to tell Newsome that she should call Justice Rios if a note was issued.

150.   On October 10, 2003, shortly before Justice Rios arrived, Rochelle Wright, the court reporter assigned to the pending trial, came to his chambers. She stopped at the entrance and asked Newsome if it was "okay" for her to speak to plaintiff. Newsome responded by giggling. Wright entered and asked plaintiff for the note from the jury. Plaintiff informed her that it was in the courtroom. Plaintiff accompanied Wright to the courtroom to assist her in locating it. As they left chambers together, Wright turned and made eye contact with Newsome. Wright and Newsome both giggled. Wright's conduct reflected that plaintiff's reputation had been severely damaged by defendants' concerted efforts to maliciously inflict such injury through the publication of defamatory statements and other means.

151.   On October 16, 2003 at approximately 1:20 p.m., a court officer placed a telephone call to chambers in which he stated that Newsome had parked her car in a street spot that was reserved for a judge. Inasmuch as Newsome was not in chambers, plaintiff related the information to Justice Rios and asked him whether he had Newsome's cell phone number. He denied that he had that information, but said that he would "take care of it." In sharp contrast to the manner in which he routinely treated plaintiff without any justification whatsoever, rather than criticizing or demeaning Newsome, Justice Rios later offered to give his own parking spot to her.

152.   On October 24, 2003, Newsome told Justice Rios that defendant Lippman was calling for him. She then raised the volume on her radio. Plaintiff, who was packing for the move to Jamaica, exited her office to retrieve a box from the anteroom. As plaintiff did so, Newsome raised the volume on her radio even louder. Newsome then opened a drawer in a filing cabinet and moved objects around, in a transparent effort to create additional noise. Immediately after defendant Rios

49

ended his telephone conversation, Newsome closed the drawer. ⬤ walked away from the filing cabinet without having placed anything in it or removing anything from it. She lowered the volume of her radio.

153.    On October 30, 2003, Justice Rios drove plaintiff to the Jamaica courthouse to see the new chambers. It did not have a law clerk's office. The desks for the principal law clerk and the clerical secretary were very close to each other. While they were returning to the Kew Gardens chambers, plaintiff asked Justice Rios if he would speak to Newsome about keeping the volume on her radio a little lower than the level that she frequently utilized once they moved. Plaintiff explained that she did not want to discuss that matter directly with Newsome because Newsome had an extremely bad temper and would almost inevitably react to such an approach by losing it. He replied that he could try to address that matter by speaking to Newsome, and angrily added that, if that did not work, plaintiff could stay in the robing room downstairs instead of working in chambers.

154.    On November 5, 2003, Justice Rios informed plaintiff that his new assignment had been changed and he would be taking over retired Justice Joan Durante's former part.

155.    In early-November 2003, Justice Rios, plaintiff and Newsome moved to Jamaica. Plaintiff met with Myra Doyle, the principal law clerk who had been assigned to Justice Durante. They discussed the cases pending in the part. Dawn DeQuatro, the clerical secretary who had been assigned to Justice Durante, told plaintiff that she was willing to assist Newsome in learning the daily routine in the civil term. Plaintiff related that information to Newsome. Although Newsome said that she would telephone DeQuatro in response to that message, she did not do so. On several occasions in the following weeks, DeQuartro stated to plaintiff that she had told Newsome that she would be willing to help Newsome in making the transition from the criminal term to the civil term, but that Newsome never followed up on her offers. She asked plaintiff if there was a problem with Newsome. Plaintiff told her that she would remind Newsome about that matter. Plaintiff did so, to no avail. After DeQuatro again

50

asked plaintiff if there was a problem with Newsome, plaintiff described the situation to defendant Rios. He thanked plaintiff.

156.   During November 2003, Justice Rios asserted to plaintiff that he had been told that he should apply for a position as an Associate Justice of the Appellate Division. He represented that, if he was designated for that position, plaintiff could serve as his Appellate Division law secretary, if she wished to do so. Stating that she knew that she was raising "a delicate matter," she asked him whether he thought that the issues that had led to his withdrawal of his prior application might present an obstacle. He said that he did not believe that those issues would pose any problem. Subsequently, plaintiff stated that she would be interested in accompanying him as his law secretary in the Appellate Division, if he received the designation. Later that month, defendant Rios told plaintiff that he had decided against applying for the position.

157.   On November 25, 2003, Justice Rios met with defendant Fisher. Later that day, while Newsome was engaged in a personal telephone conversation with Higgins, Newsome asserted that Justice Rios had met with Justice Fisher that day and that plans were underway to transfer Newsome back to the Kew Gardens courthouse. She said that, "Prayerfully that will pan out; otherwise, I'm going to need a lawyer." Newsome placed additional telephone calls that afternoon in which she repeated that Justice Rios and Justice Fisher had met that day, and, discussed plans to transfer her back to Kew Gardens.

158.   On November 26, 2003 at approximately 12:30 p.m., Justice Rios charged the jury in *Chad Kerchner v. Shin Taehoun & Habib Rasooli* (Queens Index No. 9931/01). As had been the case with every jury trial over which he had ever presided, plaintiff prepared the jury instructions. After Justice Rios and plaintiff exited the courtroom, she asked him if Newsome was going to be transferred to Kew Gardens. He claimed that he had not heard anything about such a transfer. She advised him that, the previous afternoon, Newsome had placed numerous telephone calls in which she had claimed that he had spoken to Justice Fisher about it. As soon as he and plaintiff entered chambers, he asked Newsome to join him in his office. They met

51

behind closed doors. For the first time since Newsome commenced her employment with him, he shouted at her. They stayed in his office for approximately ten minutes. At 1:00 p.m., the verdict was taken. When Justice Rios and plaintiff returned to chambers, he entered his office. He remained inside with the door closed for several minutes. At approximately 1:10 p.m., he said, "C'mon Sandra, let's go to lunch." They both walked out without saying a word to plaintiff. They returned at approximately 2:48 p.m.

159.    On November 29, 2003, Newsome, who was engaged in a personal telephone conversation at her desk, loudly proclaimed, "The walls have ears here. You can't talk here. The walls have ears. I have to talk to you outside. There have been a lot of developments - - a lot of developments."

160.    On December 1, 2003, Justice Rios and plaintiff attended the annual Appellate Term seminar. Plaintiff advised him that there were only a few motions on his calendar for the following day. He replied, "Fine." He did not inform her that he would not be present to handle them. The next morning, he telephoned Newsome and told her to instruct the clerk of his new part to handle those motions inasmuch as he would not be present for the calendar call. In so doing, he again acted in a manner designed to damage plaintiff's reputation. It obviously was unusual for him to assign his clerical secretary to relate such directions to the part clerk, rather than directing his law clerk to ascertain whether any of the pending matters could be settled.

161.    On December 2, 2003, Justice Spires telephoned chambers and spoke to Newsome. She listened for a couple of moments, then laughed and said, "I'll get to Kew somehow." Later that day, defendant Fisher's clerical secretary, Paula Reardon, telephoned chambers. While speaking to her, Newsome laughed and declared, "If you call here the caller ID shows your number, so I always hit 67 before I call here."

162.    On December 2, 2003, plaintiff gave Justice Rios the drafts of the short form orders that she had prepared regarding two unopposed motions for leave to withdraw as counsel that had been filed in *Miguel Hernandez v. New York City Transit Authority* (Queens Index No. 19354/01) and *James Williams v. New York City Transit*

52

*Authority* (Queens Index No. 27553/02), together with the related court files. After barely looking at the drafts, he wordlessly deposited them and the attached files into the basket on plaintiff's desk without either signing them or directing any changes. At approximately 1:17 p.m., defendant Desole telephoned chambers. Inasmuch as Newsome had stepped out, plaintiff answered the call. DeSole asked to speak to defendant Rios. He had been in his office with the door closed. After plaintiff answered the telephone, he emerged. Plaintiff informed him that DeSole wanted to speak to him. He told plaintiff that he would be in his office during the lunch hour, and, instructed her that he would answer the telephone during that time. He closed his door and took DeSole's call. Contrary to his earlier pronouncement, at approximately 1:30 p.m., he informed plaintiff that he was going out. He returned at approximately 1:45 p.m. and removed the drafts and the files from the basket on plaintiff's desk. He asked plaintiff where the law department was located. Plaintiff provided him with that information. Smirking, he brought the drafts and the files into his office. At approximately 2:05 p.m., he stated that he was going to the law department. When he left, his arms were filled with various motions and files. He returned at approximately 2:25 p.m. without them. Approximately three days later, he so ordered the draft in *Miguel Hernandez v. New York City Transit Authority* (Queens Index No. 19354/01). He directed plaintiff to change the draft in *James Williams v. New York City Transit Authority* (Queens Index No. 27553/02) to deny the motion based upon a technical defect that he stated existed in the affidavit of service. Plaintiff prepared the revised draft, in compliance with his instructions. It was apparent that DeSole had advised him to bring the drafts to the law department in an attempt to find some flaw in plaintiff's work (regardless of its triviality or whether the supposed imperfection merely suggested that the Court exercise its power to overlook defects in form), as well as to damage her reputation among her colleagues by creating the false impression that plaintiff was not trusted to perform her duties as a principal law clerk. It was unprecedented for him to do so.

      163.   On December 4, 2003, the door to Justice Rios' office was open when plaintiff arrived for work. He was not present. Plaintiff entered his office to skim the New York Law Journal. As she began to do so, Newsome loudly exclaimed, "I

don't think the Judge wants anyone hanging out in his office!" Plaintiff replied that he had never told her that she was not allowed to review the New York Law Journal in his office (in the days immediately following the move to Jamaica, plaintiff set up the library in Justice Rios' office; on several occasions, he entered and observed her performing that duty - - never once did he object to her doing so). Newsome raised her voice and insisted, "Well, he told me." In view of Newsome's unprofessional and abusive conduct, plaintiff firmly but quietly responded, "Well, I haven't heard it from the Judge and you conveyed your message - - if he wants to tell me that, he can tell me that, but you are not my boss." Newsome put her hands on her hips, glared at plaintiff and shouted over and over again that, "The Judge doesn't want anyone hanging out in his office." She continued to do so until plaintiff completed reviewing the law journal and exited - - a process that took approximately two minutes. Newsome's claim that plaintiff was "hanging out" in Justice Rios' office was inappropriate, insulting and specious. Plaintiff was performing a routine duty of a principal law clerk. Newsome was interfering with plaintiff's work. As plaintiff left Justice Rios' office, she stated what had been obvious for so many years - - that Newsome was acting toward plaintiff in a demeaning manner due to plaintiff's religion and race. Shortly thereafter, Dennis Miller, the clerk of Justice Rios' new part, telephoned chambers. He spoke to Newsome. From Newsome's side of the conversation, plaintiff learned that a case had been sent to the part. Newsome did not speak to plaintiff about it. Apparently, Miller did not seek to discuss the matter with plaintiff. Their conduct in that regard was highly unusual. When a case is sent to a part, it is the function of the law clerk to go to the courtroom, review the file, speak to the attorneys for the parties and subsequently return to chambers to brief the justice. Plaintiff went to the courtroom to perform her duties. When she returned, Justice Rios was sitting at his desk. Newsome was seated in a chair in front of his desk. Without saying, "Good morning," he raised his voice and demanded that plaintiff tell him what had happened. Plaintiff asked to speak to him alone. He angrily shouted that he wanted Newsome to remain. Plaintiff related the events of that morning. He hollered, "I don't want anyone in my office!" Far from finding any fault with Newsome's conduct, he blamed plaintiff for not following her orders. His reaction was an extreme example of the hostile work environment and disparate treatment that existed in the workplace.

Plaintiff noted that he had never told her that she was not allowed in his office. She asked him whether she was prohibited from entering to retrieve any of the volumes on his bookshelves to do research. He pretended not to understand the question and falsely declared that plaintiff was "ranting." He again shouted, "I don't want anyone in my office!" Plaintiff stated that it had become very clear that, in every situation, he was automatically siding with Newsome and that, although he was dismissing out of hand all of the complaints that plaintiff had made about Newsome's behavior, he was adopting every criticism that Newsome had made with regard to plaintiff. Plaintiff asserted that those circumstances indicated that plaintiff was being treated in a discriminatory fashion. He responded by yelling at plaintiff, "Bring all of the motions that you think that you are working on and put them on the table in here, then go home for the day." Newsome gleefully giggled. Plaintiff asked Justice Rios whether she was being fired. He repeated the same instruction. He directed plaintiff to return the following morning. Plaintiff complied. Before leaving for the day, plaintiff attempted to brief him regarding the case that had been sent to the part. He screamed that she should leave and return the next day. When plaintiff returned the following morning, she found that work been placed on her desk in the interim.

164.   On December 9, 2003, defendant D'Angelis placed a telephone call to Justice Rios. Defendant Rios began his conversation with D'Angelis by hollering, "When am I getting my new carpet? When? When?" After pausing briefly, defendant Rios continued, "All right - - I should call her? I should call her? All right." He hung up the telephone and closed his door. Ensuing events revealed that it was almost certain that the word "carpet" was being used as a code for "law clerk," and that the "her" that he referred to during that conversation was defendant DeSole.

165.   On December 10, 2003, Justice Rios signed the draft of the order that plaintiff had prepared in *Helen Newton v. New York City Transit Authority and Metropolitan Transportation Authority* (Queens Index No. 13033/02), which granted a motion for summary judgment. Plaintiff had performed all of the work that related to the determination of that motion. That evening, plaintiff asked Justice Rios when she should update the volumes of the McKinney's Consolidated Laws of New York that

were in his office with the new pocket parts. He retorted that, "From now on, Sandra will do that." Plaintiff stated that, inasmuch as the set of McKinney's in his office had been left for him in the new chambers before they had moved into it, she had planned to develop a list of missing volumes while updating the rest. He replied that she should do so the next day at 10:00 a.m. and, added, "when I get here - - when I get here."

166.    On December 11, 2003, as described below, a ruse was utilized that evidenced the joint participation of defendants Lippman, DeSole, Fisher, D'Angelis, Gardner, Rios and Newsome in an unconscionable preplanned effort to destroy plaintiff's reputation so as to protect Justice Rios from accountability for his own misconduct, and, to retaliate against plaintiff for the political purposes detailed herein at the behest of defendants Manton, Sweeney, Reich and Koslowitz. Defendant Lippman obviously authorized DeSole to counsel defendant Rios in that regard. D'Angelis' immediate supervisor was defendant Fisher. Major Gardner's immediate supervisors were defendant Fisher, defendant D'Angelis and Deputy Chief Clerk Maureen D'Aquila.

167.    The court officers' log for December 11, 2003 reflected that, at 11:10 a.m., Major Gardner advised Captain Fulton, Lieutenant Sullivan, Court Officer Urso, Court Officer Pastore and Court Officer Cunningham that defendant DeSole would arrive at approximately 2:00 p.m. The log noted that Court Officer Stephens was to escort DeSole to D'Angelis' office, ". . . then report to Major." The log also stated that at 12:30 p.m., D'Angelis authorized the use of a "jury bus to pick up Lauren DeSole at Beaver Street at 1:45 p.m. SCO Mari assigned." While those events were underway, defendants Rios and Newsome, court officers and various other court employees attempted to mislead plaintiff into believing that they were engaged in activities related to the installation of cable television in Justice Rios' office. At the time, plaintiff was conducting legal research on her computer with respect to a motion. The log also stated that, at 1:45 p.m., Court Officer Mari called from OCA's office at 25 Beaver Street and related that he was waiting for defendant DeSole. Shortly after 2:00 p.m., plaintiff stepped out of chambers. She discovered that a female court officer was posted outside the door. No legitimate security concern was involved. The assignment of that court officer clearly was intended to create a spectacle in an effort to damage

56

plaintiff's reputation. As plaintiff returned to chambers shortly thereafter, she observed
a co-worker asking the court officer why she was standing in front of Justice Rios'
chambers. Responding in a low voice, the court officer still could be heard to say that
plaintiff was the reason for this assignment. The court officer and the co-worker both
erupted in laughter. Plaintiff entered chambers and resumed her research. At
approximately 2:08 p.m., a court officer entered. That court officer and Justice Rios
met in his office behind closed doors. Newsome supposedly went downstairs with a
person who had been identified in the presence of plaintiff as a cable company
employee. Other "workers" arrived at chambers. Defendant Rios brought them into his
office and again closed his door. At approximately, 2:14 p.m., Lieutenant Sullivan
arrived. He entered through the main door, near the desk where plaintiff was working.
As he walked into defendant Rios' office, Justice Rios loudly called out to him, "Hey
don't go out there, that's dangerous duty man!" Loud laughter emanated from
defendant Rios' office after he made that false and disparaging remark, which obviously
was intended to damage plaintiff's reputation. The log reflected that DeSole and Court
Officer Mari arrived at the Jamaica courthouse at 2:30 p.m. It also stated that at 2:45
p.m., Lieutenant Franzone was assigned to a "security detail." In reality, Franzone was
not dispatched to any valid security assignment. She was sent to relieve the court
officer who had been posted outside of Justice Rios' chambers. While Franzone was
so engaged, other OCA employees predictably inquired about the unusual spectacle
created by her activity. She laughed and claimed that she was there due to plaintiff.
Throughout the day, plaintiff had been working. Neither Lieutenant Franzone, nor the
court officer posted at the door to chambers prior to her arrival, approached plaintiff's
desk or plaintiff that day. Obviously, it would have been bizarre for them to have stood
guard at a law clerk's desk while she conducted research, but at least they would have
been on the same side of the door as the person who was the focus of so much undue
negative attention by the court officers that day. Copies of the pages of the court
officers' log that were disclosed by OCA, pursuant to a FOIL request made by plaintiff,
are annexed as Exhibit "M" hereto and are incorporated by reference as if fully set forth
herein.

        168.   At approximately 3:54 p.m. on December 11, 2003, DeSole and

D'Angelis arrived at Justice Rios' chambers. For a few moments, they met alone with him in his office, behind closed doors. Plaintiff continued to conduct legal research on her computer. Newsome already had left for the day. Defendant Rios soon opened his door and directed plaintiff to sit down at the table in his office next to D'Angelis and DeSole. Justice Rios informed plaintiff that he was giving her the choice of either going on vacation until January 28, 2004 or being fired. He did not state any reason for forcing plaintiff to make such a choice. Plaintiff was told that if she did not sign a document stating that she was voluntarily taking annual leave, she would be fired immediately. Plaintiff asked whether she would be permitted to sign it "under protest." DeSole answered, refusing that request upon the basis that including such language would make it appear that plaintiff was being coerced. Obviously, plaintiff was being coerced. Defendant Rios, who seemed to be reading from a script, stated that if plaintiff chose to take the annual leave, he would not advertise her position. DeSole added that defendant Rios hoped that plaintiff would return and "once again be a productive member" of his staff, as she had been "in the past." DeSole offered plaintiff a brochure pertaining to a mental health program. It was another copy of the brochure that defendant Rios had given to plaintiff when he told her that he had presented his version of plaintiff's complaints about discrimination to Kay Ann Porter, OCA's Managing Inspector General for Bias, and that Porter had responded by supplying it to him and instructing him to give it to plaintiff. It was apparent that defendants Rios, DeSole and D'Angelis were simply acting out a rehearsed precursor to a predetermined discharge. It also was clear that the brochure was a prop. It was being given to plaintiff so that they could point to that fact in an effort to create a false impression about plaintiff. DeSole proclaimed that a judge could fire a member of his staff at will, and, that it was very unusual for defendant Rios to offer plaintiff the option of taking annual leave. That statement indicated that it was DeSole's idea for him to do so in an attempt to create the false impression that he had not long ago decided to discharge plaintiff for unconstitutional purposes. Plaintiff replied that it was her understanding that even supreme court justices are prohibited from terminating an employee for unconstitutional reasons such as discrimination or retaliation for complaints of misconduct. Plaintiff stated that she would like to speak to DeSole and D'Angelis about acts of misconduct

58

committed by defendant Rios and anti-Semitism in the workplace. Although, as
recently as September 2003, another supreme court justice in Queens (Justice Luther
V. Dye) had been censured, *inter alia,* for his anti-Semitic conduct - - and defendant
DeSole previously had never met plaintiff nor been present in plaintiff's workplace - -
she derisively mimicked, "anti-Semitism!" and giggled. Defendant Rios stated that
DeSole and D'Angelis did not want to hear any of plaintiff's complaints. DeSole
immediately agreed with him, declaring, "Yes - - we are only here to support the Judge."
Justice Rios rose and shouted that he was rescinding his "offer" because plaintiff had
dared to say that he had committed misconduct. He screamed that, if plaintiff did not
apologize to him in front of DeSole and D'Angelis, she would be terminated
immediately. Although they had witnessed that unconstitutional threat of immediate
discharge in retaliation for an attempt to raise complaints about discrimination and
judicial misconduct, neither DeSole nor D'Angelis objected to it or attempted to
intervene. In view of the coercive circumstances, plaintiff said, "I'm sorry," and signed
the document. DeSole laughed and said that plaintiff could try calling Porter. The futility
of any such attempt was so apparent that the suggestion could only have been
designed to communicate that plaintiff had no meaningful recourse.  Plaintiff asked
defendant Rios whether she should simply return to work when the annual leave time
specified in that document expired. He answered, "No." He stated that she would have
to telephone him, "after Martin Luther King's birthday" and that he would let her know
whether she would be permitted to return to work. He told plaintiff to surrender her
employee identification card and key to chambers to D'Angelis. He directed D'Angelis
to ensure that plaintiff took her personal property, and, to escort her out of chambers.
Before leaving, plaintiff offered to inform defendant Rios of the status of the motions
that she had been handling. He replied that he did not want to hear anything further
from plaintiff. DeSole laughed. Plaintiff left. The use of coercion by defendants Rios,
DeSole and D'Angelis (and sanctioned by defendants Lippman and Fisher) to force
plaintiff to use accumulated annual leave clearly demonstrated disparate treatment, as
well as a hostile and retaliatory work environment, and constituted an adverse
employment action. Previously, plaintiff had never been required to execute a form to
use vacation time. On prior occasions, whenever defendant Rios had requested a

59

writing, he had instructed plaintiff to prepare a brief memo for him to sign. The coerced use of an atypical form represented another adverse employment action; its purpose was to generate a paper pretext for the predetermined discharge of plaintiff. The form also was utilized to create a red flag in her personnel file so as to severely damage her professional career. Although defendant Rios was present when plaintiff was given a copy of the form that she had signed, the original subsequently was altered so that, above his signature, a box was checked - - it followed the preprinted statement, "Recommendation for Discretionary Leave D - H," and preceded the preprinted remark, "Approve all." Similarly, D'Angelis added his signature to the original form after he gave plaintiff a copy of it that did not bear his signature. Other additions later made to the original included the handwritten notation, "*Annual Leave credits to be used per L. DeSole," (above the initials "ML") and the signature of Deputy Chief Administrative Judge Joan B. Carey, in a box underneath the checked-off preprinted statement, "Discretionary leave granted as recommended by N.Y.C. Chief Clerk, Executive Assistant or Asst. Deputy Chief Administrator." The augmentations to the form constituted additional adverse employment actions that were used in the fabrication of a pretext for plaintiff's predetermined discharge and for the purpose of irreparably harming her ability to earn a livelihood. There simply is no requirement that anyone but a supreme court justice authorize his or her principal law clerk to go on vacation. Copies of the "Application for Leave" provided to plaintiff on December 11, 2003 and the version of that form disclosed by OCA, pursuant to a FOIL request made by plaintiff, are annexed as Exhibits "N" and "O" hereto and are incorporated by reference as if fully set forth herein. Plaintiff's social security number has been redacted from those documents. Copies of the writings signed by Justice Rios, when he approved the vacation requests submitted to him by plaintiff on February 16, 2000 and April 24, 2002, are annexed as Exhibit "P" hereto and are incorporated by reference as if fully set forth herein.

169. Although, as the immediate supervisor of defendant D'Angelis, then-Administrative Judge Fisher clearly was aware that defendant Rios had unconstitutionally threatened to discharge plaintiff in retaliation for her attempt to raise

complaints about discrimination and judicial misconduct, rather than taking any appropriate action, he provided additional resources to aid in that unlawful conduct. Defendant Fisher appointed Louise Conway, who had been assigned as a court attorney in the law department, to a referee position that he created for the purpose of taking away from plaintiff a substantial portion of the duties that are routinely performed by the principal law clerk assigned to a supreme court justice. Conway began conferencing cases for defendant Rios, conferring with him about pending matters in his part and working on many of the motions that were assigned to him.

170.   The coercion that was exerted to force plaintiff to use her annual leave time prevented her from attending a Legal Update Program for Court Attorneys in January 2004. Through attendance at such programs, law clerks keep informed of developments in various areas of law and earn the continuing legal education credits required of them without incurring any personal expense. The elimination of plaintiff's ability to attend that seminar constituted an adverse employment action.

171.   On January 23, 2004, plaintiff telephoned Justice Rios, pursuant to his instructions. After putting the call on hold for approximately one minute, he asked plaintiff how she felt about returning to work for him. Plaintiff replied that she had been "treated in a manner that was outrageous and unfair and . . . inexplicably so for any proper reason," and that she was "quite upset about that," but that it had not been her "idea to not be there." He falsely claimed that she had been subjected to that treatment because she had been disrespectful toward him. She accurately responded, "Judge, I have always shown you the respect." He stated that, "I'm willing to . . . put that behind us, because, you know, after 10 years, people are entitled to have differences of opinion," and announced that it would be necessary for plaintiff to do the same. Plaintiff asked whether he was requiring her to withdraw the complaints that she had about discrimination. He asked her whether she had filed a written complaint. Plaintiff responded that she had been referring to the complaints that she had raised with him. He asserted, "That's not what I asked you," and again asked whether plaintiff had, "filed a complaint." Plaintiff recounted that she had attempted to raise her complaints with defendants D'Angelis and DeSole. Defendant Rios declared that he was not talking

about that occurrence. Plaintiff stated to defendant Rios that he was her supervisor, and, that she had complained to him about the discrimination. He dropped that topic and informed her that he would be out of the office from January 29 until the following Tuesday. He told plaintiff that she could either report to work on Thursday, January 29 or take "three additional vacation days," and return the next Tuesday. Plaintiff selected the latter option. He commented that he would send a memo to D'Angelis about the extension of her vacation. Plaintiff noted that she did not have a key to chambers or an employee identification card. He stated that, when plaintiff arrived at the courthouse, she would have to see D'Angelis and retrieve those items from him. His statements evidenced the continuation of D'Angelis' unusual entanglement in the relationship between a supreme court justice and his principal law clerk. Inasmuch as D'Angelis reported directly to then-Administrative Judge Fisher, defendant Rios' remarks also revealed that defendant Fisher's unique involvement in that relationship persisted.

172. Although defendant Rios had given plaintiff the option of either returning to work on January 29 or waiting until the following Tuesday, in a letter to her dated January 26, 2004, he declared that, ". . . since I will be out of the office on January 29, 30 and February 2, 2004, it is understood that you will be granted three additional annual leave days and return for duty on Tuesday, February 3, 2004." The wording tended to create the false impression that plaintiff would not have been permitted in chambers until he returned. Further, contrary to that statement, plaintiff was not being "granted three additional annual leave days," she was being authorized to utilize accumulated vacation time that she had earned. His letter reiterated that plaintiff would be required to report to D'Angelis' office to retrieve her identification card. It thereby documented the adverse employment action of plaintiff's forced surrender of her identification card, and, the demeaning treatment to which she was being subjected in connection with her return. Principal law clerks ordinarily are not compelled to surrender their identification cards when they go on vacation. His gratuitous mention of that requirement in the letter, and, the letter's inclusion in plaintiff's personnel file constituted adverse employment actions designed to aid in the unconstitutional orchestration of plaintiff's predetermined discharge and to damage her career.

173.   On February 3, 2004, plaintiff appeared at D'Angelis' office to

retrieve her employee identification card and key. When she asked him for those items, he reacted by laughing loudly. He tauntingly asked her, "How do you feel?" In light of his conduct, plaintiff stated that the only reason that she had come to see him was that Justice Rios had told her that she must do so in order to recover the items that she had requested. He again questioned plaintiff, "How do you feel?" He repeated that question several times and continued to laugh, while he handed the items to her. After initially ignoring his demeaning behavior, plaintiff finally remarked that, by returning to work, she was not waiving any claims that she had based upon the manner in which she had been treated. Immediately thereafter, she exited his office. As plaintiff walked away, D'Angelis' exploded in laughter. As noted above, as recently as May 2003, a jury had returned a verdict in favor of the plaintiff in *Neilson v. D'Angelis et al.,* (E.D.N.Y. CV 00-6106 [CPS]), finding that D'Angelis and the major in charge of court officers at the Kew Gardens courthouse had violated a court officer's rights to equal protection of the laws by singling him out for harsh treatment in retaliation for his commencement of a defamation action against a supervising court officer and for his filing of a grievance. The district court denied the motion to set aside the verdict therein on July 7, 2003. It was apparent that, rather than disciplining D'Angelis for his improper actions in that situation, or suggesting that he enter a mental health program, defendants Lippman and Fisher had supported his unlawful behavior and directed him to also engage in unconstitutional retaliatory conduct against plaintiff.

174.   On February 3, 2004, when plaintiff returned to chambers, she was

unable to log onto her computer. As plaintiff was telephoning the computer department, Justice Rios arrived. He informed her that to use her computer, she would have to enter an additional password: "Victor" (the first name of senior p.c. analyst Martinez, who worked at the courthouse). Immediately thereafter, defendant Rios instructed plaintiff to enter his office. Contrary to the representations that he made during their telephone conversation on January 23, 2004, in which he had stated to plaintiff, "I'm willing to put things behind us and move forward in the same cooperative manner in which we had," as soon as she sat down, he announced that he was changing her job

63

duties. He stated that he was prohibiting her from entering the courtroom to check on the cases that came into the part. He told her that she was not to check for incoming motions, but instead only would be permitted to perform work that he directly gave to her. He also barred plaintiff from speaking to anyone in the courthouse about any pending matters unless he instructed otherwise. Additionally, plaintiff was forbidden to conference any cases or accompany him to the courtroom. He declared that all of the actions that he had taken against plaintiff were intended to punish her, based upon an assertion by defendant Newsome that plaintiff had told others that he had committed acts of misconduct. That pronouncement constituted an admission of the unlawful nature of the actions taken against plaintiff as set forth herein. It also presented direct proof of the disparate treatment to which plaintiff had long been subjected. In barring plaintiff from the courtroom, defendant Rios maliciously inflicted severe damage to plaintiff's professional reputation. By isolating plaintiff in chambers, he also prevented others from observing that the defamatory statements that he (and the other defendants herein) had been making about her mental status had no basis whatsoever in reality. The actions taken against plaintiff herein truly were reminiscent of the strategy adopted in the movie, "Gaslight."

175. On February 3, 2004,defendant Rios stated to plaintiff that he was attempting to obtain a transfer for Newsome.

176. After leaving for the day on February 3, 2004, plaintiff wrote a letter to defendant Lippman, in which she reported that Newsome had violated the Code of Ethics for Nonjudicial Employees promulgated by the Chief Judge of the State of New York by utilizing Supreme Court letterhead in an effort to influence the adjudication of a parking ticket that had been issued to her. Plaintiff enclosed a copy of the improper letter that Newsome had written to the Parking Violations Hearing By Mail Unit. Copies of plaintiff's letter to defendant Lippman, the aforementioned enclosure, proof of mailing and proof of delivery are annexed as Exhibit "Q" hereto and are incorporated by reference as if fully set forth herein.

177. At approximately 7:55 a.m. on February 4, 2004, plaintiff slipped on an icy sidewalk and broke her right ankle (at least one other OCA employee, who

worked in Queens, suffered a broken wrist in a similar accident that occurred that morning). Due to her injury, plaintiff was out on sick leave until she returned to work on March 8, 2004.

178. An additional copy of the brochure pertaining to a mental health program was enclosed in the envelope, postmarked on February 10, 2004, which was used to mail plaintiff's paycheck to her. The malicious mailing of another copy of that inappropriate brochure to plaintiff, while she was recuperating from a broken ankle, demonstrated its malevolent purpose.

179. On February 25, 2004, in response to the letter that she had mailed to defendant Lippman, plaintiff received a telephone call from Sherrill R. Spatz, who as described above, previously had been appointed as the Unified Court System's Special Inspector General for Fiduciary Appointments. When she telephoned plaintiff, Spatz expressed surprise that plaintiff's telephone number was provided in the letter to Justice Lippman and that plaintiff was at home when she called. Plaintiff explained that she was recuperating from a broken ankle and that, additionally, she was in mourning for her father, who had passed away less than one week earlier. After plaintiff declined her offer to postpone the discussion, Spatz stated that, based upon Newsome's violation of Part 50.1 of the Code of Ethics for Nonjudicial Employees, which prohibits court employees from using or attempting to use "... their positions or the prestige of judicial affiliation to secure privileges or exemptions for themselves ... ," the only actions that would be taken would be that a letter would be placed in Newsome's personnel file regarding the matter, the Inspector General's office would inform Justice Rios of Newsome's misconduct and that office would instruct him to tell Newsome not to repeat her misconduct. Spatz asked plaintiff whether she had any reason to believe that Justice Rios would not have been responsive if plaintiff had raised the matter with him. Plaintiff replied that it would have been futile for her to have done so. Plaintiff stated that she had been subjected to a lengthy course of disparate treatment and a hostile work environment. She informed Spatz that she had complained to Justice Rios about that discrimination, including comments that Newsome had made disparaging plaintiff's religion, and that he had dismissed her complaints out of hand. Plaintiff also described

65

the events during which she had been coerced into taking annual leave. Plaintiff noted that, in an obvious effort to embarrass her, court officers were posted outside of Justice Rios' chambers on that occasion. She informed Spatz that, at that time, DeSole and D'Angelis refused to hear her complaints about discrimination and judicial misconduct. Plaintiff recounted that they told her that they were only there to support Justice Rios. She told Spatz that, in their presence, defendant Rios threatened to terminate plaintiff in retaliation for her attempt to report that he had engaged in misconduct. Plaintiff also stated that defendant Rios subsequently informed plaintiff that the actions taken against her were intended as retaliation, based upon Newsome's statement that plaintiff had told others that he had committed acts of misconduct. Plaintiff related that OCA not only was on notice of the unlawful discriminatory and retaliatory actions against her, but had participated in them. Plaintiff noted that she was considering raising her complaints in another forum due to the futility of seeking redress from OCA. The telephone call from Inspector General Spatz was the only direct response that plaintiff ever received regarding her letter to defendant Lippman. No writing was furnished to plaintiff acknowledging the submission of her complaint or evidencing that any action was taken based upon it.

180.   On March 8, 2004, plaintiff returned to work. She immediately observed that an additional copy of the brochure pertaining to a mental health program had been placed in the basket on her desk. It was displayed there so that anyone who had been in view of plaintiff's desk would have noticed it.

181.   On March 8, 2004, plaintiff attempted to log onto her computer and found that the change that had been made while she had been out on the leave that she had been coerced into taking still persisted - - she was required to enter a second password. Inasmuch as she had used that procedure only once, she telephoned senior p.c. analyst Victor Martinez and asked him for the second password. Although that password actually was his first name, and he had access to all of the passwords used in the Queens courthouses, he initially claimed that he did not remember it. Plaintiff incredulously asked, "You don't remember it?" He then replied that he could not tell her what her password was without the permission of Justice Rios.

66

When Justice Rios returned to chambers that morning, he immediately told plaintiff that the second password was "Victor," although she had not discussed that matter with him. Those circumstances demonstrated the depths of the efforts that had been undertaken to destroy plaintiff's reputation among her co-workers.

182.   On March 8, 2004, Justice Rios asked plaintiff how old her father had been when he died. After plaintiff replied that he had been 84 years old, defendant Rios smirked and repeated several times, "That's young!" As he did so, he glanced at Newsome. She snickered. That afternoon, defendant Rios gave Newsome a copy of his calendar of cases for that day. He remarked to her, "I don't know if you need this." He then entered his office without giving plaintiff a copy of the calendar. Until he had coerced plaintiff into taking annual leave, he had routinely given her the calendars.

183.   On March 9, 2004, while she was in Justice Rios' chambers, Kellie Adams, the senior law librarian at the courthouse, commented to plaintiff that she had heard that plaintiff had "just returned from recovering from something else," when the accident occurred that resulted in plaintiff's broken ankle. Plaintiff replied that she had not been "recovering from anything else," but that she had taken time off, and, that she had injured her ankle the day after she returned. Newsome responded by laughing derisively. Adams' statement and Newsome's conduct both reflected that defendants had maliciously published defamatory statements to plaintiff's co-workers in an effort to injure plaintiff in her profession.

184.   On March 9, 2004, defendant Rios instructed plaintiff to work on a pro se motion in People v. Aaron Pino (Queens Ind. No. 1578/98), but told Newsome to telephone the assistant district attorney who was assigned to that case and advise her that the case would be marked submitted. It was extremely unusual for a clerical secretary to make such a call. This occurrence constituted an adverse employment action against plaintiff in which defendant Rios took a job duty away from her and transferred it to Newsome.

185.   On March 11, 2004, plaintiff stated to defendant Rios that she was reserving the right to commence litigation based upon the fact that she had been

67

unlawfully coerced into taking annual leave.   It was evident that the hostile nature of the workplace environment had been increasing exponentially in an intensified effort to drive her to resign and that, if she did not quit, she soon would be discharged. Immediately after plaintiff made that statement, he and Newsome met behind closed doors in his office.

186.    On March 12, 2004, Newsome engaged in a personal telephone conversation during which she related that she had spoken to someone in the court system about her "situation with the Judge" and that the discussion was "very intricate."

187.    On March 15, 2004, Justice Rios handed plaintiff the short form orders that she had prepared with respect to motions that had been filed in two criminal cases.  He had signed them.  Plaintiff attempted to discuss another pending motion with him.  He impatiently waved his hand in circles and walked away.  A few minutes later defendant Newsome entered his office and they engaged in small talk.

188.    On March 19, 2004 at approximately 10:52 a.m., Justice Rios' acquaintance, Judy Vargas, telephoned chambers.  Plaintiff answered the call because Newsome had not arrived.  Although Vargas had spoken to plaintiff many times in the past, she apparently was under the impression that a new employee was working in chambers - - she expressed her belief that plaintiff would not know her and identified herself as "a friend of the Judge."  Those comments demonstrated that defendant Rios had made defamatory statements about plaintiff to Vargas in which he had falsely claimed that plaintiff had been discharged.  Those defamatory statements tended to injure plaintiff in her profession; they also evidenced defendant Rios' intention to discharge plaintiff.  Vargas noted that she did not have defendant Rios' cell phone number or the name of the hotel at which he was staying in Puerto Rico, and, that, inasmuch as she was supposed to meet him that night, it was necessary for her to contact him to discuss the details.  Plaintiff truthfully replied that he had not given his cell phone number to her or furnished her with any information about the hotel.  Vargas requested that plaintiff ask Newsome to telephone her, in the event that Newsome either came to work or called chambers that day.

68

189.  On March 23, 2004, plaintiff asked Justice Rios whether she
should pick up his paycheck for him. Although plaintiff had routinely performed that
task, he told her that Newsome would be assuming that duty. Subsequently, in the
presence of plaintiff, he handed Newsome two subpoenas and an order to show cause
that had been submitted for his signature. He instructed her to distribute them to the
individuals who had submitted them. It was highly unusual for a clerical secretary to
perform such a task while a law clerk was present. Plaintiff had routinely distributed
such papers since the commencement of her employment as his law clerk. In taking
job duties away from plaintiff and transferring them to Newsome that day, defendant
Rios again undertook adverse employment actions against plaintiff.

190.  On March 24, 2004, Louise Conway came to chambers. Justice
Rios was at the Appellate Term. Newsome invited Conway into his office. They met
alone in there. Conway reviewed various cases with Newsome.

191.  On March 24, 2004, plaintiff discovered that the USB port in the
front of her court-issued computer had been damaged so that she was unable to
connect her printer to it. The inside of the port appeared to have been mangled.

192.  On March 26, 2004, Newsome was out on sick leave. Plaintiff
advised Justice Rios that two days earlier, while he was at the Appellate Term,
Newsome had invited Louise Conway into his office and that they had met in there to
discuss various cases. She told him that the occurrence had seemed unusual
inasmuch as he had instructed both plaintiff and Newsome that he did not want anyone
to use his office. Plaintiff noted that instead of acting toward Newsome as Newsome
had acted toward her, she did not order Newsome to leave his office. Plaintiff stated
that, inasmuch as she was under the impression that she was not even allowed to enter
his office to use the books on his shelves for research while he was out, it appeared
"confusing" that Newsome had held a private conference there with Conway. Instead of
stating that plaintiff was allowed to enter his office for such purposes, or criticizing
Newsome, he angrily answered that the matter was "not a priority" for him, and that he
was busy thinking about other things. He curtly added that he would speak to

69

Newsome about it. As described above, when plaintiff had entered his office on December 4, 2003 to spend two minutes reviewing the New York Law Journal, he had screamed at plaintiff, ordered her to leave for the day and (one week later) coerced her into taking annual leave under threat of immediate discharge. He did not take any such actions against Newsome. He also did not treat Newsome in a demeaning manner, give her brochures about a mental health program, take job duties away from her, complain to officials of OCA about her, plot to fire her and make statements to others about her in an effort to destroy her career.

193.    On March 26, 2004, a few minutes after plaintiff had talked to Justice Rios about Newsome's use of his office for a private conference with Conway, he left chambers. He returned holding mail that he obviously had just personally retrieved (inasmuch as plaintiff had not been told that Newsome was not coming to work that day, she had not checked for the mail). The mailboxes were located near defendant Fisher's chambers on the fifth floor of the courthouse. Those circumstances indicated that defendant Rios probably had met with defendant Fisher in reaction to plaintiff's statements, which obviously had related to the discriminatory treatment to which she had been subjected.

194.    On March 29, 2004, Newsome left early due to illness. That afternoon, plaintiff observed that the light on Newsome's telephone was flashing to indicate that there were new messages. Plaintiff tried to retrieve them, only to hear a recording that stated, "Log in incorrect." A second attempt led to the same result. Plaintiff thereby learned that the password apparently had been changed while she was on the coerced annual leave described above.

195.    On March 31, 2004, plaintiff attempted to speak to Justice Rios regarding pending motions in People v. Glyndun Sangster and Olive Sangster (Queens Ind. No. 593/03). He angrily stated that he was "too busy," but shortly thereafter engaged in small talk with Newsome. That day, he instructed Newsome to tell the court reporter to come to chambers. Such telephone calls are routinely made by the law clerk, not the clerical secretary. Plaintiff had performed that task since the commencement of her employment as defendant Rios' law clerk. In taking another

70

duty away from plaintiff and transferring it to Newsome, he again undertook an adverse
employment action against plaintiff. That afternoon, plaintiff mentioned to him that the
voice mail password apparently had been changed, and, she did not have the new
password. He replied, "Okay." He did not provide her with the new password. His
reaction evidenced that the work environment had become surrealistically hostile to
plaintiff - - she was not even permitted to utilize the voice mail. The manner in which
she was treated clearly was designed to drive her to resign. Plaintiff added, "So,
apparently it was changed since I was coerced into taking annual leave." He stated that
plaintiff was "harassing" him, and that he was "too busy" to speak to her. Moments
later, Newsome walked up to him. They conferred with each other in hushed voices.

   196. Shortly after 4:00 p.m. on March 31, 2004, plaintiff exited the
clerk's office, after giving the orders that determined the pending motions in *People v.
Renato Wilson* (Queens Ind. No. 2732/01) and *People v. Harold Barton* (Queens Ind.
No. N10026/99) to the part clerk, Dennis Miller. As she left that office, defendant Rios
entered it. Shortly thereafter, as plaintiff was walking toward an elevator, she observed
Miller, who was standing next to a female co-worker. Miller stated to that co-worker that
someone was "taking over . . ." and abruptly ceased speaking as he apparently first
noticed plaintiff. He motioned to his co-worker to end their discussion. Subsequently,
in chambers, defendant Rios announced to plaintiff that he was going to change the
decisions that she had drafted in *People v. Glyndun Sangster and Olive Sangster*
(Queens Ind. No. 593/03). Plaintiff attempted to discuss the motions with him. He
replied, "I'm not working on that now," and stated that he was too busy to talk to her.
He walked away without giving her the motion papers or any further instructions.
Apparently, the only reason that he had commented to plaintiff about the motions was
to demonstrate that he intended to retaliate for her earlier observation that the voice
mail password had been changed after she had been coerced into taking annual leave.
As noted above, earlier in the day, when plaintiff had attempted to speak to him about
the same motions, he also had declared that he was "too busy" to speak to her.  After
the transfer to Jamaica, he had adopted the practice of frequently replying that he was
"too busy" to talk to plaintiff when she tried to speak to him about work.

197.   On April 1, 2004, Newsome telephoned the part clerk and told him

that defendant Rios had left to go to the courtroom.  Such telephone calls are routinely performed by principal law clerks, not clerical secretaries.  Until plaintiff was coerced into taking annual leave, she routinely performed that task.  In taking an additional job duty away from her and transferring it to Newsome, defendant Rios again undertook an adverse employment action against her.

198.   On April 1, 2004, Justice Rios instructed Newsome to find a

decision in which he had made a specific ruling.  She unlocked a drawer, revealing that she was keeping the copies of decisions that he had previously made.  It is not within the ambit of duties of a clerical secretary to review decisions to locate particular rulings. Until plaintiff had been coerced into taking annual leave, she had kept all of the copies of his decisions since the inception of her employment as his law clerk.  During the same period, whenever he wanted to see one of his prior rulings, only plaintiff reviewed his decisions and provided it to him.  In transferring those duties to Newsome, he again undertook adverse employment actions against plaintiff.  Additionally, it almost certainly was unprecedented for a justice's decisions to be kept under lock and key so that his law clerk would not see them.

199.   On April 7, 2004, Agnes Kirschner, the principal law clerk to Justice

Allan Weiss, stated to plaintiff, "I heard that you were out sick and that, when you came back, you broke your bone and you were out again."  Plaintiff replied that she had broken her ankle, and that she had been out before that, but that the prior absence was not due to illness.  Kirschner appeared flustered and remarked, "Oh, I don't know why you were out."  Her supervisor, Justice Weiss, had been a member of the Continental Regular Democratic Club.  He had become a civil court judge, and subsequently a supreme court justice, with the support of Koslowitz, Manton, Sweeney and Reich. Kirschner's incorrect statement about the cause of plaintiff's absence mirrored that which had been made by the senior law librarian on March 9, 2004.  Kirschner's remark evidenced that defendants had maliciously published defamatory statements to plaintiff's co-workers in an effort to injure plaintiff in her profession.

200.   On April 12, 2004, a clerk, who was filling in for Dennis Miller,

72

entered chambers. Without speaking to plaintiff, he told Newsome that an attorney had submitted papers in connection with a motion. She replied that he should leave it on Miller's desk because that is what she "always" did with such papers. The fact that a substitute clerk entered Justice Rios' chambers, ignored his law clerk and discussed motion papers with a clerical secretary evidenced the widespread nature of the defamatory statements pertaining to plaintiff that defendants made on an ongoing basis in their malicious efforts to damage plaintiff in her profession.

201.    At approximately 10:54 a.m. on April 13, 2004, during a brief telephone conversation, after pausing to listen, Newsome replied, "Screen saver - - all right." That afternoon, plaintiff observed that the screen saver on Newsome's computer, which had read, "On Christ the solid rock I stand!!," since on or about May 27, 2003, had been changed to a standard screen saver. Those events indicated that the caller was aware of Newsome's religious animosity toward plaintiff, and, had directed her to conceal evidence that indicated that, in engaging in discrimination against plaintiff, Newsome apparently believed that she was participating in a religious mission. The occurrences also reflected that plaintiff's discharge was imminent.

202.    On April 13, 2004, Paula Reardon, defendant Fisher's secretary, telephoned plaintiff and asked if she would be attending an upcoming court attorneys' seminar. Reardon stated that Justice Fisher's chambers had sent out an e-mail regarding it to all of the justices in March 2004. Plaintiff replied that she had not heard about it. Reardon responded, "Oh, maybe the judge didn't think you should go." Subsequently, plaintiff informed Justice Rios about the call and asked him whether she could attend the seminar. Newsome began giggling. Defendant Rios smirked and retorted, "Forget it!" He walked into his office. Plaintiff telephoned Reardon and related that Justice Rios did not want her to attend the seminar. Newsome entered defendant Rios' office and met with him behind closed doors. As noted above, in coercing plaintiff to take annual leave, defendant Rios also had prevented her from attending the Legal Update Program for Court Attorneys held in January 2004. In prohibiting her from attending another seminar, he again undertook an adverse employment action against her. In view of ensuing events, it appears that his reply, and Newsome's reaction,

demonstrated that they both were aware that plaintiff's discharge ⬤ fast approaching.

203.   At approximately 4:39 p.m. on April 13, 2004, Louise Conway entered Justice Rios' office through his private entrance. As soon as Conway began speaking to him, he called out, "Judy, are you here?" After plaintiff responded affirmatively, he stated, "Okay - - good night," and closed his door. Immediately thereafter, he and Conway left together, exiting though the door that led from his office to the hallway.

204.   On April 15, 2004, while he was engaged in a telephone call, defendant Rios asked the other party, "You know about the law secretary?" That question evidenced the ongoing nature of the defamatory statements made by defendants to damage plaintiff's career and the fact that her discharge was at hand.

205.   On April 16, 2004, defendant Fisher was designated as an Associate Justice of the Appellate Division, effective May 3, 2004. That day, defendant Rios presented plaintiff with a completely rewritten version of the decision that she had drafted for him in connection with the pending motion in *People v. Olive Sangster* (Queens Ind. No. 593/03). He also directed her to change the proposed decision that she had drafted concerning the motion that had been submitted by the co-defendant. He had not spoken to plaintiff regarding those motions since he had announced to her, more than two weeks earlier, that he was going to change the proposed decisions. That announcement appeared to constitute retaliation for her accurate statement that, after she had been coerced into taking annual leave, the voice mail password in chambers had been changed so that she could not use it. At that time, and prior thereto, he had denied plaintiff's requests to discuss the motions, asserting that he was "too busy" to do so. After he gave her the rewritten version of the decision, plaintiff again attempted to speak to him about the motions. Although it clearly is a primary function of a principal law clerk to engage in such discussions, he appeared extremely annoyed when plaintiff sought to perform that duty. Almost as soon as she began to address the motions, he declared that he intended to proceed as he had indicated and walked away. After he entered his office, plaintiff commented that his conduct toward her obviously was motivated by his bias against her religion. Defendant Rios later

74

stated to plaintiff that he had rewritten the decision so that plaintiff would not have to do so. Plaintiff prepared the decisions as he had directed, and, gave them to him. Soon thereafter, defendant Rios exited chambers for a lengthy period of time. During that period, defendant Fisher's secretary, Paula Reardon, telephoned and asked to speak to Newsome. Plaintiff informed her that Newsome had stepped out. Reardon did not leave a message. Subsequently, defendants Rios and Newsome returned to chambers. They were smiling at each other, and, smirking. At approximately 5:30 p.m., D'Angelis telephoned chambers and asked to speak to Justice Rios. In light of the surrounding circumstances, the significance of a telephone call from D'Angelis at that time was self-evident. Before leaving for the weekend, plaintiff remarked to Justice Rios that she wondered what had happened to the case in which a jury had found that D'Angelis had unlawfully retaliated against an employee. Plaintiff then wished Justice Rios a good weekend and exited chambers.

206.   At approximately 9:00 a.m. on April 19, 2004, defendant Rios entered chambers accompanied by Major Gardner. He instructed plaintiff to enter his office. She did so. Gardner remained in the anteroom. Reading from a letter, defendant Rios stated that plaintiff's services were no longer needed. He said that she would be placed on administrative leave until May 5, 2004, and, that she would be terminated as of that date. He handed her the original of the letter, in an envelope, as well as the photocopy from which he had read. She stated that she intended to commence litigation against him. He told her to give her employee identification card to him. She complied with that instruction. He directed Gardner to escort her out of the premises. She walked to her desk to retrieve her briefcase. She stated to Gardner that she would give him her key to chambers. As she was removing it from her key chain, Gardner impatiently hovered over her. Plaintiff asked him if he knew George Neilson (the court officer who had won a judgment against D'Angelis and the major of court officers at Kew Gardens based upon their unlawful retaliation against him). Gardner became visibly angry. Fuming, he replied, "Yeah, I know him - - yeah I know him!" Surprised at the harshness of his demeanor under the circumstances, she repeated, "You know him?" She also inquired as to whether Gardner was aware of Neilson's

lawsuit. Gardner vehemently reiterated that he knew Neilson. Seconds later, plaintiff handed her key to Gardner and put on her coat. As she was leaving, she stopped in front of the door that led from the anteroom to the hallway. Plaintiff stated to defendant Rios, who had remained in his office, that his conduct toward her - - and the fact that he had engaged in affair with an assistant district attorney who was assigned to his part - - showed that he was, "sick, pathetic and a disgrace." She then exited chambers. Gardner followed her. He departed from her in a public area, near the elevators. She visited the personnel office on the fifth floor. After speaking to an employee regarding her medical benefits and accumulated annual leave, she left the courthouse.

207.   In light of the symbiotic relationship that defendants Koslowitz, Manton, Sweeney and Reich have with defendants Lippman, Fisher and Rios, it is clear that they were active participants in plaintiff's termination, as well as in the adverse employment actions taken against her prior to her discharge. In those efforts, defendant Higgins acted as defendant Koslowitz's eyes and ears in the courthouse. Defendants Rios and Newsome continuously consulted with Higgins regarding the unlawful actions that were taken against plaintiff. Higgins relayed messages back and forth between defendants Rios and Koslowitz regarding that improper activity. In retaliating against plaintiff based upon the unlawful political motives described herein, defendants violated plaintiff's rights to equal protection of the laws. Such political retaliation is not permissible in the court system.

208.   In an attempt to damage plaintiff's reputation in anticipation of litigation, Gardner wrote a memorandum "To: File" dated April 19, 2004, which contained the defamatory statement that plaintiff "began ranting" while she was gathering her belongings, and, attempted to create the false impression that plaintiff was removed from the building due to such conduct. Defendant Rios actually instructed Gardner to escort plaintiff out of the premises before she entered the anteroom to take her coat and briefcase. Additionally, plaintiff was not escorted out of the building; Gardner left her in a public area. Subsequently, plaintiff engaged in a conversation in the personnel office. Gardner was not present. Plaintiff exited the courthouse alone after leaving that office. Those facts demonstrate that Gardner had

no concern whatsoever about plaintiff's conduct. The facts also evidence that his lack of concern was warranted. By writing and publishing that unusual report, Gardner violated plaintiff's right to equal protection of the laws. He wrote it to retaliate against plaintiff, *inter alia,* for the statements that she made regarding defendant Rios' commission of judicial misconduct, her intent to commence litigation against defendant Rios and the questions that she posed to Gardner regarding whether he knew Neilson or was aware of Neilson's lawsuit. The only threat that could have been gleaned from plaintiff's statements was that she might commence litigation against Gardner and D'Angelis, as well as against defendant Rios. Nevertheless, Gardner included in his report the extremely damaging statement that, "All security personnel were notified that Ms. Memblatt is no longer employed in the Unified Court System, and to notify me if she enters the building." At a deposition that was taken on March 5, 1999, pursuant to the decision in *Sheppard v. Beerman,* 94 F.3d 823, by which the Second Circuit remanded that action to the district court, Major Edward McLaughlin ( now deceased) testified that no written report is made when a person is escorted out of the courthouse, unless that person is arrested. He also explained that no written report would have been made to document that Sheppard had been escorted out of the courthouse after he was discharged from his employment as the law clerk to Justice Beerman.

209.    Defendants' concern that plaintiff would commence litigation also was shown by an amendment to Gardner's typed report of April 19, 2004. The amendment was not initialed or dated. It added the handwritten statement, "During this conversation, Ms. Memblatt also referred to Judge Rios having slept with a A.D.A. who had a case before him." That amendment distorted plaintiff's statement, in which she noted that defendant Rios had engaged an affair with an A.D.A. who had been assigned to his part - - not one who had a single case before him.

210.    In a letter to Justice Fisher, dated April 22, 2004, plaintiff stated that,

> As you must have long been aware, the unconstitutional actions taken
> regarding the terms and conditions of my employment as the Principal
> Law Clerk to Justice Jaime A. Rios, including my termination, will be the
> subject of litigation as will related defamatory statements made by him,

77

Sandra Newsome, Heidi Higgins, Anthony D'Angelis and others within and without OCA. Your actions in connection with these matters, and with respect to Justice Rios' conduct in office, may come under governmental scrutiny. Accordingly, you are hereby reminded that all evidence regarding same must be preserved . . .

211.   In a letter that was delivered to defendant Rios via FAX

transmission on April 22, 2004, plaintiff stated that,

As you have long been aware, your unconstitutional actions regarding the terms and conditions of my employment, including my termination, will be the subject of litigation, as will the defamatory statements that you have made regarding me to individuals within and without the Office of Court Administration. Further, your conduct in office is likely to come under governmental scrutiny. Accordingly, you are hereby reminded that all evidence regarding same must be preserved . . .

Please ensure that all of my personal property is returned to me. Obviously, I had no reasonable opportunity to remove all such items, inasmuch as your blatant efforts to demean and disparage me included causing a Court Officer to escort me out of the premises moments after I was informed of my termination.

212.   By a letter dated April 22, 2004, defendant Rios advised OCA's

counsel, Michael Colodner, of his receipt of the aforementioned FAX transmission of the same date. Defendant Rios enclosed a copy of plaintiff's letter and requested that Colodner call if he had "any questions or suggestions." Defendant Rios cc'd his letter to defendants DeSole and D'Angelis.

213.   By a letter to plaintiff dated April 28, 2004, defendant Rios stated,

"Please contact Major Robert Gardner for the return of your personal property . . ." The letter purportedly was transmitted "Via FAX and Regular Mail," but plaintiff did not receive any copy of it by FAX.

214.   On April 29, 2004, plaintiff filed a complaint against Justice Rios

with the New York State Commission on Judicial Conduct ("Commission on Judicial Conduct") by express mail. A copy of it was delivered to Chief Judge Kaye by express mail. That complaint pertained to the conflict of interest regarding A.D.A. Lutsky. It

also encompassed the improper *ex parte* communications between Justice Rios and A.D.A. Reibstein regarding the retrial of *People v. Tyrone Johnson* (Queens Ind. No. 2002/00). In her complaint, plaintiff noted that, "Justice Rios' improper actions regarding my employment will be addressed in future litigation . . ."

215.   On May 4, 2004, plaintiff filed a complaint with the Commission on Judicial Conduct regarding Justice Fisher by certified mail. It was delivered the next day. A copy of it was delivered to Chief Judge Kaye on May 4, 2004 via express mail. It concerned defendant Fisher's failure to act despite his apparent knowledge of serious misconduct on the part of Justice Rios with respect to the conflict of interest involving A.D.A. Lutsky. In that complaint, plaintiff stated that, "Any support that may have been provided by Justice Fisher to Justice Rios, in aid of his improper actions regarding the terms and conditions of my employment, as well as my termination, will be addressed in future litigation, which also will encompass other violations of my constitutional rights and related defamatory statements."

216.   On May 6, 2004, plaintiff telephoned Gardner regarding her property. He unconstitutionally restricted her right to enter the public areas of the courthouse by requiring her to notify the court officers at the public entrance to contact Lieutenant Sullivan for the purpose of having him escort her to the third floor, where defendant Rios' chambers were located. In imposing those conditions, rather than simply informing her to go to the security desk on the third floor and request that the court officer at the desk contact the security office so that she could be escorted inside the nonpublic area of the courthouse, Gardner violated plaintiff's rights to equal protection of the laws by singling her out in retaliation for the oral statements that she made regarding defendant Rios' commission of judicial misconduct, her intent to commence litigation against defendant Rios, the complaints that she filed with the Commission on Judicial Conduct, the substance of those complaints [including the statements contained therein reporting the improper *ex parte* communications between Justice Rios and A.D.A. Reibstein regarding the retrial of *People v. Tyrone Johnson* (Queens Ind. No. 2002/00)] and the questions that she posed to Gardner on April 19, 2004 regarding whether he knew Neilson or was aware of Neilson's lawsuit. At

depositions taken in early-1999, pursuant to the decision in *Sheppard v. Beerman*, 94 F.3d 823, Major Edward McLaughlin, Captain John Allen and Court Officer Joseph Grimaldi all testified that, in December 1990, they were directed to inform Sheppard that he was being terminated and to remove him from the courthouse. During his deposition, then-Chief Clerk John Corcoran stated that then-Administrative Judge Lerner issued those instructions at a meeting that was attended by then-Deputy Chief Clerk Anthony D'Angelis and Justice Beerman, as well as Major McLaughlin. In his deposition, which was taken on October 15, 1998, Justice Lerner stated that he ordered the court officers to escort Sheppard out of Justice Beerman's chambers, but proclaimed that, inasmuch as a courthouse is a public place, he did not instruct them to remove Sheppard from the building. During their depositions, Justice Lerner, McLaughlin, Allen and Grimaldi all declared that, inasmuch as the courthouse was a public building, Sheppard was entitled to reenter the public areas immediately after he was removed from it. Justice Lerner testified that such unimpeded right of reentry existed regardless of his assertion that he instructed the court officers to remove Sheppard from Justice Beerman's chambers because he believed that Justice Beerman feared physical harm from Sheppard. Justice Lerner averred that the basis for that belief was Justice Beerman's claim that Sheppard had been ranting and raving at him. McLaughlin, Allen and Grimaldi also testified that any individual who is escorted out of a courthouse due to unruliness is entitled to reenter the public areas immediately upon the cessation of that unruliness. The testimony at those depositions clearly evidenced that the restrictions on plaintiff's access to the public areas of the courthouse, which Gardner announced during a telephone conversation that occurred more than two weeks after she was informed of the termination of her employment, violated plaintiff's constitutional rights to equal protection of the laws.

217.   During the telephone conversation of May 6, 2004, Gardner stated that he had selected Lieutenant Lynne Franzone to escort plaintiff in chambers after Lieutenant Sullivan escorted her to the third floor. Franzone was one of the court officers, under his control, who was posted outside Justice Rios' chambers on December 11, 2003 for no purpose other than to damage plaintiff's reputation. While

she was so engaged, other OCA employees predictably inquired about that unusual assignment. Franzone laughed and replied that she was posted there due to plaintiff.

218. On May 6, 2004, Gardner wrote a memorandum "To: File" regarding his telephone conversation with plaintiff. His repeated preparation of reports in situations where no reports ordinarily would have been made, the false impression of plaintiff created in those reports and their inclusion in the personnel file maintained by OCA regarding plaintiff evidenced that many of defendants' actions against her were intended to protect defendants from any litigation that she might institute against them. His reports were written in attempts to manufacture "evidence" to be offered under the guise that they constituted business records, although it actually was not the ordinary course of business for such reports to be made. In making those unnecessary and self-serving reports, Gardner violated plaintiff's rights to equal protection of the laws for the unlawful retaliatory purposes set forth above. Inasmuch as his report of May 6, 2004 indicated that he was continuing to consult with defendants Rios and D'Angelis regarding plaintiff, it appears that they participated in these violations of plaintiff's rights. The surrounding circumstances reflected that defendants DeSole and Lippman also were involved in these infringements upon plaintiff's constitutional rights.

219. On May 6, 2004, plaintiff asked the court officers at the front desk to notify Lieutenant Sullivan of her arrival. When he approached her, they watched and laughed, while members of the public observed. His demeanor was decidedly hostile. He smirked as he told plaintiff that he was taking her to Lieutenant Franzone. While he escorted plaintiff through public areas, he loudly broadcast transmissions about plaintiff over his radio, as though he was transporting a prisoner. Members of the public and court employees saw and heard that display.

220. On May 6, 2004, plaintiff gathered her books and some other items in chambers. Franzone stated that the remainder of her property could be kept in the security office until she returned and retrieved it. Franzone said that there was no time restriction. Plaintiff indicated that she probably would return the next week. Franzone instructed her to telephone Gardner in advance of her arrival. Plaintiff asked to be

permitted to leave on her own through the public areas after Franzone escorted her out of the restricted area. Franzone replied, "I'm afraid that won't be possible." Plaintiff responded, "So, I have less rights than other members of the public?" Franzone did not reply. She escorted plaintiff to the doorway of the building. Members of the public and court employees observed.

221.   On May 6, 2004, Lieutenants Sullivan and Franzone prepared their own unnecessary, self-serving and defamatory reports regarding plaintiff. The circumstances indicated that defendants Gardner, D'Angelis, DeSole, Lippman and Rios caused them to do so for the unlawful purposes set forth above.

222.   On May 10, 2004, plaintiff telephoned Gardner and notified him of her desire to retrieve additional items of her property that afternoon. He again unconstitutionally restricted her right to enter the public areas of the courthouse by requiring her to notify the court officers at the public entrance to contact the security office so that she could be escorted to the third floor.

223.   On May 10, 2004, plaintiff informed the court officers at the main entrance to the building that Gardner wanted them to contact his office to let them know that she had arrived. They laughed about the matter as members of the public observed. Plaintiff was escorted through public areas by a court officer who broadcast load radio transmissions regarding her presence in the building. Members of the public and court employees witnessed this spectacle.

224.   On May 26, 2004, plaintiff returned a telephone message that Gardner had left for her. He told her that he wanted to arrange to have the remainder of her property delivered to her home by court officers, or, for her to retrieve it. Contrary to Franzone's statements, he declared that he had no room in his office for the items. Plaintiff replied that she did not want court officers to come to her home. As she attempted to discuss retrieving the property, he interrupted by shouting, "Fine, then it will be put in storage with fiscal and you can pick it up whenever you want!" Plaintiff stated that he had imposed conditions upon her presence in the courthouse that were not even imposed upon convicted criminals who were out on bail. Plaintiff asserted that

82

his insistence that she not enter the public areas by herself, but that she must instead announce herself to the court officers at the front desk and be escorted by court officers through those areas, was extremely demeaning. Plaintiff noted that there was no valid reason for that restriction upon her right of access to a public building. Gardner actually denied that there were any such restrictions and absurdly proclaimed that he had simply been trying to "help." Plaintiff replied, "That's not true," and related that when she had asked Lieutenant Franzone whether she could leave the building by herself, once they had exited the nonpublic areas, Franzone had refused. As soon as she completed that statement, Gardner hung up the telephone.

225.   In another attempt to damage plaintiff's reputation in anticipation of litigation, and to retaliate against her, Gardner wrote a memorandum "To: File" dated May 26, 2004, which purported to chronicle the conversation that he had with her on that date. In making that report, he again attempted to fabricate "evidence." His report was permeated with defamatory statements. In it, rather than providing a truthful account of that conversation, he falsely claimed that plaintiff "began ranting about how she is treated in this building," and that plaintiff "continued to ramble" during this conversation. The disinformation contained in this report was published by Gardner to others in a malicious attempt to injure plaintiff in her profession and to create a false impression regarding her mental state. The surrounding circumstances indicated that defendants D'Angelis, Rios, DeSole and Lippman were involved in the preparation of this defamatory report.

226.   On May 28, 2004, plaintiff filed a second complaint against Justice Rios with the Commission on Judicial Conduct, by certified mail. It was delivered on June 2, 2004. A copy was delivered to Chief Judge Kaye on June 1, 2004 by certified mail. It reported the 1996 calendar that Justice Rios made, which included his handwritten entry for May 16 that stated: "6 PM  County Dinner 2 Tickets @ 300." Plaintiff's complaint also related, *inter alia,* that he inappropriately utilized Appellate Term stationery to send a letter that was addressed to Ms. Jayne McGee, Casino Host, Treasure Island Hotel, which was dated November 16, 2001. In that letter, Justice Rios remarked that Ms. McGee's "joviality" suggested that she was, "definitely a party

83

person," and commented, "I look forward to sharing some laughs ⬤ you in January." He also wrote that, "As in the past our group looks forward to the Super Bowl party and Treasure Island's customary hospitality." As stated in the complaint, his letter reflected that he had detracted from the dignity of judicial office and that he had attempted to use the prestige of that office to advance the private interests of himself and others in violation of the Rules Governing Judicial Conduct, 22 N.Y.C.R.R. §§ 100.1, 100.2 and 100.4. A copy of said letter is annexed as Exhibit "R" hereto and is incorporated by reference as if fully set forth herein.

227.    On June 17, 2004, plaintiff telephoned Ross Teichman at the personnel office of the courthouse to determine whether her lump sum check for accumulated annual leave had arrived. He stated that it had been delivered, but that it could not be mailed to her at that time because there was no postage remaining in the Pitney Bowes meter. He suggested that she come to his office to retrieve it. Not eager to suffer any further damage to her reputation as a result of the conduct of the court officers at that courthouse, she told him that she would prefer that his office mail it to her as soon as possible. After he replied that it might not be mailed until the following week, she agreed to retrieve it. He informed her that she could sign for it any time before 4:45 p.m. He did not direct her to announce her presence to the court officers at the main entrance to the courthouse. Upon her arrival, she entered the courthouse in the same manner as did the other members of the public. No one prevented her from so doing. After she signed for the check and approached the public elevators to leave the building, a court officer breathlessly ran up to her. In the presence of members of the public, he loudly declared that he had been instructed that she was, "not allowed in the building." He announced into his radio, "I have her on the fifth floor." He demanded that she inform him of the reason for her presence in the courthouse. She replied, "I'm here to pick up my check." He repeated her response into his radio and walked away. Plaintiff took the public elevator to the lobby. As she exited through the main entrance, the court officers at the front desk laughed loudly. Members of the public observed.

228.    In August 2004, pursuant to a FOIL request that had been made by plaintiff, OCA disclosed the aforementioned improper reports and a letter, dated May

26, 2004, that Gardner purportedly had mailed to her.  Other than the copy that was delivered in connection with her FOIL request, she had never received that letter.  It falsely stated that she had refused to make any arrangements to retrieve the remainder of her property.  It also declared that he had consulted with D'Angelis, and, that they would store her property for thirty days, after which they would no longer be responsible for its safekeeping.  Inasmuch as plaintiff had not received the original of that letter, the thirty days had expired before she was aware of its existence.

229.    On August 23, 2004, plaintiff sent a letter to Gardner that provided an accurate account of their conversation of May 26, 2004 and the events of June 17, 2004.  It also stated that, pursuant to her FOIL request, plaintiff had received records that included, "a series of reports made by yourself, Lieutenant Lynne Franzone and Lieutenant Lawrence Sullivan that are replete with false and defamatory statements, as well as a letter, dated May 26, 2004, that you purportedly sent to me," and noted that, "I have never received this letter, except for the copy furnished in response to my FOIL requests . . . you never advised me that my property would only be kept for 30 days from the date of that purported letter."  Her letter asserted that, "The manner in which you and those acting under your direction have behaved toward me appears to be intended as retaliation for my statement to Justice Rios that I will be commencing litigation against him, the complaints that I have filed with the Commission on Judicial Conduct against him and Justice Fisher and the substance of those complaints."  Her letter demanded an end to the restrictions upon her right to access the public areas of the courthouse, the cessation of any further publication of the defamatory reports and the immediate removal of those reports, "from any files in which they  appear . . ."

A copy of said letter with proof of delivery is annexed as Exhibit "S" hereto and is incorporated by reference as if fully set forth herein.

230.    Plaintiff never received any response to her letter to Gardner.

It appears that the unconstitutional restrictions upon her right to access the public areas of the Jamaica courthouse have remained in effect and that the publication of the defamatory reports has continued.  It also appears that defendants have disposed of her property without any prior notice to her.

231.   Subsequent to her termination, plaintiff mailed approximately 338 resumes to prospective employers. She was not granted a single interview. In light of her professional experience, that result obviously was due to the damage that defendants have maliciously caused to her in her profession.

232.   On December 13, 2004, Eyewitness News broadcast a report by Sarah Wallace concerning the complaint that plaintiff filed against Justice Rios with the Commission on Judicial Conduct on April 29, 2004. That report focused on the *ex parte* communications between Justice Rios and A.D.A. Reibstein regarding the retrial of *People v. Tyrone Johnson* (Queens Ind. No. 2002/00). In her report, Wallace stated that Justice Rios and the Queens District Attorney's office both had conceded that he and Reibstein had engaged in two *ex parte* conversations pertaining to that retrial, in Justice Rios' office, although they contended that nothing improper was discussed. She related that, "The Judge, who refused repeated interview requests, said in a statement, 'All I remember is that Mr. Reibstein said he needed more time to prepare for trial'" during the first *ex parte* discussion. She reported that Justice Rios claimed to have no memory of the details of the second *ex parte* conversation. She noted that, "A spokesman for the D.A.'s office, which also declined to make anyone available, stated that, "Defense counsel was aware of the discussion." In an interview that aired as part of that report, Allan Brenner, Esq., who was Johnson's first trial counsel and represented him at the time of the first *ex parte* conversation, asserted that he was not informed about that discussion, "before or after the fact." Wallace recounted that Brenner said that he first learned of the *ex parte* discussion from the Eyewitness News investigators. She added that, "Brenner says after we called him, he also received a surprise phone call from Eugene Reibstein," during which, "Reibstein admitted that in their *ex parte* conversation, the Judge had brought up Henry Hanley, the prosecution's star witness, who later signed an affidavit that he lied," about having seen Johnson murder the victim.

233.   The information uncovered in the Eyewitness News report corroborated that there were *ex parte* communications between Justice Rios and A.D.A. Reibstein regarding the retrial of *People v. Tyrone Johnson* (Queens Ind. No. 2002/00)

and demonstrated that plaintiff's complaint raised very serious questions concerning judicial misconduct.

## FIRST CLAIM

## RELIGIOUS DISCRIMINATION - HOSTILE WORK ENVIRONMENT

234.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 233 as if fully set forth herein.

235.    As described above, during the course of her employment as the principal law clerk to Justice Rios, plaintiff repeatedly was treated in a demeaning manner by defendants Rios and Newsome, which was motivated in part by their animosity toward her religion, and, created an intimidating, offensive and hostile work environment that culminated in her wrongful discharge. Defendants DeSole and D'Angelis aided and abetted defendants Rios and Newsome in this discriminatory conduct. These defendants acted under color of state law when they engaged in said acts.

236.    The conduct of defendants Rios and Newsome in this regard violated 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, Article I of the New York State Constitution, the New York State Human Rights Law (Executive Law §§ 296 and 297) and the New York City Human Rights Law (Administrative Code § 8-101, *et seq.*)

237.    The conduct of defendants DeSole and D'Angelis in this regard violated Article I of the New York State Constitution, the New York State Human Rights Law (Executive Law §§ 296 and 297) and the New York City Human Rights Law (Administrative Code § 8-101, *et seq.*)

## SECOND CLAIM

## RELIGIOUS DISCRIMINATION - DISPARATE TREATMENT

238.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 237 as if fully set forth herein.

87

239.   As described above, during the course of her employment

as the principal law clerk to Justice Rios, plaintiff repeatedly was subjected to disparate treatment by defendants Rios and Newsome, which was motivated in part by their animosity toward her religion, and, culminated in her wrongful discharge.  Defendants DeSole and D'Angelis aided and abetted defendants Rios and Newsome in this discriminatory conduct.  These defendants acted under color of state law when they engaged in said acts.

240.   The conduct of defendants Rios and Newsome in this regard

violated 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, Article I of the New York State Constitution, the New York State Human Rights Law (Executive Law §§ 296 and 297) and the New York City Human Rights Law (Administrative Code § 8-101, et seq.)

241.   The conduct of defendants DeSole and D'Angelis in this regard

violated Article I of the New York State Constitution, the New York State Human Rights Law (Executive Law §§ 296 and 297) and the New York City Human Rights Law (Administrative Code § 8-101, et seq.)

### THIRD CLAIM

### RACIAL DISCRIMINATION - HOSTILE WORK ENVIRONMENT

242.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 241 as if fully set forth herein.

243.   As  described above, during the course of her employment

as the principal law clerk to Justice Rios, plaintiff repeatedly was treated in a demeaning manner by defendants Rios and Newsome, which was motivated in part by their animosity toward her race, and, created an intimidating, offensive and hostile work environment that culminated in her wrongful discharge.  They acted under color of state law when they engaged in said acts.

244.   The conduct of defendants Rios and Newsome in this regard

violated 42 U.S.C. § 1983, the Fourteenth Amendment to the United States

Constitution, Article I of the New York State Constitution, the New York State Human Rights Law (Executive Law §§ 296 and 297) and the New York City Human Rights Law (Administrative Code § 8-101, *et seq.*)

## FOURTH CLAIM

### RACIAL DISCRIMINATION - DISPARATE TREATMENT

245.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 244 as if fully set forth herein.

246.   As described above, during the course of her employment as the principal law clerk to Justice Rios, plaintiff repeatedly was subjected to disparate treatment by defendants Rios and Newsome, which was motivated in part by their animosity toward her race, and, culminated in her wrongful discharge. They acted under color of state law when they engaged in those acts.

247.   The conduct of defendants Rios and Newsome in this regard violated 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, Article I of the New York State Constitution, the New York State Human Rights Law (Executive Law §§ 296 and 297) and the New York City Human Rights Law (Administrative Code § 8-101, *et seq.*)

## FIFTH CLAIM

### UNLAWFUL CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983 - POLITICAL RETALIATION

248.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 247 as if fully set forth herein.

249.   As described above, the acts of defendants violated plaintiff's rights to equal protection of the laws by singling her out and retaliating against her for her participation and/or lack of participation in certain political campaigns, as well as for the cessation of plaintiff's relations with the Continental Regular Democratic Club and the Democratic Organization of Queens County. Such partisan political retribution is

not permissible in the court system. Defendants Koslowitz, Manton, Sweeney and Reich entered into an agreement with defendants Rios, Fisher, Lippman, Newsome, Higgins, DeSole, D'Angelis and/or Gardner to jointly participate in committing those unlawful acts. They also shared a symbiotic relationship. Defendants' purpose in engaging in said conduct was to unconstitutionally injure plaintiff. In so doing, they acted under color of state law.

250. Defendants' conduct in this regard violated 42 U.S.C. § 1983, as well as the First and Fourteenth Amendments to the United States Constitution.

## SIXTH CLAIM

### DENIAL OF EQUAL PROTECTION - RETALIATION FOR COMPLAINTS AND ATTEMPTED COMPLAINTS OF DISCRIMINATION

251. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 250 as if fully set forth herein.

252. As described above, the acts of defendants violated plaintiff's rights to equal protection of the laws by singling her out and retaliating against her for the oral complaints that she made regarding the discrimination to which she was subjected by defendants Rios and Newsome, and, for her attempts to raise such complaints with defendants DeSole and D'Angelis. Defendants engaged in those acts under color of state law.

253. Defendants' conduct in this regard violated 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, Article I of the New York State Constitution, the New York State Human Rights Law (Executive Law §§ 296 and 297) and the New York City Human Rights Law (Administrative Code § 8-101, et seq.)

## SEVENTH CLAIM

### DENIAL OF EQUAL PROTECTION - RETALIATION FOR STATEMENTS RELATED TO JUDICIAL MISCONDUCT AND OTHER MATTERS OF PUBLIC CONCERN

254. Plaintiff incorporates by reference the allegations set forth in



paragraphs 1 through 253 as if fully set forth herein.

255.    As described above, the acts of defendants violated plaintiff's rights to equal protection of the laws by singling her out and retaliating against her for the oral statements that she made regarding defendant Rios' commission of judicial misconduct, her intent to commence litigation against defendants, the complaints that she filed with the Commission on Judicial Conduct regarding defendants Rios and Fisher, the substance of those complaints and the questions that she posed to defendant Gardner on April 19, 2004 regarding whether he knew George Neilson or was aware of Neilson's lawsuit. Defendants engaged in those acts under color of state law.

256.    Defendants' conduct in this regard violated 42 U.S.C. § 1983, as well as the First and Fourteenth Amendments to the United States Constitution.

## EIGHTH CLAIM

### DEFAMATION - 42 U.S.C. § 1983

257.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 256 as if fully set forth herein.

258.    As described above, defendants defamed plaintiff by making and publishing false oral and written statements that stigmatized her, in conjunction with the adverse employment actions taken against plaintiff (including but not limited to her wrongful termination from employment), and, in conjunction with their efforts to damage her ability to gain other employment in the profession to which she is admitted to practice by the State of New York. Defendants published said defamatory statements with actual malice, with knowledge of their falsity and intent to injure plaintiff as aforesaid, or, acted with a high degree of awareness of the probable falsity of said statements or reckless disregard for the truth or falsity of said statements. As a result of their publication of such defamatory statements (including those oral and written statements detailed herein, as well as others), plaintiff's ability to gain other employment in the profession to which she is admitted to practice by the State of New York has been severely damaged.

91

259.   Defendants' conduct in this regard deprived plaintiff of constitutionally protected liberty interests in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

## NINTH CLAIM

### DEFAMATION - SLANDER

260.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 259 as if fully set forth herein.

261.   As described above, defendants published false and defamatory oral statements about plaintiff including but not limited to false and defamatory statements that tended to injure plaintiff in her profession and to expose plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of her in the minds of right-thinking persons and to deprive her of their friendly association in society. Defendants did so without privilege or authorization.  Defendants did so with actual malice, with knowledge of the falsity of said statements and intent to injure plaintiff as aforesaid, or, acted with a high degree of awareness of the probable falsity of said statements or reckless disregard for the truth or falsity of said statements.

262.   By reason of such publication of those oral statements, plaintiff has been damaged in her profession and her reputation.  She has been shunned and held up to scorn, ridicule and contempt by her colleagues, co-workers, former co-workers, acquaintances and the public. As shown above, due to said injuries to plaintiff in her profession and in her reputation, plaintiff has suffered economic damages, including but not limited to lost wages and her loss of opportunities for other employment.

## TENTH CLAIM

### DEFAMATION - LIBEL

263.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 262 as if fully set forth herein.

92

264.   As described above, defendants published false and defamatory written statements about plaintiff, including but not limited to false and defamatory statements that tended to injure plaintiff in her profession and to expose plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of her in the minds of right-thinking persons and to deprive her of their friendly association in society. Defendants did so without privilege or authorization.  Defendants did so with actual malice, with knowledge of the falsity of said statements and intent to injure plaintiff as aforesaid, or, acted with a high degree of awareness of the probable falsity of said statements or reckless disregard for the truth or falsity of said statements.

265.   By reason of such publication of those written statements, plaintiff has been damaged in her profession and her reputation.  She has been shunned and held up to scorn, ridicule and contempt by her colleagues, co-workers, former co-workers, acquaintances and the public.  As shown above, due to said injuries to plaintiff in her profession and in her reputation, plaintiff has suffered economic damages, including but not limited to lost wages and her loss of opportunities for other employment.

WHEREFORE, plaintiff demands a jury trial and the following relief jointly and severally against the defendants:

a.   Compensatory damages in the amount of $5,000,000;

b.   Punitive damages in the amount of $5,000,000;

c.   Costs, interests and attorney's fees; and

d.   Such other and further relief as this court deems just and proper.

Dated:   Queens, New York
February 15, 2005

JUDITH B. MEMBLATT
Plaintiff Pro Se
98-51 65th Avenue #2A
Rego Park, New York 11374
(646) 239-2635

93

A



 **M E M O R A N D U M**

DATE _____

FROM: JAIME A. RIOS
      SUPREME COURT JUSTICE
      125-01 QUEENS BOULEVARD
      KEW GARDENS, N.Y. 11415

791-1000

TO:

REpent before
it is too late.

B

MAY

7/28/96
Luis + Linda Read
457 6300

Danny's Rest

Dino (Tito)
Monday 9am
Frankell
2pm - FLATAU

Fordham 90

Fordham

Taire Lawyers

Kara Game + Ceremony at School

Judy Birthday / Misk Luis

Country Dinner
2 Tickets @ 300

6pm Puerto Rico

Hoto Ba Assoc

Luis Rodriguez
1pm - LUNCH

Joe Misk Denise
457 - 6500

1pm - Crown Plaza Hotel Rei Lara '0

Justin B-Day

Yale Univ

June

Lafuente

Verano Rico

Julie 7 - 16 Sun
v. cm

For _R_

Date _5/17_ ___ Time _3⁴⁰_

**WHILE YOU WERE OUT**

M _Virginia Scherdler_

From___

Phone No _718- 638 - 6000_

| Area Code | Number | Extension |

| | | | |
|---|---|---|---|
| TELEPHONED | | URGENT | |
| PLEASE CALL | ✓ | WANTS TO SEE YOU | |
| WILL CALL AGAIN | | CAME TO SEE YOU | |
| RETURNED YOUR CALL | | | |

Message___
_re: Bi-lingual job_

Operator

D

# 13

## Thursday
## June
## 1996



| May | | | | | | 1996 | June | | | | | | 1996 | July | | | | | | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 | | | | | | | 1 | | 1 | 2 | 3 | 4 | 5 | 6 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 26 | 27 | 28 | 29 | 30 | 31 | | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 28 | 29 | 30 | 31 | | | |
| | | | | | | | 30 | | | | | | | | | | | | | |

E

MEMORANDUM

DATE _____

FROM: JAIME A. RIOS
      SUPREME COURT JUSTICE
      125-01 QUEENS BOULEVARD
      KEW GARDENS, N.Y. 11415

TO:

Danielle

Mother

Hair

Century 21
Dry Cleaner - Shirt

Snacks for Trip

Princeton Review

F

# 1996 CALENDAR

Hon Hon Hon

HAWAII

| MON | TUE | WED | THU | FRI | SAT |
|-----|-----|-----|-----|-----|-----|
| 1 | 2 | 3 | 4 | 5 | 6 |
| 8 | 9 | 10 | 11 | 12 | 13 |
| 15 | 16 | 17 | 18 | 19 | 20 |
| 22 | 23 | 24 | 25 | 26 | 27 |
| 29 | 30 | 31 | | | |

| | | | 1 | 2 | 3 |
|---|---|---|---|---|---|
| 5 | 6 | 7 | 8 | 9 | 10 |
| 12 | 13 | 14 | 15 | 16 | 17 |
| 19 | 20 | 21 | 22 | 23 | 24 |
| 26 | 27 | 28 | 29 | | |

| | | | | 1 | 2 |
|---|---|---|---|---|---|
| 4 | 5 | 6 | 7 | 8 | 9 |
| 11 | 12 | 13 | 14 | 15 | 16 |
| 18 | 19 | 20 | 21 | 22 | 23 |
| 25 | 26 | 27 | 28 | 29 | 30 |

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| 8 | 9 | 10 | 11 | 12 | 13 |
| 15 | 16 | 17 | 18 | 19 | 20 |
| 22 | 23 | 24 | 25 | 26 | 27 |

**JUL**

| SUN | MON | TUE | WED | THU | FRI | SAT |
|-----|-----|-----|-----|-----|-----|-----|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

**AUG**

| | | | | 1 | 2 | 3 |
|---|---|---|---|---|---|---|
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**SEP**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

**OCT**

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |

G

2/12 - 2/17 #37⁹⁹

AARP → 18%₃₁¹⁵ ECONomy

OR
Gov't →

HERTZ (800) ✓ ror Conf# 98561945BC
                                    6
AVIS   3371212
(800)    Conf 19293019444@131³⁶



MERYL 8967468

Budget: $125⁶⁴ AARP
Conf 238237844S5
economy -

5 ( 131³⁶

ALAMO → IWK → AARP 5% CAUILER 24⁶⁷
    $12345 + TAX + much ‾140⁵⁸ +
5196121 [WEST TERMINAL]    Sunday
                          +
                          Tax

*for holiday*

11/17 (94) - 11/18, 11/18

1/19, 11/00

return

**TRIPS** | SAN DIEGO | → 2/17 (2)

2/11 PM or 2/12 AM off TH + Fri

Holiday Wed 2/12 fm

UM 3/17

PUERTO RICO EELT 94

Holy Thurs 4/24

Good Friday 4/25

4/26

4/27

Monday 4/28 — OFF (1)

THURS 5/22 - SAT 5/23 - 5/26

5/24

MEMORIAL 5/26 5/25 Monday

**VACATION** Mon 6/30 - 7/4 (4)

7/7 - 7/11 (5)

(9)

plan PR → 6/28 #12 → NY 7/13 #4

Honolulu 6/28 → NY 7/11

Seattle AUGUST

NOVEMBER → Tues 11/4 + 11/11 off Wed Thurs Fri + Mon. (4)

[Precise?]

11/26 11/27 11/28

Fri, SAT, SUN

12/25 PM Th, T, W, TH, Fri

SAT, SUN, Mon Tues

XMAS Thursday 12/25/97 1/5 1/6

new year's THURS —

H

Supreme Court
of the
State of New York



JAIME A. RIOS
JUSTICE

CHAMBERS
125-01 QUEENS BLVD.
KEW GARDENS, NEW YORK 11415

June 5, 1998

Honorable Nan Weiner
Executive Director
Governor's Judicial Committee
633 Third Avenue - 38th Fl.
New York, New York 10017

Dear Ms. Weiner:

Please be advised that I withdraw my application for the position of Associate

Justice - Appellate Division First Department.

Thank you for your past consideration and courtesy.

Yours truly,

Justice Jaime A. Rios

JAR/sn

cc: James F. Gill, Esq.

## THE QUEENS COUNTY COMMITTEE TO PROMOTE PUBLIC TRUST
### AND CONFIDENCE IN THE LEGAL SYSTEM MEETING -MONDAY, MAY 15, 2000

| NAME (PLEASE PRINT) | SIGNATURE | ORGANIZATION | TELEPHONE NUMBER |
|---|---|---|---|
| KENNETH BUETTNER | | YORK LADDER AVE | 718 - 784-6666 |
| JOEL HARAVAY | | FK LANE H.S | 718 6470100 X 2(70 |
| LUCY C. NUNZIATO | | Queens Chamber | 718 898-8500 |
| Cristine Briuglio | | Briuglio Const | 718 4284500 |
| STEVE EAGER | | TR Bob's Coach | 718.35.1008 |
| Evelyn Frazee | | Station PT Comm | (716)428-240 |
| William C Thayer | | QD Chars PTT Dentic | 918-722-1035 |
| ARTHUR W LONSCHEIN | | Sup.Ct. Queens | 718-520-3760 |
| Patricia P Satterfield | | Sup Ct Queens | 718-520-3884 |
| SIDNEY LEVISS Sidney Leviss | | Supt Chn | 718-520-3133 |
| Robert Nash | Robert L. Nahman | Surrogate Court exaleite | 718 520-3110 |
| Edwin Kassoff | Edwin Kassoff | Term Supreme | 7185203741 |
| Michael Reich | | Manton Sweeney Gallo Reich's Bosz 2ch | 718 459-5000 |
| Frank Bolz | | Manton-Sweeney Gallo Reich-Bolz | 718-459-900 |
| CHRISTOPHER RENFROE | | RENFROE & QUINN | 718.575.8852 |
| Spiros Tsimbinos | | ATTY Queens Bar | 718 849.3899 |

### THE QUEENS COUNTY COMMITTEE TO PROMOTE PUBLIC TRUST
### AND CONFIDENCE IN THE LEGAL SYSTEM MEETING -MONDAY, MAY 15, 2000

| NAME (PLEASE PRINT) | SIGNATURE | ORGANIZATION | TELEPHONE NUMBER |
|---|---|---|---|
| Allan Weiss | *[signature]* | Supreme Queens | 520-4727 |
| Frederick D R. Sampson | *[signature]* | Supreme QUEENS | 520-3903 |
| Gloria D'Amico | *[signature]* | County clerk | 520-3135 |
| Seymour James, Jr. | *[signature]* | The Legal Aid Society | 286-2020 |
| Cristina Bricaglio | *[signature]* | Bricaglio Const. | 718 4284500 |
| You J. Previte | *[signature]* | Private Pride Engr. | 718-459-5762 |
| Stephen Eagar | *[signature]* | Tierra Comed | 718-735-1000 |
| Joseph Farden | *[signature]* | Docs-Chamber Commerce — Pacific Farren Pools | 718 459-5460 |
| Jm. Sylva A. Milano | *[signature]* | Justice Supreme Ct. | 718 520-3743 |
| KLAUS EPPLER | Klaus Eppler | Stadevale Taub and custodian Comllen Braham Steen LLP | (212) 969-3245 |
| Amy Vance | *[signature]* | OCA | (212) 428-2145 |
| Arlene Hackel | *[signature]* | OCA | (212) 428-2501 |
| Karen Koslowitz | Karen Koslowitz | Council Member | (718) 544-3242 |
| Martha Farrell | *[signature]* | Council Member Koslowitz office | (718) 544-3212 |
| Dominick C. Ampa | *[signature]* | Ampa Organization | 718 939-4888 |
| JAIME RIOS | *[signature]* | Sup C1 | 5207144 |

**AC MEETING - MONDAY - MAY 15TH**

1. Hon. Judith S. Kaye
2. Hon. John Milano
3. Hon. Seymour Rockes (NO)
4. Hon. Allan Weiss
5. Hon. Mary Ellen Fitzmaurice
6. Kenneth Buettner
7. Dr. Frank A. Boltz
8. Michael Keic
9. Amy Vance
10. Stephen Eagar
11. Seymour James
12. ~~illegible~~
13. Gloria D'Amico
14. Councilman Morton Povman
15. Hon. Ann T. Pfau
16. Jeffrey Lawine
17. Ilya Buchter
18. Mr. Donohue — Con Ed
19. Judge Kassoff
20. Christopher Renfroe
21. George Rozmsky
22. Judge Leach
23. Joseph Farber
24. Joseph Previte
25. Hon Arthur W. Lonschein
26. Dominic Ciampa
27. Anna
28. Audrey
29. Judge Fisher

33. Hon. Evelyn Frazee
34. Hon. William C. Thompson
35. Kenneth Orew
36. Seymour James
37. Hon Patricia Satterfield
38. Hon. Jaime Rios
39. Hon. Frederick D.R. Sampson
40. Hon. Karen T. Eng.

31. Suzanne Zard
30. Tony Nunziato
31. Lucy Hug
32. Christine Eraquello

<u>J.A.C. MEETING - MONDAY, MAY 15, 2000</u>

22. JEFFREY LEVINE

23. ROBERT W. DONOHUE

24. CHRISTOPHER RENFOE, ESQ.

25. GEORGE ROZMSKY

26. JOSEPH FARBER

27. JOSEPH PREVITE

28. DOMINIC CIAMPA

29. STEPHANIE ZARO

30. LUCY NUNZIATO

31. CHRISTINE BRGUGLIO

32. KENNETH DREW

33. FRANK A. BOLTZ

34. KENNETH BUETTNER

35. AUDREY LEVINE, ESQ.

36. ANTHONY D'ANGELIS

J



STATE OF NEW YORK
UNIFIED COURT SYSTEM
25 BEAVER STREET
NEW YORK, NEW YORK 10004
(212) 428-2160

**JONATHAN LIPPMAN**
Chief Administrative Judge

**MICHAEL COLODNER**
Counsel

## MEMORANDUM

November 6, 2002

TO:     State-paid Judges and Nonjudicial
        Employees of the Unified Court System

FROM:   Michael Colodner

SUBJECT: Lawsuits against judges and court employees
         for money damages

From time to time both judges and nonjudicial employees of the Unified Court System are named in lawsuits seeking money damages based upon acts performed in the course of their service with the courts. When these lawsuits are brought, there are important steps that must be taken by judges and nonjudicial employees in order to secure indemnification and legal representation. This memorandum is a periodic reminder of these steps.

Section 17 of the Public Officers Law provides that the State will indemnify any State "employee" in the amount of any money judgment obtained against the employee pursuant to a lawsuit in any state or federal court. Indemnification will be given where the act upon which the judgment is based occurred while the employee was acting within the scope of his or her public employment or duties, and where the act was not the result of intentional wrongdoing on the part of the employee. All judges and nonjudicial court employees, other than town or village justices and employees of town or village courts, are considered to be "employees" within the meaning of section 17 and are covered by this indemnification provision. We refer to judges as "employees" in this memorandum and in this connection only for purposes of the application of section 17.

Section 17 further provides that the Attorney General must represent any State employee sued for money damages if the employee was acting within the scope of




State-paid Judges and Nonjudicial                    Lawsuits against judges and . . .
Employees of the Unified Court System                Page - 2 -

his or her public employment or duties. The employee may retain private counsel and will be reimbursed by the State for reasonable attorney's fees and expenses only if the Attorney General refuses to represent an employee otherwise entitled to representation.

However, there are strict procedures required by section 17 that must be met to secure the right to indemnification and the right to representation. Judges and court employees who are served with legal papers requesting money damages must deliver either the original or a copy to the Attorney General, or any Assistant Attorney General, within five days after they are served with such documents and request representation. If there is any question concerning proper service or the procedure for accepting service, it should be raised immediately with the Attorney General's office by telephone. Counsel's Office is available to help in any way that it can to ensure that representation is obtained.

Legal papers should be delivered to The Attorney General of the State of New York, Department of Law, at any of the following offices:

### MAIN OFFICES

The Capitol                              120 Broadway, 24th Fl.
Albany, New York 12224                   New York, New York 10007
(518) 474-8370                           (212) 416-8610

### BRANCH OFFICES

44 Hawley Street, 17th Fl.               Statler Towers
Binghamton, New York 13901               107 Delaware Avenue, 4th Fl.
(607) 721-8771                           Buffalo, New York 14202
                                         (716) 853-8400

300 Motor Parkway, Suite 205             200 Old Country Road, Suite 460
Hauppauge, New York 11788                Mineola, New York 11501
(631) 231-2424                           (516) 248-3302

163 W. 125th Street, 13th Fl.            70 Clinton Street
New York, New York 10027                 Plattsburgh, New York 12901
(212) 961-4475                           (518) 562-3288

235 Main Street, 3rd Fl.                 Court Exchange Building
Poughkeepsie, New York 12602             144 Exchange Boulevard
(914) 485-3900                           Rochester, New York 14614
                                         (585) 546-7430



State-paid Judges and Nonjudicial
Employees of the Unified Court System

Lawsuits against judges and . . .
Page - 3 -

615 Erie Boulevard West, Suite 102
Syracuse, New York 13204
(315) 448-4800

207 Genesee Street, Rm. 508
Utica, New York 13501
(315) 793-2225

317 Washington Street
Watertown, New York 13601
(315) 785-2444

101 E. Post Road
White Plains, New York 10601
(914) 422-8755

In any event, please give notice of the lawsuit to Counsel's Office, Office of Court Administration, 25 Beaver Street, New York, New York 10004, within five days of service of legal papers so that we can be of assistance to the Attorney General in every appropriate way.

Judges and court employees served with lawsuits seeking relief other than for money damages should handle the legal papers as follows:

> (a) Lawsuits against judges or court employees seeking relief relating to the administration of the courts should be sent immediately to Counsel's Office, Office of Court Administration, 25 Beaver Street, Room 1170, New York, New York 10004, and Counsel's Office simultaneously should be notified by telephone [(212) 428-2160].

> (b) Lawsuits against judges for acts in their judicial capacities should be sent to the Attorney General for representation to the offices indicated above, with a copy sent to Counsel's Office to permit us to be of assistance to the Attorney General. You should be aware that judges are not required to appear and defend suits brought against them in their judicial capacities under Article 78 of the CPLR by parties to a pending action or proceeding unless ordered to do so by the court in which the proceeding is brought. CPLR 7804(i). Where no appearance is made, the Attorney General will serve a notice of non-appearance.

If you have any questions about these procedures, or about representation and indemnification in general, please feel free to contact Counsel's Office.

lm

**K**

# Weekly Schedule

## February 2003

## Week 8

| | |
|---|---|
| **26** | **Wednesday** |

Jewish Heritage NY Mtg w/Susie · [illegible]
  (9:30 AM - 10:30 AM)
Mtg w/Judge Fisher - Kew Garden Court House - Re: Youth Court Issues
  (10:30 AM - 11:30 AM)
HOLD for City Council Mtg.
  (12:50 PM - 4:20 PM)
[HOLD]Council Mtg w/Avella - Re: CB #7 & 11 - KK's Ofc - WB
  (4:00 PM - 5:00 PM)
[FYI]CB #6 Mtg @ Kew Gardens Community Cntr, 80-02 Kew Gardens Rd
  (7:45 PM - 8:45 PM)

| | |
|---|---|
| **23** | **Sunday** |

| | |
|---|---|
| **27** | **Thursday** |

Jackson Heights Elmhurst Kehillah Breakfast Mtg of Elected officials
  (9:00 AM - 10:00 AM)
Council Mtg w/Addabbo - Re: CB #9, 10 &14 - KK's Ofc - WB
  (9:30 AM - 10:30 AM)
Council Mtg w/Gennaro - Re: CB #6, 7 & 8 - KK's Ofc - WB
  (10:30 AM - 11:30 AM)
Yoswein Dev Mtg - Re: Phelps Dodge Redev
  (1:30 PM - 2:30 PM)
Dominick Bruccolieri - Re: Ft. Totten REstaurant Issue
  (2:00 PM - 3:00 PM)
Council Mtg w/Monserrate - Re: CB #3 & 4 - KK's Ofc - WB
  (3:00 PM - 4:00 PM)
[KK WNA]War Room Mtg - Re: Capital Budget
  (3:30 PM - 4:30 PM)

| | |
|---|---|
| **24** | **Monday** |

Council Mtg w/Vallone, Jr.'s Chief of Staff Mahaltses - Re: CB #1 & 3 - KK
  (10:00 AM - 11:00 AM)
Councilman Sanders - Re: District Budget Needs
  (10:30 AM - 11:30 AM)
Eric Gioia w/Mayor - Rescheduled Mtg because of manhole fire
  (12:00 PM - 1:00 PM)
BP's Luncheon - AR
  (1:15 PM - 2:15 PM)
Council Mtg w/Gioia - Re: CB 1, 2, 4, 5 Application
  (3:00 PM - 4:00 PM)
Council Mtg w/Sears - Re: CB #2, 3, 4 & 6 - KK's Ofc - WB
  (4:15 PM - 5:15 PM)

| | |
|---|---|
| **28** | **Friday** |

[FYI]Breakfast w/115th Comm Council - Holiday Inn Crown Plaza
  (8:00 AM - 9:00 AM)
Council Mtg w/Katz - Re: CB #4, 5, 6 & 9 - KK's Ofc - WB
  (10:00 AM - 11:00 AM)
Council Mtg w/Comrie - Re: CB #12 & 13 - KK's Ofc - WB
  (11:00 AM - 12:00 PM)
Council Mtg w/Weprin - Re: CB#8,11, 12 & 13 - KK's Ofc - WB
  (1:00 PM - 2:00 PM)
David Berke Mtg. re: Queens Blvd. Devel - IP/GL/TC
  (2:00 PM - 3:00 PM)
[FYI]African Amer Her Month - BP Welcoming - Annual Event
  (6:30 PM - 7:30 PM)

| | |
|---|---|
| **25** | **Tuesday** |

Port Auth Airtrain Beautification
  (10:00 AM - 11:00 AM)
Office Opening w/Dina Improta, Dept Consumer Affairs Enforcement Office
  (10:30 AM - 11:30 AM)
Mtg w/FDNY/Parks - Re: Ft. Totten
  (11:30 AM - 12:30 PM)
NYC Sports Comm Mtg - Re: 5 Boro Race
  (2:00 PM - 3:00 PM)

[FYI]Dinner Fundraiser Qns Cntr for Progress
  (7:00 PM - 8:00 PM)

| | |
|---|---|
| **1** | **Saturday** |

[FYI]College Fair - St. Albans Church - BP Guest Speaker
  (11:00 AM - 12:00 PM)

[FYI]Annual Luncheon: East Elmhurst Corona Civic
  (1:30 PM - 2:30 PM)

L



# Memo

| | |
|---|---|
| **To:** | All Queens Law Secretaries |
| **From:** | Richard Lazarus, |
| | Queens Delegate to the Citywide Association of Law Secretaries |
| **Date:** | May 13, 2003 |
| **Subject:** | Immediate Concerns of Job Security |

**The following represents the personal opinion of Richard Lazarus, only, and does not necessarily represent the position of the Citywide Association of Law Secretaries or the other members of the Queens Delegation:**

Dear Colleagues:

In my recent e-mail I reported to you that job security was a major concern of the Law Secretarys' Association. Law Secretaries serve at the pleasure of their Judge, without any civil service protection. At the end of the Judge's term or the termination of the relationship as a result of the Judge's displeasure with the Law Secretary, that Law Secretary becomes unemployed. This has been a big issue in the other four counties of the City. Every year there are unemployed Law Secretaries looking for work at the end of their Judge's term. I will refer to this situation with the term "displaced Law Secretaries". The Association and our counsel have spent considerable time and effort trying to find work for these displaced Law Secretaries.

Because of the unique political climate of this particular County, job security has not been an issue for Queens Law Secretaries. Traditionally, upon the expiration of a Judge's term, that Judge's Law Secretary could be confident that a new Law Secretary position could be found. This Queens job security was as a result of political party affiliation and not as a result of any policy of our employer. Queens County Administrative Judges have also been helpful, but their powers are extremely limited, in this regard. One of the reasons that political influence has been so successful at providing job security is that there has, to the best of my recollection, never been a turnover of more than a few Law Secretaries at any one time. This year might be different.

You are undoubtedly aware that OCA has announced a new policy concerning certification of Judges who have reached the mandatory retirement age of 70 years. Previously, if the Judge was in reasonably decent physical condition, that Judge was virtually assured of certification. OCA has now announced that because of budgetary shortfalls, certification of Judges may well be denied. OCA has already made good on this new policy and at the end of last year, declined to certify one

or more Judges. That declination resulted in Law Secretaries being out of a job.

A meeting of the LSA Board was held last night. It was reported that in Queens County there will be 10 Judges up for certification at the end of this year. This is only an estimate and the exact number has not been exhaustively researched. Five Judges will be reaching 70 years of age and an additional five will be up for recertification. That equates to ten Law Secretaries in immediate jeopardy because there may be ten less positions available than there were at the beginning of the year. Although there will be five new elected Justices, who will likely choose five of the displaced Law Secretaries, that still leaves a net loss of five jobs. Factor in additional Law Secretaries that are looking to move to a different Judge and you may well have more Law Secretaries than the usual political machinery can place.

This is a new situation which Queens Law Secretaries have not previously faced. The Association, has been reasonably successful in finding positions for small numbers of displaced Law Secretaries, in the past. However, if a large number of Judges are not certified, the large number of displaced Law Secretaries will overwhelm the ability of the Association to place them. Likewise, the usual Queens political machinery may also be overwhelmed.

Accordingly, there is an added urgency to the Association negotiating some sort of job security with OCA. This could be achieved by some sort of assurance that a displaced Law Secretary would be reassigned to the Law Department or a continuation of that Law Secretary's salary line and being placed in a different legal position or being hired for some other legal position on a different salary line.

Our quest for job security may impact upon OCA's desire for legal title salary unification as well as our quest for reclassification to a higher salary line and the quest for creation of a Magistrate's position. I feel it best not to discuss specifics via e-mail.

On June 2, 2003 there will be a meeting of Queens County Law Secretaries. The meeting was called initially to conduct an election to fill the vacancy created by Diccia's judicial election. Now that the issue of job security may have become a more immediate concern to all Queen's Law Secretaries, this meeting will be a good opportunity for you to ask questions about what the Association is doing and to present your opinions on the issue of job security as well as other issues.

Again, I would encourage your participation in Association activities. There is still time to submit your name for inclusion on the ballot. If you believe that there is room for improvement in your career as a Law Secretary, then I heartily encourage you to run for election as a Queens Representative to the Board. Please contact either Len, Pete or myself regarding your desire to run for election and whether you will be attending the meeting.

Sincerely,
RICHARD LAZARUS
Queens County Representative

M

06/31/2001 TUE 14:21 FAX



## QUEENS SUPREME COURT - JAMAICA

13th TERM FROM: DEC. 1, 2003 TO: JAN. 2, 2004
MAJOR: Robert W. Gardner (Unit 1)
CAPTAIN: John J. Fulton (Unit 2)
LIEUTENANTS: Lawrence E. Sullivan (U-3)
Lynne Franzone (U-17)

Date **DEC 1 1 2003**          Day: Thurs

0730 Supervisor: ................................

0600 x 0900 SCO Tucker - North Gate

SCO Brodenberde Patrol

Closing Supervisor: SGT JAMES ALFIERI

1700 x 2200 SCO Gilbert SCO Bredenberd

| ♦ CHARGED PARTS ♦ | | DRIVER: | | |
|---|---|---|---|---|
| PART | SGT. | HOTEL | DISP | TIME |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## SECURITY POSTS

| TOUR | MEAL | EXT./RADIO # | ASSIGNMENT | OFFICERS | |
|---|---|---|---|---|---|
| 0800-1600 | 1200-1300 | Unit 3 | Security Lt. | SULLIVAN | |
| 0900-1700 | 1300-1400 | Unit 17 | Desk Lieutenant | FRANZONE | |
| 0900-1700 | 1300-1400 | Unit 5 | Sergeant | ALFIERI SL | |
| 0800-1600 | Variable | Unit 4 | North Lot | URSO | Tucker |
| 0800-1600 | Variable | Unit 6 | South Lot | PASTORE | Flaherty |
| 0730-1530 | 1200-1300 | Unit 7   ext-1001 | Basement | CUNNINGHAM Bredenberder MARI (Aurigemma |
| 0730-1530 | 1100-1200 | Unit 8   ext-1008 | Lobby Security | MARI | |
| 0900-1700 | 1300-1400 | Unit 9 | Security 2nd Fl. | RUIZ | |
| 0900-1700 | 1200-1300 | Unit 14   ext-1703 | Security 3rd Fl. | MACRI | |
| 0900-1700 | 1300-1400 | Unit 10 | Security 4th Fl. | HOPKINS | |
| 0900-1700 | 1200-1300 | Unit 11   ext-1174 | Security 5th Fl. | HORNBECK | |
| 0800-1700 | 1300-1400 | Unit 12 | Security 6th Fl. | | |
| 0900-1700 | 1300-1400 | | Library | | |
| 0900-1700 | 1300-1400 | Unit 16 | Elevator | PRINSSL Ruiz | |
| 0800-1600 | Variable | Ext. 1070 | Operations | MANERI | |
| 0900-1700 | Variable | Ext. 1070 / U-19 | Operations | MELTZER | |

| TOUR | MEAL | EXT./RADIO # | ASSIGNMENT | OFFICERS | FIRE WARDENS | ALTERNATE |
|---|---|---|---|---|---|---|
| 0730-1530 | 1130-1230 | Unit 8 | Scanner | MARI | B CUNNINGHAM | STEPHENS |
| 0800-1600 | 1200-1300 | Unit 18 | Scanner | HOFFMAN | 1 MARI | HOFFMAN |
| 0800-1600 | 1200-1300 | " | Scanner | TUCKER | 2 RUIZ | GRASSI |
| 0800-1600 | 1200-1300 | " | Scanner | STEPHENS | 3 MACRI | MANERI |
| 0800-1600 | 1200-1300 | " | Scanner | AURIGEMMA | 4 HOPKINS | DELVAC |
| 0900-1700 | 1300-1400 | " | Scanner | MOLNAR | 5 HORNBECK | JOHNSON |
| 0900-1700 | 1300-1400 | " | Scanner | NITSCHKE | 6 COLTELLI | GALLER |
| 0900-1700 | 1300-1400 | " | Scanner | DIPRIMA | 7 LICURSE | COATES |
| 0900-1700 | 1300-1400 | " | Scanner | PASSARELLA | ASSIST DAILY | AT SCANNERS |
| 0900-1700 | 1300-1400 | " | Scanner | | 1) assign daily | 2) assign daily |
| 0900-1700 | 1300-1400 | | Patrol | MANSFIELD late | Close Scanners | 1715 Hrs.: |
| 0900-1700 | 1300-1400 | ext-1044 | J.H.O. | HUSS | 1) Nitschke | |
| 0900-1700 | 1300-1400 | ext-1222 | J.H.O. | SUSSMAN | 2) Aurigemma | |
| 0900-1700 | 1300-1400 | ext-1100 | CHAMBERS | COUGHLIN | | |

Date: **DEC 1 1** 2003

| PART | RM | PHONE | JUDGE | SCO | AM | PM |
|------|-----|-------|-------|-----|-----|-----|
| 1 SPITRA | 25 | 1048 | LEVINE | GRASSI | CAL | CAL |
| 2 5ᵃᵐ | 28 | 1054 | WEISS | McMANUS (Deneed) | TR | TR -change. |
| 3 405 | 22 | 1037 | THOMAS | LYNDE | HRG. | Cont. |
| 4 630 | 505 | 1210 | GRAYS | JOHNSON | TR | TR |
| 5 412 | 47 | 1123 | O'DONOGHUE | SMITH | Guard. | HRG Guard. |
| 6 350 | 60 | 1214 | PRICE | COATES   PM Maier | TR Voir dire | TR voir dire. |
| 7 ↓ | 45 | 1121 | DYE | LAUSELL PT 14 | ↓ | ↓ |
| 8 | — | — | — | — | | |
| 9 ↑ | 43 | 1116 | FLUG | BYERS %o | OPEN | OPEN ↓ |
| 10 255 | 122 | 1005 | SCHULMAN | BEEDENBENDER JL | TR delil. | TR - delib. |
| 11 5 - | 562 | 1186 | GOLDSTEIN | GILBERT PT 23 | OPEN | OPEN ↓ |
| 13 4 | 48 | 1126 | DOLLARD | MAIER PM PT6 | Mental Hygiene | OPEN : |
| 14 4.15 | 27 | 1052 | POLIZZI | ROMANO SL Lausell. | TR | TR |
| 15 430 | 21 | 1035 | TAYLOR | DIXON TRANS Matranga. | TR | TR |
| 16 405 | 42 | 1113 | KELLY | SURASKY | TR | TR |
| 17 00 | 116 | 1002 | KITZES | SPINELLI E/o | TR | ↓ |
| 18 9 | 41 | 1110 | HART | BATTLE PT 22. | ↓ | ↓ |

05/31/2003 TUE 11:30 FAX                                                    ☎002

# QUEENS SUPREME COURT - JAMAICA

13th TERM FROM :DEC. 1, 2003  TO: JAN. 2, 2004
**MAJOR:** Robert W. Gardner (Unit 1)
**CAPTAIN:** John J. Fulton (Unit 2)
**LIEUTENANTS:** Lawrence E. Sullivan (U-3)
Lynne Franzone (U-17)

Date DEC 1 1 2003                                              Day: Thurs

0730 Supervisor: _____

0600 x 0900 SCO Tucker - North Gate
sco Perdenberdo Patrol

Closing Supervisor: SGT _____

1700 x 2200 SCO Gilbert sco Brodenberodt

| ♦ CHARGED PARTS ♦ | | DRIVER: | | |
|------|------|------|------|------|
| PART | SGT. | HOTEL | DISP | TIME |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## SECURITY POSTS

| TOUR | MEAL | EXT./RADIO # | ASSIGNMENT | OFFICERS | |
|------|------|------|------|------|------|
| 0800-1600 | 1200-1300 | Unit 3 | Security Lt | SULLIVAN | |
| 0900-1700 | 1300-1400 | Unit 17 | Desk Lieutenant | FRANZONE | |
| 0800-1700 | 1300-1400 | Unit 5 | Sergeant | ALFIERI SL. | |
| 0800-1600 | Variable | Unit 4 | North Lot | URSO | Tucker |
| 0800-1600 | Variable | Unit 6 | South Lot | PASTORE | Fisher |
| 0730-1530 | 1200-1300 | Unit 7  ext-1001 | Basement | CUNNINGHAM | MARI |
| 0730-1530 | 1100-1200 | Unit 8  ext-1008 | Lobby Security | MARI | |
| 0900-1700 | 1300-1400 | Unit 9 | Security 2nd Fl. | RUIZ | |
| 0900-1700 | 1200-1300 | Unit 14  ext-1703 | Security 3rd Fl. | MACRI | |
| 0900-1700 | 1300-1400 | Unit 10 | Security 4th Fl. | HOPKINS | |
| 0900-1700 | 1200-1300 | Unit 11  ext-1174 | Security 5th Fl. | HORNBECK | |
| 0900-1700 | 1300-1400 | Unit 12 | Security 6th Fl. | | |
| 0900-1700 | 1300-1400 | | Library | | |
| 0900-1700 | 1300-1400 | Unit 16 | Elevator | PRINSSL Ruiz | |
| 0800-1600 | Variable | Ext. 1070 | Operations | MANERI | |
| 0900-1700 | Variable | Ext. 1070 / U-19 | Operations | MELTZER | |

| TOUR | MEAL | EXT./ RADIO # | ASSIGNMENT | OFFICERS | FIRE WARDENS | ALTERNATE |
|------|------|------|------|------|------|------|
| 0730-1530 | 1130-1230 | Unit 8 | Scanner | MARI | B CUNNINGHAM | STEPHENS |
| 0800-1600 | 1200-1300 | Unit 18 | Scanner | HOFFMAN | 1 MARI | HOFFMAN |
| 0800-1600 | 1200-1300 | " | Scanner | TUCKER | 2 RUIZ | GRASSI |
| 0800-1600 | 1200-1300 | " | Scanner | STEPHENS | 3 MACRI | MANERI |
| 0800-1600 | 1200-1300 | " | Scanner | AURIGEMMA | 4 HOPKINS | DELVAC |
| 0900-1700 | 1300-1400 | " | Scanner | MOLNAR | 5 HORNBECK | JOHNSON |
| 0900-1700 | 1300-1400 | " | Scanner | NITSCHKE | 6 COLTELLI | GALLER. |
| 0900-1700 | 1300-1400 | " | Scanner | DIPRIMA | 7 LICURSE | COATES |
| 0900-1700 | 1300-1400 | " | Scanner | PASSARELLA | ASSIST DAILY | AT SCANNERS |
| 0900-1700 | 1300-1400 | " | Scanner | | 1) session daily | 2) session daily |
| 0900-1700 | 1300-1400 | | Patrol | MANSFIELD | Close Scanners | 1715 Hrs.: |
| 0900-1700 | 1300-1400 | ext-1044 | J.H.O. | HUSS | 1) Nitschke | |
| 0900-1700 | 1300-1400 | ext-1222 | J.H.O. | SUSSMAN | 2) Aurigenma | |
| 0900-1700 | 1300-1400 | ext-1100 | CHAMBERS | COUGHLIN | | |

05-31-2004 TUE 11:31 FAX                                    Date:                    ☐003

| PART | RM | PHONE | JUDGE | SCO | AM | PM |
|------|-----|-------|-------|-----|-----|-----|
| TSPITRA 4 25 | 25 | 1048 | LEVINE | GRASSI | CAL | CAL |
| 2 500 28 | 28 | 1054 | WEISS | McMANUS | TR | TR -change |
| 3 405 22 | 22 | 1037 | THOMAS | LYNDE | HRG. | CSUY |
| 4 630 505 | 505 | 1210 | GRAYS | JOHNSON | TR | TR |
| 5 413 47 | 47 | 1123 | O'DONOGHUE | SMITH | Guard. | HRG Guard. |
| 6 350 60 | 60 | 1214 | PRICE | COATES  P.J. McGov | TR Jail qtr | TR Jail qtr |
| 7 | 45 | 1121 | DYE | LAUSELL PT 14 | ↓ | ↓ |
| 8 | — | — | — | — | — | — |
| 9 | 43 | 1116 | FLUG | BYERS 5/0 | OPEN | OPEN ↓ |
| 10 255 | 122 | 1005 | SCHULMAN | BEEDENBENDER (T) | TR detal. | TR -delib |
| 11 5 - 562 | 562 | 1186 | GOLDSTEIN | GILBERT PT 23 | OPEN | OPEN ↓ |
| 13 4 48 | 48 | 1126 | DOLLARD | MAIER 24 PTL | Mental Hygiene | OPEN |
| 14 40 27 | 27 | 1052 | POLIZZI | ROMANO SL Lausell | TR | TR |
| 15 4 21 | 21 | 1035 | TAYLOR | DIXON TRIAL Matringa | TR | TR |
| 16 405 42 | 42 | 1113 | KELLY | SURASKY | TR | TR |
| 17 100 116 | 116 | 1002 | KITZES | SPINELLI 5/0 | TR | ↓ |
| 18 9 41 | 41 | 1110 | HART | BATTLE PT 22 | ↓ | ↓ |
| 19 63 | 63 | 1213 | SATTERFIELD | FLAHERTY | ↓ | ↓ |
| 21 350 44 | 44 | 1117 | GOLIA | DELVAC | conf. | OPEN. |
| 22 330 26 | 26 | 1051 | RIOS | SACCO (late) BATTLE | Framed /about us 135107 | OPEN. |
| 23 500 24 | 24 | 1049 | MERRELLY GLOVER | MELGAREJO SL Gilbert | TR | TR comb. |
| 24 23 | 23 | 1042 | MERRELLY GOLAR | MARRON PT 23 (PM) | HEARING ↓ | ↓ |
| 35 405 | 405 | 262-7328 | WEINSTEIN | | ↓ | ↓ |
| 38 4 308 | 308 | 262-7164 | HUTTNER | ACCARDI | TR | OPEN. |
| 39 — 87A | 87A | 1221 | REF.GELLER | MATRANGA PT 15 | — | — |
| 51 67 | 67 | 1215 | DORSA | COLTELLI | HEAR. PG COMP. CAL | ↓ |
| 52 410 68 | 68 | 1216 | GAVRIN | GALLER | Comb. TR | comb. TR |
| CSC 44A | 44A | 1093 | RITHOLTZ | PALMIERI REBELE | comp. | comp. |
| PC 24A | 24A | 1046 | REF. YABLONS | MANCINELLI (late) | CAL | ↓ |

| STATUS | | | | STATUS | | | |
|--------|----|-------|-----|--------|-----|-------|-----|
| Part J.25 | Rm | Judge FISHER | Ext. | Part | Rm | Judge | Ext. |
| SGT. | | | | SGT. | | | |
| SCO | | | | SCO | | | |
| SCO | | | | SCO | | | |
| SCO | | | | SCO | | | |

PERIMETER: A.M.

P.M.

RESERVE:                     M.L.

TDY
RUTHERFORD (BRONX)

LUNCH RELIEFS
3rd Fl. MARRON
5th Fl. DELVAC
Bsmt. RUIZ
Lot 12:00 Battle
Lot 1:00 HOPKINS

BREAKS
AM: Lots  Hopkins
Bsmt.
3rd Fl.  BYERS
5th Fl.  Delvac
PM: Lots — HOPKINS
Bsmt. — Battle
3rd Fl.  Gilbert
5th Fl.

05/31/2004 TUE 14:31 FAX                                    ☎004

**DAILY LOG**                              **DATE: OF:** ___ ___

- 0600 Scheduled SCO Tucker N-gate, SCO Beeber border patrol
- 0710 Major opens OPS
- 0715 Bus keys issued to SCO Masi
- 0720 Radio check w/ Capt Valcarce 5x5
- 0725 SCO Beeber border opens S-gate
- 0730 SCO Cunningham on post base, SCO Masi on post lobby
- 0800 Lt Sullivan opens lobby to public
- 0850 Sts Spinelli ut issue weapon for on duty use
- 0900 - Lt Franzone on desk
- 0901 - SCO Urso reports rear No. Judge's entrance is flooded. Don Ash (DCAS) notified
- 0955 - Lt Sullivan reports rapiscan X-ray machine %
- 1005 - Jerome (CoCiK) RQ jury bus trans to PO + KG. SCO Masi to drive.
- 1010 - SCO Polvac reports that he observed J. Sherman fall in front of building. Lt Sullivan to bring ice packs to J. Sherman in J. Kitzes chambers. All personnel present and/or accounted for. All OT assigned and notified
- 1040 - Jury bus (SCO Masi) leaves en CoCiK PO/KG rund.
- 1041 - Maureen D'Aquila calls — next Fri, 12/19 there will be a luncheon in CR 26. She RQ that we put up signs re-directing auction to CR 26 on that day
- 1045 - SCO Johnson reports loud drilling noise in CR 505. Norberto (Velez) notified. Masi to CC.
- 1110 - Masi advises that Lauren De Sole (Employee Relations) will arrive approx 2PM. SCO Stephens is to escort to CC office then report to major. Units 4, 6, 7 and Lt Sullivan (scanners) notified.
- 1200 Capt relieves Lt Franzone for meal
- 1210 SCO Masi returns with jury bus.
- 1230 - Chief Clerk authorizes jury bus to pick up Lauren De Sole at Beaver St at 1:45 PM. SCO Masi assigned.
- 1240 - SCO Masi departs with bus en route to Beaver St.
- 1300 - Lt Franzone on desk

05/31/2004 TUE 14:32 FAX

**DAILY LOG**

**DATE:** ___

1305 - SCO Spinelli secures weapon and returns
Key. Capt to meal.

1345 - SCO Masi calls from 25 Beaver St., He is
waiting for Lauren DeSole

1420 - HattVan (SCO Coughlin) leaves for KG OTC
w/ AJ.

1430 - Jury bus (SCO Masi) returns to base
w/ Lauren DeSole

1450 - Brian Kelly calls - Rep from J.P. Reddington
will arrive @ 10³⁰ Fri. 12/12, to order
wooden benches. Please accom.

1500 - Lt Sullivan returns X-ray Key - secured in
Admin. locker.

1515 - SCO Cunningham returns BOMT Black Light

1545 - Capt on desk. Lt Krainpee on security detail / Hous
Guard to Civil Gt for Eviction of Judge Elliot.

1550 - State van returns. / Holiday Press Schedule posted.

1615 - Al Blake (K-3) request bed transportation on Thurs.12/18
for Hosp. arraignment of Kings County Hosp. - Judge Rowe.

1635 - Hous guard returns from Civil Gt.

1700 - All parts down except : Pr. 4 / Scos Gilbert +
Breedenbender staff front lobby

1815 - Front gates + lobby secured / Scos Gilbert + Breedenbender
commence patrol.

1830 - Pr. 4 down - Scos Johnson off duty / Second post secured.

1845 - Sco Masi returns from Hosp off duty

1950 - Last judge (Ritholtz) departs, gates secured.

2015 - Office + safe secured / Books checked. Equipment accounted
for. Capt + Scos Flaherty + Tucker off duty. Scos
Gilbert + Breedenbender continue patrol.

CAPT JOHN J FULTON

us.31.2004 TUE 14:32 FAX                                                          @906

## QUEENS SUPREME COURT
## DAILY ATTENDANCE

**GOOD MORNING!!!!!!!!**

TODAY IS:___Thursday___                    DATE:___12-11-03___

FACILITY: JAMAICA SUPREME COURT      SUPERVISOR: Capt. John Fulton
DEPARTMENT: SECURITY

**SICK LEAVE**                       **OFFICIAL BUSINESS**
Melgarejo ( FMLA )
Alfieri
Prins
Romano
**ANNUAL LEAVE**                     **L.W.O.P.**

                                     **WORKERS' COMPENSATION**


                                     **MILITARY LEAVE**


**PRE-TOUR PREP. TIME**
                                     **RANGE**

                                     **TRAINING**

**COMPENSATORY TIME**
                                     **JURY DUTY**


**FAMILY SICK LEAVE (RELATION)**     **DEATH IN FAMILY (RELATION)**


**T.D.Y.**                           **RELIGIOUS HOLIDAY**

Rutherford ( Bronx )


                                     Submitted By: SCO Frank Maneri

N

**APPLICATION FOR LEAVE**

NAME JUDITH B. MEMBLATT                    SOC. SEC. NO. ███████

COURT/AGENCY QUEENS SUPREME COURT          NEGOTIATING UNIT _____

**I. TYPE(S) OF LEAVE REQUESTED:**

|  |  |  | FROM | THROUGH |  |
|---|---|---|---|---|---|
| A. | ☐ | Family and Medical Leave <u>with</u> pay | | | Lv. Credits to be used |
| | ☐ | Family and Medical Leave <u>without</u> pay | | | |

**NON-DISCRETIONARY LEAVES**

| B. | ☐ | Child Care Leave - first year | | | Lv. Credits to be used |
|---|---|---|---|---|---|
| C. | ☐ | Military Leave | | | |

**DISCRETIONARY LEAVES**

|  |  |  | FROM | THROUGH |  |
|---|---|---|---|---|---|
| D. | ☐ | Child Care Leave - extension (beyond first year) | | | |
| E. | ☐ | Advancement of Sick Leave | | | |
| F. | ☐ | Sick Leave at Half Pay | | | |
| G. | ☐ | Leave without Pay (Please explain below) | | | |
| H. | ☒ | Other Leaves (Please explain below) | 12/12/03 | 1/28/04 | Lv. Credits to be used |

**II.   PURPOSE FOR LEAVE** (Refer to instructions) _____

**III. EMPLOYEE AFFIRMATION:** I have been granted leave before.   ☐ Yes   ☒ No

I hereby affirm that to the best of my knowledge, the information reported is accurate. I understand that the granting of such leave does not extend my employment beyond the period where it would otherwise terminate by operation of law, rule or regulation.

Employee Signature _Judith B. Memblatt_  Title _Principal Law Clerk to Judge_ Date _Dec. 11, 2003_

**IV         LOCAL CHIEF CLERK / SUPERVISOR / DESIGNEE**

DATE RECEIVED _____  Recommendation for Discretionary Leaves D - H:  ☐ Approve All  ☐ Deny All  ☐ See Over

☐ FMLA Designation has been issued for the period _____ through _____ ; or referred to the appropriate administrative authority on _____

Authorized Signature _____  Title _J.S.C._  Date _12-11-2003_

**V. (A)              ADMINISTRATIVE APPROVALS**
N.Y.C. CHIEF CLERK / EXECUTIVE ASSISTANT / OCA ASSISTANT DEPUTY CHIEF ADMINISTRATOR

☐ Employee not eligible for FMLA.  Circle one: Not employed for one year / Does not have 1250 hours of paid service / Employee has already exhausted FMLA entitlement for calendar year.

☐ Required documentation has been received and supports the request for leave. Documentation is being retained in the local court/agency.

☐ FMLA Designation has been issued for the period _____ through _____

☐ FMLA / Child Care Leave / Military Leave has been approved as requested in Section I and a copy sent to the appropriate payroll agency.

☐ FMLA / Child Care Leave / Military Leave has been approved with the following changes:

| Leave Type _____ | From _____ | Through _____ |
|---|---|---|
| Leave Type _____ | From _____ | Through _____ |

☐ Recommend granting of discretionary leave (type(s) D through H) as requested in Section I.   ☐ Yes  ☐ No

☐ Recommend granting of discretionary leave (type(s) D through H) with the following changes:

| Leave Type _____ | From _____ | Through _____ |
|---|---|---|
| Leave Type _____ | From _____ | Through _____ |
| Leave Type _____ | From _____ | Through _____ |

☐ Employee <u>not eligible</u> for leave requested .  Recommend granting the following leave _____ from _____ through _____

*Applicable Contract Article(s) or Rule Part(s)* _____

Signature _____  Title _____  Date _____

**V. (B)       DEPUTY CHIEF ADMINISTRATIVE JUDGE/ADMINISTRATIVE JUDGE**

☐ Discretionary leave granted as recommended by N.Y.C. Chief Clerk, Executive Assistant or Asst. Deputy Chief Administrator.

☐ Discretionary leave type(s) D through H granted with the following changes:

| Leave Type _____ | From _____ | Through _____ |
|---|---|---|
| Leave Type _____ | From _____ | Through _____ |
| Leave Type _____ | From _____ | Through _____ |

☐ Discretionary leave type(s) _____ denied.

Signature _____  Title _____  Date _____

NOTE: FMLA Leave, Child Care Leave (first year) and Military Leave are mandatory and must be extended to eligible employees. The appropriate administr...

**APPLICATION FOR LEAVE**

NAME JUDITH B. NEME___                    SOC. SEC. NO. _____

COURT/AGENCY QUEENS SUPREME COURT         NEGOTIATING UNIT _____

**I.   TYPE(S) OF LEAVE REQUESTED:**

|   |   |   | FROM | THROUGH |   |
|---|---|---|------|---------|---|
| A. | ☐ | Family and Medical Leave with pay | | | Lv. Credits to be used |
| | ☐ | Family and Medical Leave without pay | | | |

**NON-DISCRETIONARY LEAVES**

| B. | ☐ | Child Care Leave - first year | | | Lv. Credits to be used |
| C. | ☐ | Military Leave | | | |

**DISCRETIONARY LEAVES**

|   |   |   | FROM | THROUGH |   |
|---|---|---|------|---------|---|
| D. | ☐ | Child Care Leave - extension (beyond first year) | | | |
| E. | ☐ | Advancement of Sick Leave | | | |
| F. | ☐ | Sick Leave at Half Pay | | | |
| G. | ☐ | Leave without Pay (Please explain below) | | | |
| H. | ☒ | Other Leaves (Please explain below) (LEAVE WITH PAY) | 12/12/03 | 1/28/04 | Lv. Credits to be used |

**II.  PURPOSE FOR LEAVE** (Refer to instructions)

_____

**III. EMPLOYEE AFFIRMATION:** I have been granted leave before.    ☐ Yes   ☒ No

I hereby affirm that to the best of my knowledge, the information reported is accurate. I understand that the granting of such leave does not extend my employment beyond the period where it would otherwise terminate by operation of law, rule or regulation.

Employee Signature _____ Title Principal Law Clerk to Judge Date Dec. 11, 2003

**IV            LOCAL CHIEF CLERK / SUPERVISOR / DESIGNEE**

DATE RECEIVED _____ Recommendation for Discretionary Leaves D - H:  ☒ Approve All  ☐ Deny All  ☐ See Over

☐ FMLA Designation has been issued for the period _____ through _____ ; or referred to the appropriate administrative authority on _____

Authorized Signature _____ Title J.S.C. Date 12-11-2003

**V. (A)                        ADMINISTRATIVE APPROVALS**
N.Y.C. CHIEF CLERK / EXECUTIVE ASSISTANT / OCA ASSISTANT DEPUTY CHIEF ADMINISTRATOR

☐ Employee not eligible for FMLA. Circle one: Not employed for one year / Does not have 1250 hours of paid service / Employee has already exhausted FMLA entitlement for calendar year.

☐ Required documentation has been received and supports the request for leave. Documentation is being retained in the local court/agency.

☐ FMLA Designation has been issued for the period _____ through _____ .

☐ FMLA / Child Care Leave / Military Leave has been approved as requested in Section I and a copy sent to the appropriate payroll agency.

☐ FMLA / Child Care Leave / Military Leave has been approved with the following changes:

| Leave Type _____ | From _____ | Through _____ |
| Leave Type _____ | From _____ | Through _____ |

☒ Recommend granting of discretionary leave (type(s) D through H) as requested in Section I.    ☒ Yes  ☐ No

☐ Recommend granting of discretionary leave (type(s) D through H) with the following changes:

| Leave Type _____ | From _____ | Through _____ |
| Leave Type _____ | From _____ | Through _____ |
| Leave Type _____ | From _____ | Through _____ |

☐ Employee not eligible for leave requested . Recommend granting the following leave _____ from _____ through _____

Applicable Contract Article(s) or Rule Part(s) _____

Signature _____ Title Chief Clerk VI Date 1/14/03

**V. (B)            DEPUTY CHIEF ADMINISTRATIVE JUDGE / ADMINISTRATIVE JUDGE**

☒ Discretionary leave granted as recommended by N.Y.C. Chief Clerk, Executive Assistant or Asst. Deputy Chief Administrator.

☐ Discretionary leave type(s) D through H granted with the following changes:    ※ Annual Leave Quarts to be used per Werke.

| Leave Type _____ | From _____ | Through _____ |
| Leave Type _____ | From _____ | Through _____ |
| Leave Type _____ | From _____ | Through _____ |

☐ Discretionary leave type(s) _____ denied .

Signature _____ Agency DCAJ-NYC . Date 12/17/03  MLC-17

NOTE: FMLA Leave, Child Care Leave (first year) and Military Leave are mandatory and must be extended to eligible employees. The appropriate administrative approvals are required for all other leaves.

P

To: Judge
From: JBM

Dated: 2/16/2000

As previously discussed, with your approval, I intend to take annual leave time from Feb. 22 - Feb. 29, 2000.

J. Memblett

approved
2/16/2000

## MEMORANDUM

**4/24/02**

**To: Justice Jaime A. Rios**
**From: Judith B. Memblatt**

    As per conversation today, I will be on vacation on the following days:  April 26, April 29 and April 30, 2002.  Thank you for your consideration.

*approved*

Q



**Judith B. Memblatt, Esq.**
**98-51 65th Avenue, #2A**
**Rego Park, NY 11374**
**(718)275-9578**

Feb. 3, 2004

**Hon. Jonathan Lippman**
**Chief Administrative Judge**
**Office of Court Administration**
**25 Beaver Street**
**New York, N.Y. 10004**

Re: Sandra Newsome

Dear Judge Lippman:

At a time of increased concern over ethical issues regarding the Court system, it seems clear that improprieties should be reported by Court employees, not simply ignored by them. The shield of confidentiality offers no protection for misconduct.

Accordingly, as the Principal Law Clerk to Justice Jaime A. Rios, Supreme Court, Queens County, I herewith submit a copy of a letter by Justice Rios' personal secretary, Sandra Newsome, dated July 9, 2002. Writing to the Parking Violations Hearings By Mail Unit, Ms. Newsome utilized Supreme Court letterhead in a blatant effort to improperly influence the adjudication of a parking ticket that had been issued to her. In so doing, she obviously violated Part 50.1 of the Code of Ethics for Nonjudicial Employees promulgated by the Chief Judge of the State of New York, which prohibits Court Employees from using or attempting to use ". . . their positions or the prestige of judicial affiliation to secure



privileges or exemptions for themselves . . . "

This issue is brought to your attention to facilitate your stated goal of restoring public confidence in the judiciary.

Thank you for your attention to this matter.

Sincerely,

*Judith B. Memblatt*

**Judith B. Memblatt**

Enc.

Supreme Court of the State of New York
Criminal Term
125-01 Queens Boulevard
Kew Gardens, N.Y. 11415

Personal & Unofficial

July 9, 2002

Parking Violations Hearing
By Mail Unit
P.O. Box 29021
Brooklyn, New York 11202-9021

Re: Violation Number: 367064922-0

On Sunday, July 7th I received the enclosed ticket for parking in a "No Standing" zone. I respectfully submit that I am not guilty of this violation.

My understanding is that if your car is parked beyond the point of the sign (the arrow was pointing right of the pole) then you are in violation. My car was not beyond the pole. My rear bumper was parallel with the pole that the sign was on. (Incidentally, my car color is bronze - not green as indicated on the citation.)

While I understand that there is a "crackdown" on parking violations and the city is trying to raise much needed money, I believe that a standard of fairness must be maintained.

I have enclosed a diagram of the position of my car as defense for my opposition. I appreciate your time in evaluating this appeal and pray for a favorable adjudication.

Sincerely,

Sandra Newsome
171-12 119th Avenue
St. Albans, NY 11434
Lic. # AHG 2931

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

NEW YORK, NY 10004

| | | |
|---|---|---|
| Postage | $ | 0.37 | UNIT ID: 0013 |
| Certified Fee | 2.30 | |
| Return Receipt Fee (Endorsement Required) | 1.75 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | Clerk: KKCZ02 |
| Total Postage & Fees | $ | 4.42 | 02/04/04 |

Sent To  Hon. Jonathan Lippman

Street, Apt. No.; or PO Box No.  Chief Administrative Judge
of Court Administration

City, State, ZIP+4  25 Beaver St.
New York, NY 10004

PS Form 3800, June 2002                    See Reverse for Instructions

7003 3110 0002 4571 6257

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hon. Jonathan Lippman
Chief Administrative
Judge
Office of Court
Administration
25 Beaver Street
New York, NY 10004

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  | C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
   (Transfer from service label)  7003 3110 0002 4571 6257

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540

 

**UNITED STATES
POSTAL SERVICE®**

## Track & Confirm

**Current Status**

You entered 7003 3110 0002 4571 6257

Your item was delivered on February 09, 2004 at 6:27am in NEW YORK, NY 10004. The item was signed for by J WILLIAMS. Additional information for this item is stored in files offline. A proof of delivery record may be available through your local Post Office for a fee.

**Restoration Options**

▶ **Restore Offline Item**      What is this?        *Go>*

**Track & Confirm**
Enter label number:

Track & Confirm FAQs

POSTAL INSPECTORS
Preserving the Trust

site map  contact us  government services
Copyright © 1999-2002 USPS. All Rights Reserved. Terms of Use  Privacy Policy

R







**Appellate Term**
**Supreme Court of the State of New York**
**2nd and 11th Judicial Districts**

JAIME A. RIOS
ASSOCIATE JUSTICE

SUPREME COURT CHAMBERS
125-01 QUEENS BOULEVARD
NEW GARDENS, NY 11415-1565
(718) 520-7144

**Personal**

November 16, 2001

Ms. Jayne McGee
Casino Host
Treasure Island Hotel
3300 Las Vegas Boulevard
Las Vegas, NV  89109

Dear Ms. McGee,

It was a pleasure speaking with you last month. Unfortunately with all the stress accompanying the recent tragedies in New York City, I didn't have the opportunity to write sooner. Your comments to Art Polner, and the joviality expressed during our conversation, suggest you are definitely a p arty person. I look forward to sharing some laughs with you in January.

I wish to remind you that I will arriving at the hotel on January 31, 2002, and will depart on February 4, 2002 (4 nights).

As in the past our group looks forward to the Super Bowl party and Treasure Island's customary hospitality. Wishing you and yours a safe and meaningful Thanksgiving holiday.

Yours truly,

Jaime A. Rios

JAR/sb

S



**Judith B. Memblatt, Esq.**
98-51 65th Avenue, # 2A
Rego Park, NY 11374

August 23, 2004

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Major Robert Gardner
Supreme Court, Queens County
88-11 Sutphin Boulevard
Jamaica, NY 11435

Dear Major Gardner:

On May 26, 2004, I placed a telephone call to you in response to a message that you had left for me. You stated that you wanted to arrange for personal property of mine that was in your custody to be delivered to my home by personnel of your office, or, for me to personally retrieve the items. I replied that I did not want anyone from your office to come to my home. You shouted, "Fine, then it will be put in storage with fiscal and you can pick it up whenever you want to!" I noted that, on the two prior occasions that I had appeared at the courthouse for the same purpose, I had been required to telephone in advance and, upon my arrival, announce myself to the court officers at the desk on the first floor so that they could have someone accompany me upstairs. I told you that there did not seem to be any valid reason for placing such demeaning restrictions upon my access to the public areas of a public building – restrictions that are not placed upon defendants with criminal records who are out on bail. You adamantly denied that there were any restrictions and claimed that you had only utilized such procedures "to help" me. When, I responded "That's not true," and recounted that Lieutenant Lynne Franzone previously had denied my request to be permitted to leave

the courthouse without having a court officer escort me in the public part of the building, you immediately hung up the phone.

In light of your conduct, I did not make any further attempts to retrieve my property from the courthouse. On the two earlier occasions that I had appeared and announced myself, pursuant to your instructions, the court officers at the desk on the first floor acted as though the matter was a big joke and laughed about it loudly as members of the public observed. Additionally, the manner in which court officers have behaved toward me in the public areas of the courthouse could only have led court employees and members of the public to erroneously conclude that there was some legitimate reason for me to be treated as though I were in custody. Although you must have been aware that these unwarranted restrictions upon my access to a public courthouse could only injure my reputation in the area as an attorney, you subjected me to them even prior to my first trip to the courthouse to recover my property.

On June 17, 2004, I telephoned Ross Teichman to ascertain whether my lump sum check had arrived. He told me that the personnel office had received the check, but could not mail it to me at the time inasmuch as the Pitney Bowes meter had run out of postage. He suggested that I pick up the check. Not wanting to suffer any further damage to my reputation as a result of the conduct of court officers in the Jamaica courthouse, I initially told Mr. Teichman that I would prefer that the check be mailed to me as soon as possible. After he replied that it might not be mailed until the following week, I agreed to travel to the courthouse to retrieve the check. He advised me that I could come to the personnel office and sign for my check at any time before 4:45 p.m. Inasmuch as he did not tell me that I would be required to announce myself to the court

2

officers on the first floor so that they could have someone escort me to the fifth floor, I became hopeful that you actually were ceasing to impose any such restrictions upon me. Unfortunately, it quickly became apparent that your representation to me lacked any credibility whatsoever. Although no one prevented me from coming upstairs on my own, once I had signed for my check, left the personnel office and approached the fifth floor elevators to leave the building, a court officer breathlessly ran up to me and loudly proclaimed that he had been instructed that I was "not allowed in the building." Almost simultaneously, he spoke into his radio and reported, "I have her on the fifth floor." He then demanded to know why I was there. I told him that I was there to pick up my check. He repeated my response into his radio and walked away from me. This conspicuous and demeaning display was observed by various members of the public who were in the vicinity. Once again, my reputation was damaged by the improper conduct of court officers who are under your supervision.

The records that I recently have received from the Office of Court Administration, pursuant to Freedom of Information Law (FOIL) requests, include a series of reports made by yourself, Lieutenant Lynne Franzone and Lieutenant Lawrence Sullivan that are replete with false and defamatory statements, as well as a letter, dated May 26, 2004, that you purportedly sent to me. I have never received this letter, except for the copy furnished in response to my FOIL requests. Further, you never advised me that my property would only be kept for 30 days from the date of that purported letter. To the contrary, in our telephone conversation on the same date, you specifically stated to me that I could pick up my property from the fiscal office whenever I wanted to do so.

The manner in which you and those acting under your direction have behaved

3

toward me appears to be intended as retaliation for my statement to Justice Rios that I will be commencing litigation against him, the complaints that I have filed with the Commission on Judicial Conduct against him and Justice Fisher and the substance of those complaints.

It is hereby demanded that you cease and desist from causing further damage to me in my profession by imposing unconstitutional restrictions upon my ability to access the public areas of the courthouse - restrictions that are not even imposed upon predicate felons who are out on bail. Inasmuch as I am an attorney who resides in Queens, the imposition of such unconstitutional restrictions upon me deprives me of the ability to earn a livelihood. I cannot have any hope of gaining employment in my profession if I must advise prospective employers that I will be accosted by court officers if I attempt to enter the courthouse. Additionally, I now have been granted an Attorney Secure Pass. I am entitled to all of the rights and privileges associated with that pass.

It also is hereby demanded that you cease and desist from any further publication of the aforementioned defamatory reports, and, that you cause their immediate removal from any files in which they appear.

Thank you for your attention to this matter.

Sincerely,

Judith B. Memblatt, Esq.

4



**U.S. Postal Service™**

**CERTIFIED MAIL™ RECEIPT**

(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

JAMAICA, NY 11435

| | | |
|---|---|---|
| Postage | $ | 0.37 | UNIT ID: 0013 |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | 2.30 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | 1.75 | Clerk: KRG1SX |
| Total Postage & Fees | $ | 4.42 | 08/23/04 |

Sent To Major Robert Gardner
Street, Apt. No.; Supreme Court Queens County
or PO Box No. 88-11 Sutphin Boulevard
City, State, ZIP+4 Jamaica, NY 11435

PS Form 3800, June 2002          See Reverse for Instructions



**UNITED STATES
POSTAL SERVICE**

```
***** WELCOME TO *****
  FOREST HILLS STATION
     11375-4248
  08/23/04 11:58AM

Store  USPS          Trans    48
Wkstn  sys5003       Cashier  KRG1SX
Cashier's Name       CHAMPABEN
Stock Unit Id        STACP
PO Phone Number      18002758777
USPS #               3568880013

1. First Class                      4.42
     Destination:    11435
     Weight:         0.90oz
     Postage Type:   PVI
     Total Cost:     4.42
     Base Rate:      0.37
         SERVICES
     Certified Mail             2.30
       70040750000280773983
     Return Receipt             1.75

Subtotal                       4.42
Total                          4.42


Cash                           5.00
Change Due
     Cash                      0.58

Number of Items Sold: 1

     Save a trip to the Post Office
       Ship from home or office
           Use Click-n-Ship
        USPS.com/clicknship
```

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Major Robert Gardner
Supreme Court, Queens County
Jamaica, NY 11435

*COMPLETE THIS SECTION ON DELIVERY*

A. Received by *(Please Print Clearly)*   B. Date of Delivery

C. Signature
X
☐ Agent
☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

AUG 24 2004

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number
   7004 0750 0002 6077 3983

PS Form 3811, July 1999          Domestic Return Receipt          102595-00-M-0952