UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JUDITH B. MEMBLATT,

                Plaintiff,

                                05-CV-1021
     -against-                    (RJD)(LB)


JAIME A. RIOS, Associate Jusitce,
Appellate Term, Supreme Court, State
of New York, 2nd and 11th Judicial
Districts, STEVEN W. FISHER, Associate
Justice, Appellate Division, Supreme
Court, State of New York, 2nd Department,
JONATHAN LIPPMAN, Chief Administrative
Judge of the Courts of the State of
New York, LAUREN DeSOLE, Director of
the Division of Human Resources, New
York State Unified Court System, Office
of Court Administration, ANTHONY
D'ANGELIS, Chief Clerk, Supreme Court
State of New York, Queens County,
ROBERT W. GARDNER,  Major of Officers,
Supreme Court, State of New York,
SANDRA NEWSOME, Secretary to Judge,
Supreme Court, State of New York,
HEIDI HIGGINS, Secretary to Judge,
Supreme Court, State of New York,
KAREN KOSLOWITZ, Deputy Borough
President, County of Queens, City of
New York, THOMAS J. MANTON, GERARD
J. SWEENEY and MICHAEL H. REICH,

                Defendants.

----------------------------------------X

## STATE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

### <u>Preliminary Statement</u>

        Plaintiff, Judith B. Memblatt, a former court attorney to

the Honorable Jaime A. Rios, Justice of the New York State Supreme

Court, Queens County ("Justice Rios"), brings this action pursuant

to 42 U.S.C. § 1983 alleging that defendants violated her rights under the First and Fourteenth Amendments to the United States Constitution and the New York State Constitution in connection with, and eventual termination from, her employment as Justice Rios' court attorney.

  This memorandum of law is submitted on behalf of Justice Rios, the Honorable Jonathan Lippman, Chief Administrative Judge of the Courts of the State of New York ("Justice Lippman"); the Honorable Steven W. Fisher, Justice of the New York State Supreme Court, Appellate Division, Second Department ("Justice Fisher"); Lauren DeSole, Director of Human Resources for the State of New York, Office of Court Administration ("OCA"); Anthony D'Angelis, Chief Clerk of the New York State Supreme Court, Queens County ("Chief Clerk D'Angelis"); Major Robert W. Gardner, a Senior Court Officer in the Supreme Court, Queens County ("Major Gardner"); Sandra Newsome, Justice Rios' clerical secretary; and Heidi Higgins, clerical secretary to the Honorable Mark H. Spires, (collectively "State Defendants") in support of their motion to dismiss the complaint pursuant to Rule 12 (b) (1) and (6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). As will be demonstrated below, plaintiff's complaint must be dismissed for failure to state a claim as it is an absurd concoction of confusing and disjointed "facts", allegations and conspiracy theories that has no internal coherency and relies on illogical and conclusory

2

allegations that plainly defy reason.

## STATEMENT OF FACTS

Plaintiff's complaint, which is ninety three (93) pages plus exhibits and contains two hundred sixty five (265) paragraphs, names twelve defendants and contains ten causes of action. Plaintiff's first four causes of action allege racial and religious discrimination as against Justice Rios and Sandra Newsome, aided and abetted by Lauren DeSole and Chief Clerk D'Angelis.   In the fifth, sixth and seventh causes of action, plaintiff alleges that presumably all of the defendants conspired to terminate her employment for political reasons and in violation of her First Amendment rights.   The eighth, ninth and tenth causes of action allege defamation, libel and slander as against all defendants.

## 1991 through 1995

According to the complaint, on April 24, 1991, defendant Koslowitz, a City Council member, hired plaintiff as a part-time aide.   Complaint ¶ 24.[1]   During the time plaintiff worked for

---

[1]In considering a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true. Hughes v. Rowe, 449 U.S. 5, 10 (1980).  There are, however, limitations on this requirement that are particularly applicable here. First, the court is only required to draw "*reasonable inferences*" in the plaintiff's favor. " Giaccio v. City of New York, No. 04 CIV. 3652, 2005 U.S. Dist. LEXIS 642, at *5 (S.D.N.Y. Jan. 19, 2005) (internal quotations omitted; emphasis added). Second, "mere conclusions of law or *unwarranted deductions* need not be accepted." Id. (internal quotations omitted; emphasis added); see also Cohen v. Litt, 906 F. Supp. 957, 961 (S.D.N.Y. 1995) ("a court need not accept a complaint's legal conclusions and unwarranted factual deductions").

defendant Koslowitz, she was a member and first Chairperson of the Board for the Continental Regular Democratic Club ("CRD Club"), a club lead by defendant Koslowitz and Michael Cohen.  Id. at ¶ 23.

On January 3, 1993, plaintiff began working for the New York State Unified Court System ("UCS") as a court attorney in the Housing Part of the New York City Civil Court, Queens County.  Id. at ¶¶ 5, 27.  In connection with her employment for the UCS, plaintiff resigned from her positions with defendant Koslowitz and the CRD Club.  Id. at ¶ 27.  As part of her duties as a court attorney, plaintiff occasionally assisted Justice Rios who at that time was a judge in the Housing Court.  Id.

In 1993, Justice Rios received the endorsement of the Democratic Organization of Queens County as a candidate for the Civil Court of the City of New York, Queens County ("Civil Court").  Id. at ¶ 28.  In November 1993, Justice Rios was elected a judge of the Civil Court.  Id. at ¶ 29.  After being elected, Justice Rios hired plaintiff as his court attorney.  Id.

---

Plaintiff's complaint is replete with unreasonable inferences and unwarranted factual deductions.  For example, with respect to Exhibit E to her complaint, a calender entry containing the letters "Hon.", "K" and "M" and the word Hawaii in the margin, rather than draw the logical conclusion that Justice Rios was going to travel to Hawaii in July 1996 and spend July 4, 5 and 6 in Honolulu, July 7, 8, 9, 10, and 11 in Kauai, and July 12 and 13 in Maui, plaintiff draws the patently absurd conclusion that the letter K stands for Kathellen Pizarro, Justice Rios' wife, and the letter M stands for Assistant District Attorney Meryl A. Lutsky to support of her allegation that Justice Rios was having an inappropriate relationship with Ms. Lutsky.  See Complaint ¶ 62.

In February 1994, Michael Cohen ran for and lost, in a special election, the New York State Assembly seat vacated by Alan Hevesi. Id. at ¶ 30. The Seat was won by Melinda Katz. Id. As a result of this loss and his inability to run in the September 1994 Democratic Party primary for the Assembly Seat, Michael Cohen sought to retaliate against members of the CRD Club whom he believed failed to support his candidacy. Id. at ¶ 35. Plaintiff was one of those individuals. Id. at ¶ 37.

In September 1994, Justice Rios was nominated as a candidate for the Supreme Court of the State of New York ("Supreme Court") by the Democratic Organization of Queens County. Id. at ¶ 37. In November 1994, Justice Rios was elected as a Justice of the Supreme Court. Id. at ¶ 38. After being elected, Justice Rios hired plaintiff as his principal law clerk/court attorney. Id. He also hired Sandra Newsome as his clerical secretary. Id. Plaintiff claims that Michael Cohen sought to prevent plaintiff from being hired by Justice Rios in November of 1994 and to have her employment with UCS terminated because he believed that plaintiff had failed to actively campaign for him during his failed bid for the Assembly seat in February 1994. Id. at ¶ 37.

**1995 through 1998**

In January 1995, in order to ameliorate Michael Cohen's anger over the fact that plaintiff had not been punished as part of his political vendetta, plaintiff alleges that defendant Koslowitz

5

excluded plaintiff from the inner circle of the CRD Club. Id. at ¶ 40. Plaintiff continued her membership in the CRD Club for several more years even though she was excluded from its inner circle. Id.

Plaintiff also claims that commencing on the first day of his term as a Justice of the Supreme Court in January 1995, Justice Rios became negative and hostile towards plaintiff. Id. at ¶ 41. Plaintiff claims that Justice Rios began to atypically incorporate the word "Jewish" into statements he made to plaintiff and that he and Ms. Newsome were "ostensibly cold" towards her, thereby creating an "us against her" atmosphere throughout plaintiff's employment. Id. Additionally, from the commencement of her employment, Ms. Newsome "often exhibited blatant hostility toward plaintiff." Id. at ¶ 42.

In May or June of 1995, after learning that Martin Ritholtz, a rabbi and principal law clerk, was nominated as a candidate for the Civil Court, Justice Rios repeatedly shouted in plaintiff's presence "That rabbi is getting my vacancy" (meaning the seat he had left when he became a Justice of the Supreme Court). Id. at ¶ 43. Thereafter, in June of 1995, in chambers and in  plaintiff's presence, Justice Rios predicated that Alan Hevesi would be the next candidate for mayor because it "always goes to a Jew!" Id. at ¶ 45. In July 1995, Justice Rios moved from the courthouse located in Jamaica to the courthouse located in Kew Gardens. Id. at ¶ 45.

In September or October 1995, Justice Rios stated to Ms. Newsome that Louis Farrakhan, whom plaintiff recognized as a person who frequently makes anti-Semitic statements in public, was "a great leader." Id. at ¶ 47.  In October 1995, plaintiff claims that Ms. Newsome told her that she had "a problem with [her] religion because [she] do[esn]'t accept Christ[,]" and that a Jewish Caucasian store owner deserved protests outside his business in Harlem because he was an "interloper" and "should not own a store in that neighborhood." Id. at ¶ 49.

In January 1996, Meryl A. Lutsky, an Assistant District Attorney ("ADA Lutsky"), was assigned to Justice Rios' part in the criminal term of Supreme Court.[2] Id. at ¶ 54.  Shortly thereafter, Justice Rios took plaintiff to dinner at The Parkside Restaurant in Corona, New York.  Id.  Upon entering the restaurant, Justice Rios and plaintiff noticed ADA Lutsky and several other female prosecutors having dinner.  Id.  After briefly exchanging greetings, Justice Rios and plaintiff went to their table.  Id.  A few minutes later, ADA Lutsky approached the table and spoke with Justice Rios who commented to her that she was very "svelte." Id. In the months following, Justice Rios and ADA Lutsky interacted

---

[2]Since March 6, 2000, Ms. Lutsky has been employed by this Office as an Assistant Attorney General with the Organized Crime Task Force.  This Office has considered the situation and determined, after due consideration, that its representation of the State defendants is not inconsistent with its responsibilities under the Code of Professional Conduct.

with each other in a manner "suggestive of the existence of an inappropriate personal relationship." Id. at ¶ 55.  In late 1996, plaintiff telephoned ADA Lutsky to persuade her to transfer to a different part because of the inappropriate relationship with Justice Rios. Id. at ¶ 64. When plaintiff was later confronted by ADA Lutsky's supervisor regarding her accusations, she denied making them because she felt that her employment was being intentionally jeopardized in retaliation for her statements.  Id.

In January 1998, Melinda Katz decided to run in the 1998 United States Congressional race for the seat that Charles Schumer was vacating to run for the United States Senate. Id. at ¶ 69. Defendants Koslowitz and Manton and Michael Cohen endorsed Katz. Id.  In May 1998, plaintiff attended the opening of Melinda Katz's campaign headquarters and later volunteered to work on her campaign. Id. at ¶ 70.  Defendant Koslowitz also attended the opening.  Id.  After attending the opening and volunteering to work on the campaign, plaintiff claims that defendants Koslowitz, Manton, Sweeney and Reich, and Michael Cohen took revenge against her even though they supported Katz's campaign.  Id.  As a result, plaintiff's association with the CRD Club ended. Id.  Thereafter, plaintiff alleges that Ms. Higgins began characterizing plaintiff as "disloyal" in numerous statements made to Supreme Court justices and employees of the UCS in Queens. Id. at ¶ 71.

Plaintiff alleges that in early June 1998, Justice Rios informed plaintiff that the Supreme Court, Appellate Division screening committee instructed him to withdraw his previously submitted application for the position of Associate Justice because it believed he had engaged in inappropriate "womanizing." Id. at ¶ 72. It is plaintiff's belief that "[t]he accusatory manner in which he related this occurrence appeared to reflect that the inappropriate 'womanizing' consisted of his conflict of interest concerning ADA Lutsky, and, to indicate that he blamed plaintiff for the screening committee's knowledge of that situation." Id.

**2002 through 2004**

In or about September 2002, plaintiff claims that Ms. Higgins and Ms. Newsome began routinely discussing "their knowledge" that plaintiff would be discharged from her employment. Id. at ¶ 93. Plaintiff also claims that Justice Rios was trying to avoid her. Id. at ¶¶ 94, 96. Then in late September 2002, Justice Rios ceased having plaintiff review assigned counsel plan vouchers. Id. at ¶ 97.

On March 5, 2003, plaintiff claims that Justice Rios stated to her "I'm concerned about you" and "You make noises." Id. at ¶ 111. Plaintiff stated there was no basis for the claim that she made noises and also stated that she had been subjected to "extreme hostility" by Ms. Newsome and Ms. Higgins. Id. Justice Rios stated that he would speak to Ms. Newsome. Id.

On or about May 29, 2003, Justice Rios informed plaintiff that he was concerned about her. Id. at ¶ 122.  Plaintiff alleges Justice Rios was expressing concern as a result of coaching he received from the OCA in order to set up plaintiff's discharge. Id.  On July 2, 2003, Justice Rios stated that he would like plaintiff to take two weeks of vacation before Labor Day. Id. at ¶ 127.  Plaintiff claims that because Justice Rios did not tell her when he was taking his vacation, this was an obvious attempt to ensure plaintiff would be on vacation while he was in court; therefore, she declined.  Id.

On the evening of July 18, 2003, Justice Rios provided plaintiff with the name, title and telephone number of Kay Ann Porter, OCA's Special Inspector General for Bias Matters. Id. at ¶ 130.  Plaintiff claims that Justice Rios informed her that he had spoken with Ms. Porter concerning plaintiff's complaints of discrimination.  Id.  He further stated that plaintiff could call Ms. Porter if she desired.  Id.  He also informed plaintiff that Ms. Newsome had denied making any comments about plaintiff's religion.  Id.

In November 2003, Justice Rios moved from the courthouse located in Kew Gardens to the courthouse located in Jamaica and took over retired Justice Joan Durante's part. Id. at ¶¶ 154, 155. Later that month, Justice Rios informed plaintiff that he was considering applying for a position as Associate Justice of the

Supreme Court, Appellate Division and asked if plaintiff would be interested in accompanying him as his law secretary. Id. at ¶ 156. Plaintiff said that she would.   Id.   Justice Rios later told plaintiff he had decided against applying.   Id.

On December 2, 2003, plaintiff gave Justice Rios drafts of two short form orders she had prepared. Id. at ¶ 162. Thereafter, Justice Rios deposited the drafts and the attached files into a basket on plaintiff's desk without signing or changing them.   Id.   After receiving a telephone call from Ms. DeSole, Justice Rios retrieved the drafts and the files and asked plaintiff where the law department was located. Id.  Plaintiff believes that Ms. DeSole had advised Justice Rios to bring the drafts to the law department in an attempt to find some flaws in plaintiff's work. Id.

On December 4, 2003, plaintiff entered Justice Rios' office to read the New York Law Journal. Id. at ¶ 163.  Ms. Newsome told plaintiff that she did not think Justice Rios wanted anyone in his office.   Id.   Plaintiff replied that Justice Rios had never told her that. Id.  Later that day, Justice Rios, with Ms. Newsome present, demanded that plaintiff explain what had happened earlier that morning.   Id.   After plaintiff related what had occurred, Justice Rios hollered "I don't want anyone in my office."   Id. When plaintiff asked whether she could enter his office to retrieve legal volumes for research, Justice Rios falsely declared that

11

plaintiff was "ranting" and repeated that he did not want anyone in his office. Id. Plaintiff claimed that she was being treated in a discriminatory fashion. Id. Justice Rios then instructed plaintiff to bring him all the motions she was working on and to go home for the day. Id. When plaintiff asked if she was being fired, Justice Rios told her to return in the morning. Id.

On December 11, 2003, plaintiff claims that events occurred that "evidenced the joint participation of defendants Lippman, DeSole, Fisher, D'Angelis, Gardner, Rios and Newsome in an unconscionable preplanned effort to destroy plaintiff's reputation so as to protect Justice Rios from accountability for his own misconduct, and, to retaliate against plaintiff for the political purposes . . . at the behest of defendants Manton, Sweeney, Reich and Koslowitz." Id. at ¶ 166. These events included arranging for Ms. DeSole to come meet with Justice Rios at the Jamaica courthouse. Id. at ¶ 167.

At approximately 3:45 p.m., Ms. DeSole and Chief Clerk D'Angelis met with Justice Rios in his chambers. Id. at ¶ 168. Justice Rios then invited plaintiff in and gave plaintiff the choice of either going on vacation until January 28, 2004 or being fired. Id. He informed her that if she did not sign a document stating she was taking voluntary annual leave she would be fired. Id. Ms. DeSole offered plaintiff a brochure pertaining to a mental health program. Id. Ms. DeSole further stated that Justice Rios

12

could simply fire plaintiff rather than providing her with the option of taking annual leave. Id. Plaintiff replied that Supreme Court justices were prohibited from terminating employees for unconstitutional reasons and she would like to speak to Ms. DeSole and Chief Clerk D'Angelis about acts of misconduct committed by Justice Rios. Id. Plaintiff claims that Justice Rios stated he would withdraw his offer because plaintiff stated he committed misconduct and demanded that plaintiff apologize. Id. Ms. DeSole then stated that she and Chief Clerk D'Angelis were there to support Justice Rios. Id. Plaintiff apologized and signed the document agreeing to take annual leave. Id. Plaintiff was instructed to call Justice Rios prior to returning. Id. Plaintiff believes this meeting was rehearsed. Id.

On January 23, 2004, plaintiff called Justice Rios as instructed. Id. at ¶ 171. While discussing how plaintiff felt about returning to work, plaintiff asked whether Justice Rios was requiring her to withdraw the complaints of discrimination she raised with him. Id. Justice Rios told plaintiff she could return to work on Thursday, January 29, 2004 or take three additional days. Id. Plaintiff chose to take the three additional days. Id. Justice Rios memorialized this in a letter. Id. at ¶ 172.

On February 3, 2004, plaintiff returned to work. Id. at ¶ 173. After retrieving her identification card from Chief Clerk D'Angelis, plaintiff went to chambers but was unable to log onto

13

her computer. Id. at ¶ 174. Justice Rios informed her that in order to log onto her computer she would have to enter an additional password.  Id.  Justice Rios then informed plaintiff that he was changing her job duties and that she would only be allowed to work on matters he gave her. Id.  The next day, plaintiff slipped on an icy sidewalk and broke her right ankle. Id. at ¶ 177.  As a result, plaintiff went out on sick leave until March 8, 2004. Id.  While she was out, plaintiff received a telephone call from Sherrill Spatz, then the Special Inspector General for Fiduciary Appointments of OCA, with respect to a letter plaintiff had written concerning Ms. Newsome. Id.  During their conversation, plaintiff informed Ms. Spatz that she had complained to Justice Rios about discrimination and that he had dismissed her complaints. Id. at ¶ 179.  Plaintiff also informed Ms. Spatz of the events surrounding her taking annual leave.  Id.

On March 8, 2004, plaintiff returned to work. Id. at ¶ 180.  Upon her return, she was unable to log onto her computer and had to be given an additional password by Justice Rios.  Id.   On March 11, 2004, plaintiff informed Justice Rios that she "was reserving the right to commence litigation based upon the fact that she had been unlawfully coerced into taking annual leave." Id. at ¶ 185.  Plaintiff further claims after her return, Justice Rios had given tasks that she used to perform to Ms. Newsome. Id. at ¶¶ 184, 189, 195, 197, 198.

14

On April 16, 2004, Justice Rios provided plaintiff with a redrafted version of a decision she had drafted and instructed her to change the decision she had drafted on the co-defendant's motion to conform with it. <u>Id</u>. at ¶ 205. When she attempted to speak to him about the decisions, he told her he intended to proceed as indicated. <u>Id</u>. As he walked away, "plaintiff commented that his conduct toward her obviously was motivated by his bias against her religion." <u>Id</u>.

**<u>Plaintiff's Termination</u>**

On April 19, 2004, at approximately 9:00 a.m., Justice Rios, accompanied by Major Gardner, entered chambers. <u>Id</u>. at ¶ 206. Justice Rios asked plaintiff into his office and read her a letter stating that her services were no longer needed. <u>Id</u>.  He told her that she would be placed on administrative leave until May 5, 2004. <u>Id</u>.  After Justice Rios terminated her, plaintiff informed him that she intended to commence litigation against him. <u>Id</u>.  Justice Rios then instructed plaintiff to provide him with her identification card, which she did, and directed Major Gardner to escort plaintiff out.  <u>Id</u>.

**<u>Plaintiff's Post Termination Complaints</u>**

In a letter, dated April 22, 2004, plaintiff wrote to Justice Fisher stating that she was going to bring a lawsuit as a result of her employment by Justice Rios and demanded that Justice Fisher preserve evidence. <u>Id</u>. at ¶ 210.  In a letter, transmitted

to Justice Rios by facsimile on April 22, 2004, plaintiff informed him that his "unconstitutional actions regarding the terms and conditions of my employment, including my termination, will be subject to litigation . . .." <u>Id</u>. at ¶ 211.

On April 29, 2004, plaintiff filed a complaint with the New York State Commission on Judicial Conduct ("Commission") complaining of Justice Rios' conflict of interest with respect to ADA Lutsky and his <u>ex parte</u> communication with another assistant district attorney. <u>Id</u>. at ¶ 214.  On May 4, 2004, plaintiff filed a complaint with the Commission complaining of Justice Fisher. <u>Id</u>. at ¶ 215.  On May 28, 2004, plaintiff filed a second complaint with the Commission complaining of Justice Rios' improper use of Supreme Court, Appellate Term stationary and a 1996 calendar entry concerning a county dinner. <u>Id</u>. at ¶ 226.

## ARGUMENT

### POINT I

**PLAINTIFF'S CLAIMS PURSUANT TO 42 U.S.C. § 1983, THE HRL, THE CHRL, AND STATE TORT LAW AGAINST THE STATE DEFENDANTS ARE BARRED BY THE ELEVENTH AMENDMENT**

The Eleventh Amendment to the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  Eleventh

Amendment immunity "represents a real limitation on a federal court's federal-question jurisdiction," Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 270 (1997), and bars a suit in a Court of the United States by a citizen of a state against that state, or one of its agencies, absent its consent to such a suit or an express statutory waiver of immunity.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 (1984).

    The State of New York has not consented to suit in federal court, and the provisions of 42 U.S.C. § 1983 were not intended to override a state's immunity. Quern v. Jordan, 440 U.S. 332, 343 (1979); Santiago v. New York State Dep't of Correctional Servs., 945 F.2d 25, 31 (2d. Cir.), cert. denied, 502 U.S. 1094 (1992).  Nor has the State of New York waived its Eleventh Amendment immunity with respect to claims arising under the Human Rights Law, see Jungels v. State Univ. Coll. of New York, 922 F. Supp. 779, 784 (W.D.N.Y. 1996), aff'd sub nom., Jungels v. Jones, 112 F.3d 504 (2d Cir. 1997); Schallop v. New York State Dep't of Law, 20 F. Supp. 2d 384, 391 (N.D.N.Y. 1998), or with respect to claims arising under the New York City Human Rights Law. Leiman v. New York, 98 Civ. 5538, 2000 U.S. Dist. LEXIS 13586 (S.D.N.Y. Sept. 21, 2000) (holding that the City of New York does not have the power to waive the State's sovereign immunity regarding Administrative Code claims).  Thus, the Eleventh Amendment absolutely bars suits against the State or one of its agencies for

17

monetary relief, as well as suits seeking declaratory and injunctive relief. See Pennhurst State Sch. & Hosp., 465 U.S. at 100; Cory v. White, 457 U.S. 85, 91 (1982)).

Eleventh Amendment immunity also extends to damage actions against state officials sued in their official capacities if the state is the real party in interest. Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993); Thaler v. Casella, 960 F. Supp. 691, 700 (S.D.N.Y. 1997). See also Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060 (2d Cir. 1989). Here, there is no question that plaintiff is suing State defendants in their respective official capacities as plaintiff describes each State defendant by his or her respective title/position and fails to state that she is suing the State defendants in their respective individual capacities. See Complaint ¶¶ 6-13 (e.g. ¶ 6 "Defendant Jaime A. Rios is a Justice of the Supreme Court of the State of New York, Queens County."). Plaintiff's naming of the State defendants in their official capacities must be viewed as a conscious decision on the part of the plaintiff[3] who is an attorney and a former employee of the UCS and Justice Rios and who would, therefore, be aware of the distinction between an official capacity action and an individual capacity action.

---

[3]"Practicing attorneys who choose to represent themselves cannot claim the special considerations normally afforded to pro se litigants." Levine v. McCabe, 357 F. Supp.2d 608, 613-14 (E.D.N.Y. 2005), (citing Harbulak v. Suffolk County, 654 F.2d 194, 198 (2d Cir. 1981)).

Accordingly, plaintiff's claims are barred by the Eleventh Amendment.

## POINT II

### PLAINTIFF FAILS TO STATE A POLITICAL TERMINATION CLAIM

Plaintiff alleges that her discharge by Justice Rios was politically motivated.[4]  Accepting this allegation as true for the purposes of this motion, plaintiff fails to state a claim for retaliatory discharge because plaintiff, a beneficiary of a political patron, could be terminated for purely political reasons.

As the United States Supreme Court has recognized, political affiliation is a permissible employment criterion for policy making and/or confidential positions.  See Branti v. Finkel, 445 U.S. 507, 517-18 (1980); Elrod v. Burns, 327 U.S. 347, 367 (1976).  Plaintiff, a law secretary to Justice Rios, was employed in a confidential position subject to termination based upon political affiliation.

Determining whether a person occupies a position subject to discharge for political reasons is a question of law.  Gordon v. County of Rockland, 110 F.3d 886, 888-89 (2d Cir. 1997).  In Vezzetti v. Pellegrini, 22 F.3d 483, 486 (2d Cir. 1994), the Second

---

[4]The actions which plaintiff alleges led to her termination for political reasons occurred in 1994 and 1998 and therefore, are outside the applicable statute of limitations.  See infra, Point VI.  Additionally, the time between those occurrences and plaintiff's termination make her claims untenable.

Circuit identified eight factors used to determine if an individual is in a position susceptible to discharge for reasons related to political patronage.  These factors include:

> whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, (8) is responsive to partisan politics and political leaders.

Id.  "Th[e] list is not exhaustive, but instead serves as a guide; no one factor or group of factors is always dispositive."  Butler v. New York State Dept. of Law, 211 F.3d 739, 744 (2d Cir. 2000), citing Vezzetti, 22 F.3d at 486.

Based on these factors, plaintiff clearly held a confidential position and, therefore, was not protected from political patronage dismissals.  As an initial matter, Justice Rios is an elected official.  See N.Y. Const. Article VI, § 6( c); complaint ¶ 38.  Pursuant to N.Y. Judiciary Law § 36, Justice Rios is authorized to appoint a court attorney and secretary as his or her "personal assistant."  It cannot be disputed that plaintiff was appointed by Justice Rios pursuant to this section as his court attorney and that Justice Rios alone had the authority to hire and fire her.  See Complaint ¶ 38; see also N.Y. Judiciary Law § 36(1); 22 NYCRR § 5.1.  Thus, a court attorney to a judge is an at-will employee who serves at the pleasure of the judge for whom he or she

is employed.  See Shepard v. Beerman, 94 F.3d 823, 829 (2d Cir. 1996), (citing Olivia v. Heller, 839 F.2d 37, 40 (2d Cir. 1998) (law clerks amount to "extensions of the judges at whose pleasure they serve" (internal citations omitted)).  Additionally, as a court attorney, plaintiff occupied a position that required technical competence and expertise.  State defendants concede however, that plaintiff did not control others.

        The remaining factors have been condensed into one question:  "whether the employee in question is empowered to act and speak on behalf of a policymaker, especially an elected official."  Butler, 211 F.3d at 744, (quoting Gordon v. County of Rockland, 110 F.3d 886, 890 (2d Cir. 1997)).  Clearly the answer to this question is yes.  In Olivia v. Heller, the Second Circuit described a court attorney as "probably the one participant in the judicial process whose duties and responsibilities are most intimately connected with the judge's own exercise of the judicial function."  839 F.2d at 40.  Indeed, in Shepard v. Beerman, the Second Circuit noted that the position of a court attorney is "an extremely confidential [and/] or highly placed advisory position."  317 F.3d 351, 356 (2d Cir. 2003) (citations omitted)).  While a court attorney does not literally act or speak on behalf of a judge, he or she handles sensitive communications for the judge, assists the judge in the rendering of legal opinions and decisions, and is aware of the disposition of cases prior to their being

announced to the public. <u>Olivia</u>, 839 F.2d at 40. Based upon the foregoing, plaintiff occupied a position which satisfied the factors set fourth by the Second Circuit in <u>Vezzetti</u>. <u>See</u> <u>Gordon</u>, 110 F.3d at 891-92 (court did not accept argument that assistant county attorneys only gave legal advice in holding they could be discharged for political reasons); <u>Balogh v. Charron</u>, 855 F.2d 356 (6th Cir. 1998) (in holding that a bailiff who serves only one judge is a patronage employee who can be discharged for purely political reasons, court noted that "[t]he need for confidentiality between a judge and the staff in his immediate chambers is no less necessary than the need for confidentiality between legislators and their aides."); <u>Aliff v. Parker</u>, C-1-02-092, 2002 U.S. Dist. LEXIS 21422, at *31 (S.D. Ohio July 23, 2002) (court held that because of close working relationship requiring, among other things, confidentiality, clerk of court could be terminated based upon political patronage).

Thus, to the extent that plaintiff alleges that her discharge by Justice Rios was politically motivated, she fails to state a claim because at the time of her firing, plaintiff was a confidential at-will employee and therefore not protected from politically motivated discharge. Accordingly, plaintiff's termination was lawful.

## POINT III

**PLAINTIFF FAILS TO STATE A FIRST AMENDMENT RETALIATION CLAIM**

To the extent that plaintiff claims her termination was in retaliation for the exercise of her First Amendment Rights, she again fails to state a claim. In order to prevail on a § 1983 freedom of speech claim, plaintiff must demonstrate by a preponderance of the evidence that: (1) the speech at issue is protected; (2) she suffered an adverse employment action; and (3) the speech was at minimum a substantial or motivating factor in the adverse action. See Mount Healthy City School District Board of Education, 429 U.S. 274, 283-84 (1977); Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000).

A public employee's speech is only protected when the employee speaks "as a citizen upon matters of public concern." See Connick v. Myers, 461 U.S. 138, 147 (1983). The requirement that a government employee's speech touch on matters of public concern protects the employee's interest in free expression while recognizing that "government offices could not function if every employment decision became a constitutional matter." Id. at 143. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Id. at 146.

23

The issue of whether a government employee's speech is protected is one of law for the Court (Connick at 148 n.7; Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 781 (2d Cir.), cert. denied 502 U.S. 1013 (1991)) and is determined "by the content, form and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48.

The instances of speech alleged in plaintiff's complaint can be separated in two categories: (1) pre-termination complaints, including those concerning working conditions; and (2) post-termination complaints. As will be demonstrated, none of these instances of speech are protected by the First Amendment to the United States Constitution.

1. **Pre-Termination Complaints**

It is well settled that expressing dissatisfaction with working conditions is simply not speech on matters of public concern. Tiltti v. Weise, 155 F.3d 596, 603 (2d Cir. 1998); see, e.g., Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d at 781; see also Rivera v. Community School District Nine, 00 Civ. 8208, 2002 U.S. Dist. LEXIS 12185, at *14-15 (S.D.N.Y. Jul. 8, 2002) (collecting cases determining that a public employee's speech related to matters of private interest). Plaintiff's complaints regarding several disagreements with and the alleged racial and religious discrimination by her co-worker, Ms. Newsome, were personal in nature and clearly related to her own situation. See

24

Ezekwo, 940 F.2d at 781 (holding speech not matter of public concern because plaintiff's intent was not to protect public welfare but to protect her reputation and professional development); Saulpaugh v. Monroe Community Hosp., 4 F.3d 134, 143 (2d. Cir 1993), cert denied, 510 U.S. 1164 (1994). Thus, these complaints were not ones of public concern and therefore, not actionable under the First Amendment.

In addition to the complaints about her working conditions, plaintiff threatened to commence litigation with respect to her claims that she was treated in a discriminatory fashion if she were terminated. Specifically, on March 11, 2004, plaintiff stated that she "was reserving the right to commence litigation based upon the fact that she had been unlawfully coerced into taking annual leave" (complaint ¶ 185). Plaintiff's threat that she would commence litigation does not qualify as protected speech. White Plains Towing Corp., v. Patterson, 991 F.2d 1049, 1059 (2d Cir. 1993) ("Even as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight."). If anything, plaintiff's threat of litigation makes clear that she sought "to vindicate personal interests," not "to bring to light a 'matter of political, social, or other concern to the community.'" Rao v. New York Health & Hosps Corp., 905 F.

Supp. 1236, 1243 (S.D.N.Y. 1995) (quoting <u>Connick</u>, 461 U.S. at 46).

Significantly, plaintiff failed to file or make any complaint alleging judicial misconduct on the part of Judge Rios with the Commission during her employment as his law clerk, and when given the opportunity to complain that Justice Rios engaged in inappropriate conduct with ADA Lutsky in or about late 1996, plaintiff denied making any such allegations. <u>See</u> Complaint ¶ 64. Clearly, this is not protected speech. <u>See</u> <u>Giacalone v. Abrams</u>, 850 F.2d 79, 86 (2d Cir. 1988) ("Abstract concern about a particular subject carries no weight if the employee chooses not to articulate it."). Nor did plaintiff suffer any adverse employment action as a result of this "speech", as the first alleged adverse employment action plaintiff alleges to have suffered occurred in late September 2002 when plaintiff alleges Justice Rios altered her work responsibilities (<u>see</u> complaint ¶ 97), six years after the alleged "speech." Finally, the fact that plaintiff filed a complaint against Justice Rios with the Commission after she was terminated does not make her termination retaliatory.

### 2. <u>Post-Termination Complaints</u>

After plaintiff was terminated, she informed Justice Rios she intended to commence litigation, sent letters to Justices Fisher and Rios threatening litigation and filed three complaints with the Commission, one with respect to Justice Fisher and two with respect to Justice Rios. These complaints cannot be relied

upon by the plaintiff in an attempt to establish a First Amendment violation, as they were made after plaintiff was terminated. <u>See</u> <u>Gilligan v. Town of Moreau</u>, 00-7109, 2000 U.S. App. LEXIS 27198, at *6 (2d Cir. Oct. 25, 2000) (noting that "[t]o show a causal connection between the protected activity and the retaliatory discharge, there must be sufficient evidence to support an inference that the protected speech was a substantial motivating factor in the adverse employment action," and consequently rejecting First Amendment retaliation claim because the defendants were unaware of the protected speech before terminating plaintiff); <u>see also</u> <u>Velasquez v. Goldwater Mem. Hosp.</u>, 88 F. Supp. 2d. 257, 264 (S.D.N.Y. 2000) (rejecting retaliation claim in Title VII context, noting that the protected activity only occurred *after* the alleged retaliatory act). Accordingly, plaintiff's First Amendment retaliation claim must be dismissed.

<u>**POINT IV**</u>

### PLAINTIFF FAILS TO DEMONSTRATE A HOSTILE WORK ENVIRONMENT

To prevail on a hostile work environment claim, plaintiff must show that, "her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment . . .." <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997), (citing <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 715 (2d Cir. 1996). This test has both objective and subjective elements: first, the alleged

harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must subjectively perceive the environment to be abusive. <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993).  As a general rule, "the plaintiff must show more than a few isolated incidents of racial enmity; there must be a steady barrage of opprobrious racial comments."  <u>Williams v. County of Westchester</u>, 171 F.3d 98, 100-01 (2d Cir. 1999) (internal quotations and citations omitted). "Casual comments, or accidental or sporadic conversation" do not create a hostile work environment.  <u>Snell v. Suffolk County</u>, 782 F.2d 1094, 1103 (2d Cir. 1986).

Plaintiff cannot establish a hostile work environment claim.  For the most part, plaintiff's allegations are conclusory and reflect her own subjective belief, without objective evidence, that statements made by either Justice Rios and Ms. Newsome[5] reflect discrimination towards plaintiff's race and religion (<u>see</u> complaint ¶¶ 59, 80, 87, 106, 163, 205).  Plaintiff offers no facts

---

[5]Plaintiff cannot state a claim for hostile work environment against Ms. Newsome because she fails to allege, nor could she, that Ms. Newsome exercised supervisory authority or control over her; therefore, Ms. Newsome cannot be found to have acted under "color of state law" and plaintiff's claims against her must be dismissed.  <u>See</u> <u>Quinn v. Nassau County Police Dept.</u>, 53 F. Supp. 2d 347, 355 (E.D.N.Y. 1999); <u>see</u> <u>also</u> <u>David v. City and County of Denver</u>, 101 F.3d 1344, 1354 (10th Cir. 1996), <u>cert.</u> <u>denied</u> 522 U.S. 858 (1997) ("to establish the state action necessary to support a § 1983 [claim], [the defendant] had to be plaintiff's supervisor or in some other way exercise state authority over her.") (citations omitted).

to support her belief that the statements made were motivated by her race or religion.

Plaintiff worked for Justice Rios from approximately November 1993 until April 19, 2004. During that period of time, plaintiff claims that Justice Rios and Ms. Newsome harassed plaintiff because of her race and her religion. <u>See</u> Complaint ¶¶ 234-36, 242-44. Plaintiff identifies the following as incidents of racial and/or religious discrimination:

1.   In January 1995, Justice Rios began to atypically incorporate the word "Jewish" into statements he made to plaintiff and would glare angrily at her when doing so (<u>see</u> Complaint ¶ 41);

2.   In May or June 1995, Justice Rios repeatedly shouted "That rabbi is getting my vacancy" in front of plaintiff (<u>id</u>. at ¶ 43);

3.   In June 1995, Justice Rios in plaintiff's presence predicted that Alan Hevesi would be the democratic candidate for mayor because "[i]talways goes to a Jew!" (<u>Id</u>. at ¶ 45);

4.   In late September or early October 1995, Justice Rios proclaimed to Ms. Newsome that Louis Farrakhan was "a great leader" (<u>id</u>. at ¶ 47);

5.   In February 1997, Justice Rios laughed after plaintiff informed him that then-Secretary of State, Madeleine Albright had been raised Christian without the knowledge that she was born Jewish (<u>id</u> at ¶ 65);

6.   In September 2000, Justice Rios told plaintiff that then Bronx County Democratic Chairman and Assemblyman Roberto Ramirez backed State Senator Lawrence Seabrook in the Democratic primary for the United State Congressional race over incumbent Eliot Engel solely because Engel was Jewish and Caucasian (<u>id</u>. at ¶ 80);

29

7.   On July 24, 2002, Justice Rios made a comment in the presence of plaintiff about challenging a potential juror for cause because he was wearing a yarmulke (<u>id</u>. at ¶ 90);

8.   During a private lunch in December 2002, Justice Rios told plaintiff that Mark Green, who is Jewish and Caucasian, should have supported Fernando Ferrer, who is Hispanic and Christian, for the mayoral race (<u>id</u>. at ¶ 106);

9.   On April 7, 2003, during a telephone conversation with another judge, Justice Rios referred to plaintiff as his "law secretary that doesn't have that Latin flavor" (<u>id</u>. at ¶ 114); and

10.  On April 22, 2003, Justice Rios made a comment to Ms. Newsome about U.S. soldiers stealing art work during World War II and laughed (<u>id</u>. at ¶ 117).

With the exception of the one alleged comment in September 2000, plaintiff has failed to identify any specific incidents occurring between late February 1997 and June 2002. Additionally, plaintiff has not alleged that any of these alleged comments interfered in any way with her job performance.

The few, if any, instances plaintiff cites as evidence of racial and religious animus, even if true, are insufficient to establish a workplace which is permeated with discriminatory intimidation. <u>See</u> <u>Harris</u>, 510 U.S. at 21 ("mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment. . .." (quotations and citations omitted); <u>Schwapp</u>, 118 F.3d at 110 (For racist comments, slurs, and jokes to constitute a hostile work environment, there must be "more than a few isolated incidents of

racial enmity," (quoting <u>Snell</u>, 782 F.2d at 1103).

The alleged comments occurring over plaintiff's more than nine years of employment with Justice Rios were neither severe nor pervasive and, therefore, do not satisfy the requirements for establishing a claim for hostile work environment. <u>See</u> <u>Alfano v. Costello</u>, 294 F.3d 365, 376 (2d Cir. 2002) (twelve incidents over 6-year period when taken together were insufficient to demonstrate hostile work environment); <u>Richardson v. New York State Dep't of Corr. Serv.</u>, 180 F.3d 426, 440 (2d Cir. 1999) (allegations of fifteen specific incidents of harassment, including three involving racial slurs, over nearly two-year period were insufficient to establish hostile work environment); <u>Bostick v. Suffolk County</u>, 191 F. Supp.2d 665, 673 (E.D.N.Y. 2002) (three incidents twelve months apart failed to create hostile work environment); <u>Francis v. Chemical Banking Corporation</u>, 62 F. Supp.2d 948, 959 (E.D.N.Y. 1999) ("Considering the totality of the circumstances, plaintiff has suggested that [defendant] uses offensive language and has evinced a dislike for plaintiff; plaintiff has not however, sufficiently established a hostile work environment."); <u>Kantar v. Baldwin Cooke Co.</u>, 93 C 6239, 1995 U.S. Dist. LEXIS 17330 (N.D.Ill. Nov. 20, 1995) (plaintiff failed to establish hostile work environment despite evidence of being referred to as a "JAP" (Jewish American Princess), asked about the cost or price of her religious faith, teased about leaving early on Fridays for

31

religious services and that a coworker had referred to someone as "Jewish speaking").

Finally, while plaintiff claims that Justice Rios did nothing about her complaints concerning Ms. Newsome, she concedes that Justice Rios spoke with Ms. Newsome, but that Ms. Newsome denied making any derogatory or discriminatory comments (see Complaint ¶ 130). Accordingly, plaintiff fails to state a claim for hostile work environment.[6]

## POINT V

### PLAINTIFF FAILS TO STATE A DISPARATE TREATMENT CLAIM

To establish a <u>prima facie</u> case of disparate treatment based on race or religion, a plaintiff must demonstrate that she: (1) is a member of a protected class; (2) satisfactorily performed the duties of her position; (3) was subjected to an adverse employment action; and (4) that the adverse employment action occurred in circumstances giving rise to an inference of

---

[6]Plaintiff alleges that Ms. DeSole and Chief Clerk D'Angelis acted as aiders and abettors in violation of New York Executive Law § 296 <u>et</u>. <u>seq</u> with respect to plaintiff's claims of religious discrimination only. <u>See</u> Complaint ¶¶ 237, 241. Executive Law § 296 (6) requires actual participation in the conduct that gives rise to discrimination for a defendant to be held liable as an aider and abettor. <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1317 (2d Cir. 1995), <u>abrogated on other grounds by</u>, <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998); <u>Sowemimo v. D.A.O.R. Sec., Inc.</u>, 43 F. Supp.2d 477, 487 (S.D.N.Y. 1999). For the reasons set forth in Point I, <u>supra</u>, these claims are barred by the Eleventh Amendment, in any event, plaintiff fails to demonstrate actual participation by Ms. DeSole and Chief Clerk D'Angelis (see Point VII, <u>infra</u>).

discrimination.  See Shumway v. United Parcel Serv. Inc., 118 F.3d 60, 63 (2d Cir. 1997).  It is also well settled that in order to sustain a disparate treatment claim, a plaintiff must compare the treatment she has endured to that of fellow employees who are similarly situated.  See Alenski v. Potter, CV-03-2179, 2005 WL 1309043, at *19 (E.D.N.Y. May 18, 2005).

Accordingly, disparate treatment of employees in the workplace is not sufficient evidence of discrimination if the two employees are not similarly situated.  Id.  To be similarly situated, the individual with whom a plaintiff compares herself must be similarly situated in all material respects.  See Shumway, 118 F.3d at 64.  Although the ultimate burden in making a prima facie case is slight, the inquiry of whether the compared employees are similarly situated is somewhat strict.  Alenski, 2005 WL 1309043 at *20.  A plaintiff must show that she shared sufficient employment characteristics with the comparator so that they could be considered similarly situated.  See McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).  Courts have consistently held that employees who have different job titles, descriptions, qualifications, and assignments are not similarly situated.  Id.; see Norris v. N.Y.C. Hous. Auth., 02 Civ. 6933, 2004 U.S. Dist. LEXIS 8619, at *42-43 (S.D.N.Y. May 14, 2004).  Here, plaintiff fails to identify anyone similarly situated to her who was treated differently.  To the extent plaintiff is attempting to claim that

Ms. Newsome was similarly situated to her, she fails.  Ms. Newsome is Justice Rios' clerical secretary, is not an attorney and therefore, not a court attorney.  Accordingly, plaintiff disparate treatment claim must fail.

### POINT VI

### THE STATUTE OF LIMITATIONS BARS ANY ADVERSE EMPLOYMENT ACTIONS OR DISCRETE DISCRIMINATORY ACTS OCCURRING PRIOR TO FEBRUARY 24, 2002

To the extent any adverse employment actions or discrete discriminatory acts of which plaintiff complains occurred prior to February 24, 2002, they are barred by the statute of limitations. The limitations period for filing § 1983 actions "is found in the 'general or residual [state] statute [of limitations] for personal injury actions.'" Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir. 1997), (quoting Owens v. Okure, 488 U.S. 235, 249-50 (1989)).  New York Civil Practice Law and Rules ("CPLR") § 214 is the statute of limitations applicable to § 1983 actions brought in federal court in New York. Ormiston, 117 F.3d at 71.  CPLR § 214 provides that an action to recover upon a liability imposed by statute must be brought within three years of the date of its accrual. Owens, 488 U.S. at 251;  Ormiston, 117 F.3d at 71.

While state law provides the length of the period of the statute of limitations, federal law determines the date of accrual of a § 1983 claim. Ormiston, 117 F.3d at 71.  The courts have established that a § 1983 claim accrues when the plaintiff knows or

34

should know of the injury that is the basis of the action. Id. Plaintiff, an attorney, clearly should have been aware of any adverse employment actions or discrete discriminatory acts when they occurred, and therefore, any such actions or acts occurring prior to February 24, 2002 are barred by the statute of limitations, including those acts plaintiff claims make up her political termination claim.

Accordingly, any adverse employment actions or discrete discriminatory acts occurring prior to February 24, 2002 are time-barred and should be dismissed.

## POINT VII

### PLAINTIFF FAILS TO DEMONSTRATE THE PERSONAL INVOLVEMENT OF DEFENDANTS JUSTICE LIPPMAN, JUSTICE FISHER, LAUREN DESOLE, CHIEF CLERK D'ANGELIS, MAJOR GARDNER AND HEIDI HIGGINS

It is well settled law in this Circuit that, in order to state a cognizable claim under 42 U.S.C. § 1983, a plaintiff must allege conduct under color of state law, that deprives her of rights secured by the Constitution or laws of the United States. See Parratt v. Taylor, 451 U.S. 527, 535 (1981); Davidson v. Mann, 129 F.3d 700, 701 (2d Cir. 1997). To that end, plaintiff must show: (i) defendants acted under color of state law, and (ii) as a result of defendants' actions, plaintiff suffered a denial of federal statutory rights or constitutional rights or privileges. Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998).

Moreover, plaintiff must prove that each defendant was personally involved in the alleged constitutional deprivation of her rights. See Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001); McKinnon v. Patterson, 568 F.2d 930, 934 (2nd Cir. 1977), cert. denied, 434 U.S. 1087 (1978). This requires plaintiff to show that each defendant, through his or her own action, was directly involved in the alleged unconstitutional acts. Gill v. Mooney, 824 F.2d 192, 196 (2nd Cir. 1987).

In this case, with the exception of Justice Rios and Ms. Newsome, plaintiff fails to demonstrate how any of the other State defendants are personally involved in the alleged racial and religious discrimination claims, the alleged retaliation claims, or the alleged defamation claims. The fact that Justices Lippman and Fisher were supervisors of Justice Rios and should have been aware of what Justice Rios was doing (see complaint ¶¶ 168, 169) or that Ms. DeSole, Chief Clerk D'Angelis and Major Gardner were present when Justice Rios took certain actions (see complaint ¶¶ 168, 172) or that Ms. Newsome would speak with Ms. Higgins (see complaint ¶¶ 93, 111, 112) is not enough to demonstrate their personal involvement.

Conclusory allegations do not suffice, as they fail to demonstrate the requisite personal involvement on the parts of Justices Lippman and Fisher, Lauren DeSole, Chief Clerk D'Angelis, Major Gardner and Heidi Higgins. See, e.g., Monell v. Dep't of

<u>Soc. Servs. of the City of New York</u>, 436 U.S. 658, 690-95 (1978). Accordingly, the complaint must be dismissed as against defendants Justice Lippman, Justice Fisher, Lauren DeSole, Chief Clerk D'Angelis, Major Gardner and Heidi Higgins.

**POINT VIII**

**PLAINTIFF FAILS TO STATE A VALID
CONSPIRACY CLAIM**

Plaintiff summarily alleges that State defendants together with the Non-State defendants violated her civil rights under 42 U.S.C. § 1983 by means of a conspiracy. Plaintiff's claims are insufficient to make a valid conspiracy claim.

Under 42 U.S.C. § 1983, "a complaint alleging a conspiracy to violate civil rights is held to a heightened pleading standard." <u>Julian v. N.Y.C. Transit Authority</u>, 857 F. Supp. 242, 252 (E.D.N.Y. 1994), <u>aff'd</u>, 52 F.3d 312 (2d Cir. 1995). Indeed, "[i]t is incumbent upon a plaintiff to state more than conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive him of his constitutional rights." <u>Dwares v. City of New York</u>, 985 F.2d 94, 99-100 (2d Cir. 1993); <u>Polur v. Raffe</u>, 912 F.2d 52, 56 (2d Cir. 1990), <u>cert. denied</u>, 499 U.S. 937 (1991). The allegations should provide some details of the time, place and alleged effect of the conspiracy. <u>Id</u>. "Thus, complaints containing only conclusory, vague or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." <u>Id</u>. Plaintiff

37

must allege "specific facts suggesting that there was a mutual understanding among the conspirators to take action directed toward an unconstitutional end." <u>Julian</u>, 857 F. Supp. at 252, <u>quoting</u> <u>Duvall v. Sharp</u>, 905 F.2d 1188, 1189 (8th Cir. 1990) (<u>per curiam</u>). The allegations set forth by plaintiff in support of her conspiracy claim are clearly conclusory.  Throughout her complaint, plaintiff talks about "symbiotic relationships" (<u>see</u> complaint ¶¶ 44, 168, 207, 249); however nowhere does plaintiff demonstrate the alleged results of such relationships.  Plaintiff fails to establish, nor can she, that there was a mutual understanding among the alleged conspirators to deprive her of her constitutional rights.  The fact that Ms. DeSole and Chief Clerk D'Angelis were present when Justice Rios asked plaintiff to take a leave of absence (<u>see</u> complaint ¶ 168) or that Major Gardner was present when Justice Rios terminated plaintiff (<u>see</u> complaint ¶ 206) or that Justice Fisher met with Justice Rios (<u>see</u> complaint ¶¶ 145, 157) is not enough.  Nor is plaintiff's speculation enough (<u>see</u> complaint ¶ 166).  In fact, the majority of the allegations concerning the alleged conspiracy are made by plaintiff only because she believed the individuals were talking about her.  <u>See</u> <u>e.g.</u> Complaint ¶¶ 109, 124, 127, 130, 208, 221, 225.

     As such, plaintiff's complaint fails to meet the heightened standard required to state a claim of conspiracy on behalf of the State defendants and Non-State defendants, or on

behalf of the State defendants among themselves.   Therefore her conspiracy claim must be dismissed.

### POINT IX

**PLAINTIFF'S STATE AND CITY LAW CLAIMS MUST BE DISMISSED**

**A.   This Court Should Decline to Exercise Supplemental Jurisdiction over Plaintiff's Pendent Claims**

In addition to alleging § 1983 claims, plaintiff asserts pendant state and city law claims under the New York State Human Rights Law, common law and the New York City Administrative Code.[7] These claims should be dismissed because this Court should decline to exercise its supplemental jurisdiction over the pendant claims after it dismisses plaintiff's federal claims.   See Valencia v. Lee, 316 F.3d 299, 306-07 (2d Cir. 2003) (exercise of supplemental jurisdiction after all federal claims dismissed during pre-trial discovery was an abuse of discretion); Buckley v. Con Edison, 155 F.3d 150, 157 (2d Cir. 1998) (en banc) ("we note that the district court, after dismissing [plaintiff's federal [disability discrimination] claims properly declined to exercise supplemental jurisdiction over [plaintiff's state claims]"); 28 U.S.C. § 1367(c)(3).   Accordingly, plaintiff's state law claims must be dismissed.

---

[7]Because the standards governing HRL and CHRL cases are identical to those governing 42 U.S.C. § 1983 cases, plaintiff's HRL and CHRL claims must be dismissed for the reasons set forth in Point IV, supra. Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180-82 (2d Cir.), cert. denied, 506 U.S. 826 (1992).

**B.   Plaintiff's State Law Tort Claims Are Barred By The Applicable Statute of Limitations**

Plaintiff's state law tort claims, including defamation and slander, are time-barred by state law statute of limitations. Pursuant to New York Civil Practice Law and Rules ("CPLR") § 215(3), plaintiff's state law tort claims are governed by a one-year statute of limitations.   Additionally, claims accrue when damages are ascertainable. <u>See</u> CPLR § 215.

The statute of limitations for defamation and slander claims is one year from the date of "publication," the date that the offending material becomes generally available to the public. <u>Celi v. Canadian Occidental Petroleum Ltd.</u>, 804 F. Supp. 465, 470 (E.D.N.Y. 1992); <u>Love v. William Morrow and Co., Inc.</u>, 193 A.D.2d 586, 589, 597 N.Y.S.2d 424, 427 (2d Dep't 1993).

Since the last possible date that any allegedly defamatory remarks regarding plaintiff occurred over one year prior to the filing of this action (<u>see</u> complaint ¶ 71, Higgins referring to plaintiff as disloyal in May 1998), the claims of defamation and slander are time-barred and accordingly, should be dismissed.

**C. <u>Plaintiff Fails To State A Defamation Claim</u>**

In any event, in order to succeed on her § 1983 defamation claim, plaintiff must show both that State defendants' statements stigmatized or otherwise damaged her reputation and that the "reputational damage was entangled with some other tangible interest such as employment." <u>Ewers v. Board of County Comm'rs</u>, 802

F.2d 1242, 1247 (10th Cir. 1986), (quoting <u>McGhee v. Draper</u>, 639 F.2d 639, 643 (10th Cir. 1981)); <u>see</u> <u>also</u> <u>Paul v. Davis</u>, 424 U.S. 693, 701-02, 711-12 (1976) (constitutional due process deprivation under § 1983 requires showing of damage to property or liberty interest in addition to damage to reputation).

Plaintiff claims that the oral statements allegedly made by the State defendants have caused damage to her profession and her reputation, as well as caused her to lose opportunities for other employment. For example, plaintiff claims that: (1) Ms. Higgins characterized her as disloyal (<u>see</u> complaint ¶ 71); (2) a note on Justice Rios' desk claimed that plaintiff wasted time (<u>id</u>. at ¶ 124); (3) a note on Justice Rios' desk misquoted a statement made by plaintiff (<u>id</u>. at ¶ 131); (4) Justice Rios' stated in August 2003 that plaintiff placed an incorrect date on an order (<u>id</u>. at ¶ 135); and (5) another law clerk commented to plaintiff that she thought plaintiff had been out sick (<u>id</u>. at ¶ 199). Clearly such statements do not rise to such a level that would reasonably have exposed plaintiff to public contempt, ridicule, aversion or disgrace, or deprive her of the friendly association of right-thinking persons in society. <u>See</u> Complaint ¶ 261. Nor do the statements identified by plaintiff rise to such a level as to reasonably cause the severity of damage to her profession or reputation in which she has claimed. <u>See</u> Complaint ¶ 262.

## CONCLUSION

**FOR THE FOREGOING REASONS, THE STATE DEFENDANTS' MOTION TO DISMISS THE COMPLAINT SHOULD BE GRANTED IN ALL RESPECTS**[8]

Dated:    New York, New York
          November 21, 2005

                              Respectfully submitted,

                              ELIOT SPITZER
                              Attorney General of the
                               State of New York
                              Attorney for State defendants
                              By:


                              _____/S_____
                              CONSTANTINE A. SPERES (CAS-9100)
                              Assistant Attorney General
                              120 Broadway
                              New York, New York 10271
                              (212) 416-8567

CONSTANTINE A. SPERES
Assistant Attorney General
 of Counsel

---

[8]Should this Court fail to grant State defendants' motion in its entirety, State defendants respectfully request that this Court direct plaintiff to conform her complaint with Federal Rule of Civil Procedure 8(a), which requires that a complaint be "a short and plain statement of the claim showing that the pleader is entitled to relief."  "Unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." Alliance v. U.S. Dep't of Defense, 00 Civ. 2295, 2001 U.S. Dist. LEXIS 4655, at *3 (D.P.R. 2001) citing Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988).

## <u>DECLARATION OF SERVICE</u>

_____CONSTANTINE A. SPERES pursuant to 28 U.S.C. § 1746,

declares under penalty of perjury as follows:

That on November 21, 2005, I caused true and correct

copies of the annexed Notice of Motion and Memorandum of Law to be

personally served on:

> Judith B. Memblatt
> Plaintiff <u>pro</u> <u>se</u>
> 98-51 65th Avenue
> Apt. 2-A
> Rego Park, New York 11374

at the address within the State designated by her for that purpose;

and upon

> Madeleine S. Egelfeld, Esq.
> <u>Attorney for Defendant Koslowitz</u>
> 125-10 Queens Boulevard
> Suite 311
> Kew Gardens, New York 11415

> John Quinn, Esq.
> Renfroe & Quinn
> Attorneys for Defendants Manton,
> <u>Sweeney and Reich</u>
> 118-35 Queens Boulevard
> 14th Floor
> Forest Hills, N.Y. 11375

by electronic mail and via Federal Express pursuant to the

agreement of defense counsel at the address within the State

designated by them for that purpose.

> _____/s_____
> CONSTANTINE A. SPERES

Executed On January 11, 2006

**AFFIDAVIT OF SERVICE**
**OF**
**Notice of Motion**

Bureau __Litigation__

**STATE OF NEW YORK:**
**COUNTY OF NEW YORK:**

I, __Inv. Kevin R. McCann Sh# 41__ , being duly sworn, deposes and says:

That on __November 21__ 20 __05__ , at __98-51 65th Avenue (Apt.2A)__

City of __Rego Park__ , State of New York, deponent served the above

on __Judith B. Memblatt__ at __03:40 pm__ by:

1.  **INDIVIDUAL**

   ☐   (a) Delivering a true copy thereof to _____
          personally. Deponent knew the person so served to be the person described in said document(s).

   X   (b) Delivering a true copy to __Shirley Memblatt (mother)__
          a person of suitable age and discretion at person's actual place of business, dwelling place, or usual
          place of abode.

          Deponent also enclosed a copy of same in a postpaid, sealed wrapper properly addressed to person's last
          known business, dwelling place or place of abode at __98-51 65th Avenue, (2A)Rego Park, NY__
          and deposited said wrapper in an official depository under the exclusive care and custody of the U.S.
          Postal Service.

   ☐   (c) Affixing a true copy to the door of person's actual place of business, dwelling place, or usual place of
          abode. Deponent was unable, with due diligence, to find the person named therein or a person of
          suitable age and discretion having called there:
          On _____ 20 _____ , at _____
          On _____ 20 _____ , at _____
          On _____ 20 _____ , at _____

          Deponent also enclosed a copy of same in a postpaid, sealed wrapper properly addressed to person's last
          known business, dwelling place or place of abode at _____
          and deposited said wrapper in an official depository under the exclusive care and custody of the U.S.
          Postal Service.

2.  **CORPORATION:** Serving the above on _____
    Corporation, personally, whom deponent knew to be the said corporation by delivering a true copy thereof
    with _____
    an officer of said corporation or other agent authorized to receive service for said corporation.

**DESCRIPTION:** Deponent describes the individual served as follows:

   Sex: __Female__ , Hair: __Blonde__ ,
   Skin: __White__ , Approx. Age: __79__ ,
   Approx. Ht.: __5'5"__ , Approx Wt.: __110-115 lbs__ ,

Signature __Inv. Kevin R. McCann   5h #41__

Sworn to before me this __25__ day of __Nov__ , 20 __05__

Notary Public __Elaine S. Betza__

Elaine S Betza
Notary Public State of New York
No. 01BE5085861
Qualified in Queens Cty
Commission Expires Sept 29 2009