UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
JUDITH B. MEMBLATT,

                                    Plaintiff,

            -against-

JAIME A. RIOS, et al.,

                                    Defendants.
--------------------------------------------------------x

**AFFIDAVIT IN OPPOSITION
TO MOTIONS TO DISMISS
05 CV 1021 (RJD) (LB)**

<u>Pro Se</u>

Judith B. Memblatt, being duly sworn, deposes and says:

1.      I am the plaintiff *pro se* in this action.

2.      This affidavit is submitted together with the accompanying memorandum of law in opposition to the three motions to dismiss the complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, that have been served by defendants herein.

3.      This action was commenced pursuant to 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York.

4.      For the reasons set forth in the annexed memorandum of law, the complaint is sufficient to meet the liberal pleading requirements that are applicable to the claims raised against the defendants herein.

            Wherefore, it is respectfully submitted that all of the Rule 12(b)(6) motions for dismissal that have been served by defendants in this action must be denied in their entirety, and, that the Court should grant to plaintiff such other and further relief as it

may deem just and proper.

Dated: Queens, New York
        December 26, 2005

By: _____
    JUDITH B. MEMBLATT
    Plaintiff Pro Se
    98-51 65th Avenue #2A
    Rego Park, NY 11374

WARREN ALAN LANE
Notary Public, State of New York
No. 01LA6102840
Qualified in Nassau County
Commission Expires December 08, 20__

Sworn to before me this
26 day of December 2005

Notary Public

2

## TABLE OF CONTENTS

**PROCEDURAL BACKGROUND** ....................................................................... 1

**PRELIMINARY STATEMENT** ...................................................................... 2

**ARGUMENT** ................................................................................................. 90

   **Standard of Review** ................................................................................ 90

   **POINT I** ..................................................................................................... 90

   THE "STATE" DEFENDANTS ARE SUED IN THEIR INDIVIDUAL
   CAPACITIES AND LACK ELEVENTH AMENDMENT IMMUNITY ................. 93

   POINT II

   THE PURPORTED "RULE 56.2 STATEMENT" OF DEFENDANTS
   MANTON SWEENEY AND REICH MUST BE DEEMED A NULLITY ............. 98

   POINT III

   THE "PRIVATE" DEFENDANTS' REQUESTS FOR THE DISMISSAL
   OF CLAIMS NOT RAISED AGAINST THEM CANNOT BE GRANTED ............. 100

   POINT IV

   42 U.S.C. § 1983 PERMITS PRIVATE PARTIES TO BE HELD LIABLE
   FOR CONSPIRACY WHEN THE ULTIMATE ACT IS COMMITTED BY ................ 101
   A STATE ACTOR

   POINT V

   THE COMPLAINT SUFFICIENTLY STATES A POLITICAL TERMINATION .......... 102
   CLAIM

i

**POINT VI**

**THE COMPLAINT SUFFICIENTLY RAISES A TIMELY 42 U.S.C. § 1983
CLAIM BASED UPON RETALIATION FOR SPEECH ABOUT MATTERS OF
PUBLIC CONCERN** .................................................................................... 109


**POINT VII**

**THE COMPLAINT SUFFICIENTLY RAISES TIMELY HOSTILE WORK
ENVIRONMENT CLAIMS BASED UPON RELIGIOUS AND RACIAL** ................... 117
**DISCRIMINATION**


**POINT VIII**

**THE COMPLAINT SUFFICIENTLY RAISES TIMELY CLAIMS OF
ADVERSE EMPLOYMENT ACTIONS OCCURRING UNDER
CIRCUMSTANCES GIVING RISE TO INFERENCES OF RELIGIOUS
AND RACIAL DISCRIMINATION** .......................................................... 125


**POINT IX**

**THE COMPLAINT SUFFICIENTLY RAISES TIMELY DEFAMATION
CLAIMS** ................................................................................................... 129


**CONCLUSION** ................................................................................... 132

ii

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JUDITH B. MEMBLATT,

                                   **05 CV 1021 (RJD) (LB)**

                Plaintiff,       <u>Pro Se</u>

    -against-



JAIME A. RIOS, et al.,

                Defendants.
-------------------------------------------------------------x



## **MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS**



Submitted by:
JUDITH B. MEMBLATT
Plaintiff Pro Se
98-51 65th Avenue #2A
Rego Park, NY 11374

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JUDITH B. MEMBLATT,

                                **05 CV 1021 (RJD) (LB)**

                Plaintiff,      <u>Pro Se</u>


   -against-



JAIME A. RIOS, et al.,

                Defendants.
-------------------------------------------------------------x



## <u>MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS</u>


                Submitted by:
                JUDITH B. MEMBLATT
                Plaintiff Pro Se
                98-51 65th Avenue #2A
                Rego Park, NY 11374

## **Procedural Background**

This action was commenced by service of a summons and complaint dated February 24, 2005.

Plaintiff seeks relief for defendants' violations of her rights secured by 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York.

These claims arise from religious and racial discrimination, retaliation for plaintiff's complaints about same, retaliation for plaintiff's statements regarding acts of judicial misconduct and other matters of public concern, retaliation for plaintiff's participation and/or lack of participation in certain political campaigns and retaliation for the cessation of plaintiff's relations with the Continental Regular Democratic Club and the Democratic Organization of Queens County, as well as from defamatory statements regarding plaintiff that defendants have published.

The initial conference herein was held before Magistrate Judge Lois Bloom on November 10, 2005 to set up a briefing schedule for defendants' proposed motions for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

By an order dated November 17, 2005, Magistrate Judge Bloom finalized the briefing schedule as follows: "defendants shall serve their motions upon plaintiff by November 21, 2005; plaintiff shall serve her opposition to the motions upon defendants by December 27, 2005; defendants shall serve any reply and file the fully briefed motions with the Court by January 12, 2006."

In the aforementioned order, Magistrate Judge Bloom stayed all discovery pending the adjudication of defendants' motions.

Defendants served their motions for dismissal upon a timely basis.

Plaintiff respectfully submits this memorandum of law in opposition to all Rule 12(b)(6)

motions for dismissal submitted by defendants herein.

## **Preliminary Statement**

This action involves a lengthy and complex sequence of events. They are set forth in the complaint in chronological order.

The complaint includes claims that plaintiff was subjected to a hostile work environment motivated by religious and racial bias while she was employed as the principal law clerk to New York State Supreme Court Justice Jaime A. Rios from January 1995 until May 2004, and, that she also was subjected to discrete acts of discrimination in connection with that employment. Additionally, the complaint raises claims of retaliation for statements and attempted statements about matters of public concern; retaliation based upon partisan politics; and, defamation. It is a long story.

Inasmuch as, under the continuing violation doctrine, a number of relevant acts that otherwise would be barred by the statute of limitations are nevertheless timely, it was deemed advisable to set forth facts spanning the entirety of the aforementioned period of employment. Additionally, the applicability of the totality of the circumstances test to the evaluation of hostile work environment claims provides good reason for a plaintiff raising such claims to set forth relevant facts in a chronological and extended fashion even though the complaint is only required to meet liberal pleading standards.

As previously stated, this action also includes, *inter alia,* claims of unlawful political retaliation. For that reason, the complaint addresses the reality of the infamous courts-politics nexus in Queens and the interrelationship between the "state" defendants herein, (who represent the court part of that formula) and the "private" defendants (who represent its solely political part).

In addition to defendant Rios, the "state" defendants include defendants Steven W. Fisher, Jonathan P. Lippman, Lauren DeSole, Anthony D'Angelis, Robert W. Gardner,

2

Sandra Newsome and Heidi Higgins.

The "private" defendants are Karen Koslowitz, Thomas J. Manton, Gerard J. Sweeney and Michael H. Reich.

All of the defendants herein are sued in their individual capacities. Those referred to as the "state" defendants all are either officials or employees of New York State. All other defendants are referred to as the "private" defendants.

Defendant Fisher was the Administrative Judge of the Supreme Court, State of New York, 11th Judicial District from January 1998 until on or about May 3, 2004.

Defendant Lippman has been the Chief Administrative Judge of the Courts of the State of New York since 1996.

Defendant DeSole is an attorney who is employed by the New York State Office of Court Administration ("OCA") as the Director of its Division of Human Resources. She has been so employed at all times relevant to the complaint.

Defendant D'Angelis is employed by OCA as the Chief Clerk of the Supreme Court in Queens. He was so employed at all times relevant to this action.

Defendant Gardner is employed by OCA as a major of court officers. He has been so employed at all times relevant herein.

Defendant Newsome has been employed by OCA as the clerical secretary to Justice Rios since January 1995.

Defendant Higgins is the daughter of defendant Koslowitz. She has been employed by OCA as the clerical secretary to Justice Mark H. Spires since January 1995.

As shown in the complaint, defendant Manton has headed the Democratic Organization of Queens County since September 1986. Defendants Sweeney and Reich have been key insiders in that organization at all times relevant to the complaint as shown therein.

Defendant Koslowitz has been the Deputy President of the Borough of Queens since

3

2002. From 1991 through 2001, defendant Koslowitz was a New York City Council member. From 1986 through 2001, defendant Koslowitz was the female District Leader of the Democratic party from the 28th Assembly District, Part A, State of New York, as well as an Executive Member of the Continental Regular Democratic Club, which is under the control of the Democratic Organization of Queens County.

The complaint alleges that defendant Koslowitz gained great influence over the Queens judiciary due to the pivotal role that she played in defendant Manton's initial election as the leader of the Queens Democratic political machine. Her role in that event is chronicled in a newspaper article that is quoted in the complaint.

The complaint relates that defendants Rios, Fisher, Lippman, D'Angelis, Koslowitz and Reich all are members of the "Queens County Committee to Promote Public Trust and Confidence in the Legal System" (originally known as the "Judicial Advisory Council of Queens County"). The complaint also states that when that committee was formed, in 1993, defendant Koslowitz told plaintiff was that its actual purpose was to provide an excuse for supreme court justices in Queens, who are barred from many political activities, to convene with the political insiders in the Democratic Organization of Queens County, including herself. The complaint reflects that the committee is one of the means by which the "private" defendants and the "state" defendants keep in close contact with each other.

This action does not constitute some generalized attack upon the influence of politics over the New York State courts. All of the defendants are alleged to have had personal involvement in each claim applicable to them. The prayer for relief requests compensatory and punitive damages for the harm suffered by plaintiff due to their wrongful acts; it does not ask for the eradication of the courts-politics nexus.

No title or position held by any of the defendants herein places them above the law or permits their assertions to be afforded more weight than that accorded to plaintiff's allegations.

The complaint sets forth facts regarding the courts-politics nexus and the specific role

4

that it played in plaintiff's employment from her hiring to her firing. Facts describing the role that

the "private" defendants played in the hiring of plaintiff as defendant Rios' principal law clerk are

included not because plaintiff is complaining that she was hired, but rather to demonstrate the

control that the "private" defendants actually exercised over plaintiff's employment. From those

facts and the circumstances set forth in the complaint regarding plaintiff's discharge, a jury may

rationally infer that the "private" defendants and the "state" defendants entered into an

agreement that plaintiff would be terminated from her employment (after a pretext for her

discharge was created), and that, in forming such an agreement, they were motivated by a

number of unlawful purposes, including their desire to open up a law clerk position to be filled

by some individual who, unlike plaintiff, had the political support of the "private" defendants. As

outlined in the complaint, at the time, they apparently believed that there would be a shortage of

such positions due to the budgetary concerns of OCA.

Other motives behind the agreement to terminate plaintiff's employment (and to

create a pretext for plaintiff's preplanned discharge) also are set forth in the complaint. Those

unlawful motives include the religious and racial bias of defendants Rios and Newsome against

plaintiff as well as defendants' desire to retaliate against plaintiff for her statements (and

attempted statements) about matters of public concern such as discrimination and additional

acts of misconduct committed by defendant Rios. The complaint reflects that defendant Rios is

Christian and Hispanic; defendant Newsome is Christian and African-American; and, plaintiff is

Jewish and Caucasian.

The complaint alleges facts from which it may be inferred that all of the defendants were

aware of plaintiff's statements and attempted statements about matters of public concern

through their communications with each other.

The complaint alleges that defendant Rios surrendered his decision-making authority

over plaintiff's employment to such an extent that the "private" defendants were acting jointly

with him, under color of state law, in connection with a number of the unlawful acts detailed

therein, including plaintiff's discharge from a job that they controlled.

The complaint also sets forth facts regarding unlawful retaliatory acts related to plaintiff's termination that occurred after plaintiff's discharge. Those acts included the preparation of unusual, false and defamatory reports, which were inserted into plaintiff's personnel file, as well as retaliatory restrictions upon plaintiff's access to the public areas of a public courthouse. The complaint alleges that those retaliatory restrictions were designed to further damage the professional reputation of plaintiff - - an attorney residing in the county in which that courthouse is located - - and to prevent plaintiff from practicing her profession.

As indicated above, in describing the parties and events involved herein, the complaint sets forth facts demonstrating the power of the "private" defendants over the courts in Queens, including their *de facto* control over plaintiff's employment in the court system (as well as her termination from that employment).

The complaint cites newspaper accounts and an e-mail authored by the Queens Delegate to the Citywide Association of Law Secretaries, which clearly reflect the reality that all of the defendants herein disingenuously pretend does not exist: the "private" defendants select both the judges and their law clerks in the local courts in Queens. As explained in the complaint, their power to do so stems from the well-known fact that they control the nomination process of the Democratic party in Queens, which is heavily Democratic.

The complaint states that on December 15, 2002, the New York Daily News published an editorial entitled, "*School for Scandal*," regarding the "*How to Become a Judge*," seminar that had been held that month by the Association of the Bar of the City of New York.  Noting that New York State Chief Judge Kaye spoke at that event, the editorial stated that her presence gave, "an undeserved imprimatur of probity to the day."  It observed that New York State Court of Appeals Judge Carmen Beauchamp Ciparick also spoke at the session. The editorial recited that,

> "Today," Ciparick said in her welcoming remarks, "you
> will meet the people who can help make it happen for you.
> "It," of course, being a judgeship. The judge-makers being
> the city's Democratic political bosses: Brooklyn's Clarence

> Norman, Tom Manton of Queens and Staten Island's John
> Lavelle. They were joined by Manhattan and Bronx honchos
> and the chairmen of the mayor's and governor's judicial
> screening committees.

The complaint notes that the editorial pertaining to the "*How to Become a Judge*"
seminar also recounted that defendant Manton counseled the attendees that, "Membership in
your local Democratic club is not hurtful at all," because that party's "nomination in Queens is
tantamount to election."

The complaint demonstrates that, in 1993, as part of an apparent attempt to ingratiate
himself with defendant Koslowitz due to her powerful role in the courts-politics nexus, defendant
Rios informed plaintiff that he was willing to hire plaintiff as his court attorney upon his election
to the New York City Civil Court, but that he would only do so if plaintiff asked defendant
Koslowitz to gain the approval of those in control of the Queens Democratic machine (i.e.,
defendants Manton, Sweeney and Reich) for him to hire her, and, they granted such approval.
Defendant Rios was aware that plaintiff was closely allied with defendant Koslowitz at the time
and also knew that she frequently socialized with defendant Koslowitz.

The complaint demonstrates that, after those preconditions were met, defendant
Rios hired plaintiff as his court attorney in the Civil Court effective January 1994. Throughout
1994, defendant Rios was generally quite amiable to plaintiff. The complaint does not allege
that he acted in any unlawful manner toward plaintiff during that year.

The complaint states that defendant Reich visited defendant Rios' chambers in 1994
and informed him that he would be nominated for the New York State Supreme Court at the
judicial convention of the Queens Democratic party to be held that year.

The complaint reflects that, apparently due to his continued interest in ingratiating
himself to defendant Koslowitz, defendant Rios informed plaintiff that he was willing to hire
plaintiff as his principal law clerk upon his election to the state Supreme Court, but that he

would do so only if plaintiff asked defendant Koslowitz to gain the approval of the insiders in the Queens Democratic machine (i.e., defendants Manton, Sweeney and Reich) for him to hire her for that position, and, they gave such approval.

The complaint demonstrates that, after plaintiff met those preconditions, defendant Rios hired her as his principal law clerk in the state Supreme Court effective January 1995.

The complaint also reflects that defendant Newsome was hired as defendant Rios' clerical secretary in January 1995, at the direction of defendant Manton's political machine.

The complaint states that defendant Reich personally informed defendant Rios that the insiders in Manton's machine were granting defendant Rios their approval to hire plaintiff as his principal law clerk at the behest of defendant Koslowitz and over the objection of Michael Cohen, who was a District Leader in the Democratic party.

The complaint reflects that the political winds began to shift against plaintiff at that time. It explains that Cohen's objections to her employment were related to his anger over his loss of a special election for the New York State Assembly, which was held in February 1994. As described in a newspaper account quoted in the complaint, that election began a very long and bitter feud between the political machine headed by defendant Manton, which had supported Cohen in the election, and Alan Hevesi, who had backed Melinda Katz. The Assembly seat had been vacated by Hevesi due to his election as the New York City Comptroller. As shown in the complaint, Katz's victory was widely perceived as a major embarrassment to Manton's machine.

The complaint reflects that Cohen sought defendant Koslowitz's assistance in retaliating against three members of the Continental Regular Democratic Club targeted by him as having been insufficiently supportive of his campaign. Plaintiff was one of them. The complaint provides specific details of the retaliatory acts taken against the two other club members (one of whom was fired by defendant Koslowitz from a job he had held since May 1991).

8

just realized that she was Jewish and that he hated her for it.

The complaint illustrates that defendant Rios first began signaling his religious animosity toward plaintiff by incorporating the word "Jewish" into such an extraordinary number of the statements that he made to her that its repetition would have been noticed by any reasonable person. The complaint also reflects that, in an apparent effort to ensure that plaintiff could not possibly fail to recognize the religious animosity that he was trying to convey, he often dramatically paused and angrily glared at plaintiff while he did so. In that manner, he communicated his religious animus without spelling it out in sentences that might be quoted. That was only the beginning of his demonstration of religious bias against plaintiff. Together with many other acts, it contributed to the formation of the hostile work environment to which he subjected plaintiff. The complaint demonstrates that in late May or early-June 1995, defendant Rios displayed his anti-Semitism in such a blatant manner that he altered plaintiff's working conditions by causing her to reasonably believe that his prejudice against her religion was so intense that it might affect her job security.

As stated in the complaint, at that time, defendant Rios received a telephone call during which he learned the names of the candidates for Civil Court judge that were to be included on the nominating petitions circulated by the Democratic Organization of Queens County in connection with the primary election to be held in September 1995. One such candidate was Martin Ritholtz (who currently is a New York State Supreme Court Justice). Ritholtz was both a principal law clerk and a rabbi. In the presence of plaintiff, defendant Rios suddenly became enraged and began repeatedly shouting, "That rabbi is getting my vacancy!" When he did so, he pronounced the word "rabbi" as though he considered it to be a vile obscenity. The complaint also demonstrates that, in the following months, defendant Rios repeatedly reenacted this anti-Semitic tantrum in front of plaintiff, frequently glaring at her as he did so. The complaint further reflects that, in his rush to lash out at the Jewish candidate, he was unimpeded by any desire to ascertain the facts - - Ritholtz actually was running in a municipal district, not for the

10

countywide vacancy that was created in the Civil Court by defendant Rios' election to the state Supreme Court.

The complaint states that plaintiff was the only Jewish employee who was under the supervision of defendant Rios. The fact that defendant Rios was openly expressing such animosity toward her religion in her presence so obviously led to the conclusion that his bias might threaten her job security, that, in early-June 1995, plaintiff spoke to defendant Koslowitz about the anti-Semitism to which defendant Rios was subjecting her. Plaintiff stated to her that, if defendant Rios discharged her due to his anti-Semitism, plaintiff would commence litigation against him.

The complaint relates that, although defendant Koslowitz initially responded by unequivocally promising that she would be supportive of plaintiff if those events transpired, approximately two weeks later, she informed plaintiff that she had changed her mind. She instructed plaintiff not to raise the issue of defendant Rios' anti-Semitism and represented that she had the power to arrange for plaintiff to be transferred to a different judge. The complaint states that plaintiff told defendant Koslowitz that she did not believe that acquiescing to anti-Semitism was an acceptable solution.

The complaint reflects that, in various telephone conversations that occurred in the ensuing months, defendant Koslowitz became increasingly adamant in asserting that plaintiff should comply with her instructions to sweep defendant Rios' anti-Semitism under the rug and accept a transfer to another judge. Defendant Koslowitz repeatedly represented that she had the power to arrange an immediate transfer. Plaintiff consistently responded that no one should be transferred from a job because of prejudice based upon religion or race, and, that to accept such a transfer could only encourage further acts of discrimination. As those discussions replicated themselves, defendant Koslowitz began angrily denouncing plaintiff as, "crazy." She demanded that plaintiff follow her directions. Plaintiff reiterated her position. Eventually, that series of conversations simply ceased.

11

The complaint also demonstrates that, although defendant Rios did not fire plaintiff at the time, the discriminatory hostile work environment that he created within the confines of his chambers constituted an attempt to drive plaintiff to quit.

The complaint demonstrates that one method by which defendant Rios conveyed his religious hostility to plaintiff throughout the course of her employment as his principal law clerk was to initiate conversations with her or in her presence that had no apparent purpose other than to demonstrate that bias indirectly. It may be inferred from such indirect expressions of bias that defendant Rios was prejudiced against plaintiff due to her religion, and, that acts and words of his, which were directed against plaintiff, actually were motivated by unlawful discriminatory purposes even when on the surface they seemed to be neutral as to religion (or race).

As set forth in the complaint, on numerous occasions the conversations that defendant Rios appeared to initiate solely to convey his animosity toward plaintiff's religion, without making any direct statement that could be quoted, involved various Jewish politicians. Examples of such indirect expressions of his religious animus cited in the complaint include comments that he made regarding Comptroller Alan Hevesi (June 1995), Congressman Eliot Engel (September 2000), New York City Council member David Weprin (February 2002) and Mark Green (December 2002).

Obviously, the aforementioned outbursts exhibited by defendant regarding Ritholtz's candidacy for judicial office similarly demonstrated his bias against plaintiff's religion.

The complaint also cites other indirect expressions of his religious animus. It recounts that in the weeks preceding the "Million Man March," which was held on Monday, October 16, 1995, in Washington, D.C., that event generated extensive media coverage.  Much of the media's attention was focused on the controversy surrounding the march's organizer, Louis Farrakhan. Farrakhan was well-known for his anti-Semitic statements, including his famous declaration that, "Judaism is a gutter religion." During that month, defendant Rios approached defendant Newsome, who was sitting at her desk, a few feet away from plaintiff. Looking toward

12

plaintiff, and dramatically raising his voice, defendant Rios emphatically proclaimed that Farrakhan was "a great leader."

The complaint relates that, on Friday, October 13, 1995, while defendant Rios and plaintiff were alone in chambers, he said that he had signed a decision that she had drafted, and, that he had left it on his desk for her, together with the court file. He then exited chambers. When plaintiff entered his office to retrieve the decision and the file, she found that he had left a note atop the decision. His handwritten note stated, "NOTICE Repent before it is too late." A copy of that note is annexed to the complaint as ""Exhibit A."

Another indirect expression of defendant Rios' anti-Semitic bias, which is described in the complaint, occurred in February 1997. The complaint states that, during that month, after a news story was widely disseminated regarding then-Secretary of State Madeleine Albrights' Jewish ancestry, defendant Rios approached plaintiff in chambers and requested that she explain that situation. Plaintiff related that, according to the media accounts, numerous members of Albright's family had been killed in Nazi concentration camps and that, in an effort to protect Albright, her parents had raised her as a Christian without telling her that she had been born Jewish. Defendant Rios responded by erupting in laughter and walking away.

The complaint recounts that, during a telephone conversation with plaintiff on April 24, 2002, defendant Rios stated that, "Maybe we ought to write a novel." Plaintiff replied, "That might be worthwhile." In response, defendant Rios proclaimed, "I'll write it in German."

The complaint reflects that, on July 24, 2002, during jury selection in *People v. Andrew Brathwaite* (Queens Ind. No. 3851/00), in the presence of plaintiff, defendant Rios posed the question, "The shoemaker had a yarmulke, do you agree that he should be challenged for cause?"

The complaint states that, on April 8, 2003, while standing a few feet away from plaintiff, defendant Rios initiated a conversation with defendant Newsome about *People v. Valdemar Wilson,* 303 A.D.2d 773, in which the Appellate Division, Second Department had vacated the sentence that he had imposed and remitted the matter for resentencing by a

13

different justice. Defendant Rios angrily commented to defendant Newsome that the court probably did so because, during the sentencing, he had "said that Hitler had a mother." He stated to defendant Newsome, "Maybe I should have said Genghis Khan." Defendant Newsome replied, "Yeah, probably."

The complaint also notes that, on April 22, 2003, while plaintiff was a few feet away from him, defendant Rios loudly stated to Newsome that U.S. soldiers stole art work during the Second World War, and, started laughing.

The complaint shows that the discriminatory treatment to which plaintiff was subjected was based upon her race in addition to her religion. It states that, in May 1996, defendant Rios actually posted a job listing at Fordham University School of Law advertising for a bilingual attorney to replace plaintiff. From the facts described in the complaint, it may be inferred that the ad for a bilingual job as an attorney with defendant Rios was designed to attract Hispanic applicants.

It is alleged in the complaint that being bilingual was not a legitimate job requirement for the position that plaintiff held as defendant Rios' principal law clerk. The complaint also notes that, although defendant Newsome was not bilingual and one of her main job duties was to answer the telephone in defendant Rios' chambers, he never imposed such a requirement upon her job or advertised in an effort to replace her with a bilingual clerical secretary. A copy of a message that defendant Newsome had written for defendant Rios, which related that an applicant had telephoned in response to his ad "Re: Bi-lingual [sic] job," is annexed to the complaint as "Exhibit C."

As alleged in the complaint, defendant Rios' conduct in advertising to replace plaintiff based upon her race was so severe that it changed her working conditions by demonstrating that his racial prejudice jeopardized her job security, including her right to be protected from termination based upon racial discrimination.

The complaint states that, on or about May 1996, plaintiff informed defendant Koslowitz about defendant Rios' posting of an ad for a "bilingual" attorney to replace plaintiff. Defendant

14

Koslowitz again told plaintiff to refrain from raising the issue of defendant Rios' discrimination against plaintiff, and, stated that she had the power to arrange for plaintiff to be transferred to another judge. Plaintiff again asserted that she did not believe that acquiescing to discrimination was an acceptable solution.

As shown in the complaint, on December 6, 1995, the defendant in *People v. Flavio Torres* (Queens Ind. No. N11860/95) sought to have the Legal Aid Society relieved as his attorney because he intended to call his Legal Aid counsel as a witness.  In the presence of plaintiff, defendant Rios attempted to dissuade him from seeking the reassignment of counsel by telling him that, if the application was granted, his new attorney probably would be, "an American, not of Latin descent" (the assigned Legal Aid attorney was Sandra Cerna, who is Hispanic).

The complaint reflects that, or about June 12, 2001, in the presence of plaintiff, during a calendar call pertaining to *People v. Adrian Vasquez* (Queens Ind. Nos. 2961/99 and 3432/00), defendant Rios remarked to a representative from the Treatment Alternatives to Street Crime program, "I'm glad they are hiring my paisanos, I'm Puerto Rican."

The complaint states that, on April 7, 2003, during a telephone conversation that he had with then-Suffolk County District Court Judge Sonia Veras, defendant Rios referred to plaintiff as his, "uh . . . law secretary that doesn't have that Latin flavor."

The complaint recounts that, on April 10, 2003, plaintiff informed defendant Rios that Garnett Sullivan, Esq. had been assigned to represent the defendant in *People v. Brandon Rogers* (Queens Ind. No. 2771/02). Defendant Rios replied, "That's good - - at least he'll have a black attorney."

The complaint establishes that defendant Newsome shared in defendant Rios' religious (and racial) bias against plaintiff. It reflects that, upon the commencement of her employment by defendant Rios, she often exhibited blatant hostility toward plaintiff.  When defendant Newsome typed work that plaintiff drafted for defendant Rios, it routinely was replete

15

with far more errors than she appeared to make when she typed directly for him. After supposedly correcting the errors, as marked by plaintiff, defendant Newsome repeatedly returned the work to her with additional typographical errors. She did not perform in that manner when typing defendant Rios' work directly for him. Eventually, due to that situation, plaintiff began typing almost all of her work by herself.

Similarly, when defendant Newsome answered the telephone and the caller sought to speak to plaintiff, she frequently announced to plaintiff in a contemptuous tone, "Someone's on the phone for you," without providing the name of the individual. When a caller asked to speak to defendant Rios, defendant Newsome invariably furnished the relevant information to him, acting in a markedly different and professional manner. On many occasions throughout the years that they worked together, defendant Newsome kept office supplies under lock and key so that plaintiff would be unable to use them. Additionally, defendant Newsome engaged in other hostile and unprofessional conduct that was directed against plaintiff, as shown in the complaint.

The complaint reflects that after months of conducting herself in a hostile and unprofessional manner toward plaintiff, defendant Newsome provided an apparent explanation for her animosity. In October 1995, while plaintiff and Newsome were alone in chambers, Newsome announced, "I have a problem with your religion because you don't accept Christ."

The complaint recounts that, in or about the same month, while protests were occurring in Harlem during which the Jewish Caucasian owner of "Freddy's Fashion Mart" was denounced as an "interloper," due to his religion and his race, Newsome told plaintiff that she considered the owner of the business to be an "interloper," who deserved the protests because he should not own a store in that neighborhood.

From the statements described in the complaint, in which defendant Newsome clearly communicated her prejudice, it may be inferred that she was biased against plaintiff due to her religion, and, that acts and words of hers, which were directed against plaintiff, actually were motivated by unlawful discriminatory purposes even when they superficially appeared be neutral

16

as to religion (or race).

The complaint alleges that defendant Rios enlisted defendant Newsome in subjecting plaintiff to a discriminatory hostile work environment intended to drive plaintiff to quit.

The complaint reflects that, commencing in January 1995, when visitors came to see defendant Rios in his chambers, he frequently introduced them to defendant Newsome but drew negative attention to plaintiff by acting as though she was not present. Under the totality of the circumstances set forth in the complaint, it may be inferred that he did so due to his religious and racial bias against defendant and that such conduct was part of a discriminatory hostile work environment to which he subjected plaintiff.

The complaint reflects that in early-1996 a series of events commenced that are relevant to a separate motive for defendants' unlawful acts against plaintiff.

The complaint recounts that, in about January 1996, then-Assistant District Attorney Meryl A. Lutsky, who was in her late-twenties, was assigned to defendant Rios' courtroom. She was a member of a team of three prosecutors that was assigned by the Queens District Attorney's office to appear in that part on a daily basis. Neither plaintiff nor defendant Rios previously had met her.

The complaint recites that one evening, in or about the same month, while defendant Rios and plaintiff were alone in chambers, he suddenly insisted upon taking plaintiff to dinner that night, ostensibly to pay off a "bet" that he had lost to plaintiff months earlier. Until that night, he had not mentioned that "bet" since he had lost it.

Plaintiff told him that she had never thought that it was a "real bet," but he declared that she had to go to dinner with him that night. He offered plaintiff a drink. She declined that offer. He picked up one of the bottles of alcohol that he kept in his office and poured himself a drink. Moments later, he drove plaintiff to the restaurant that he selected - - The Parkside, in Corona. When they entered the restaurant, Lutsky was seated at a table with other female prosecutors. Defendant Rios and plaintiff briefly exchanged greetings with them before sitting down at a table in a separate area.  Shortly thereafter, Lutsky approached that table alone. Defendant

17

Rios immediately held her hand and, gazing into her eyes, commented that she was very "svelte." For several minutes, he continued to hold her hand and spoke to her in a similar vein, using the word "svelte" several times to describe her appearance. Afterwards, Lutsky returned to her table. Plaintiff did not see her again for the remainder of the evening.

The complaint relates that, in the months following that encounter at The Parkside, the manner in which defendant Rios and Lutsky interacted with each other in his courtroom was so suggestive of the existence of an inappropriate personal relationship between them that it frequently was discussed by court personnel. The complaint also states that Lutsky made many remarks to in which she appeared to acknowledge the existence of such a relationship. The complaint additionally notes that on numerous occasions, both defendant Rios and Lutsky separately absented themselves from the courtroom for lengthy periods of time without explanation, while the court otherwise would have been in session. They returned separately, but almost simultaneously. One day, in the courtroom, defendant Rios repeatedly instructed Lutsky that she should speak to him," at some point during the day," about "an unrelated matter." He never called her up to the bench to discuss any such "unrelated matter," but instead kept repeating, "at some point during the day." On another occasion, while Lutsky was handling cases on his calendar, defendant Rios suddenly asked her how many bedrooms there were in her apartment. They both immediately began giggling. There were many similar incidents.

The complaint relates that, on May 13, 1996, the trial-ready case of *People v. Jeff Lange* (Queens Ind. No. N12086/95), was transferred from defendant Rios' part to another part. The following day, defendant Rios directed the clerk of his part, George Plunkett, to arrange for that case to be returned to his courtroom because it was assigned to A.D.A. Lutsky, and, she wanted to continue to handle the remainder of the cases on defendant Rios' calendar, as well as to have him preside over that trial. Plunkett complied with that instruction. (The complaint notes that, later that day, the matter was transferred back to the other part upon the application of the defendant's attorney, who represented that he was no longer ready for trial because he deemed it advisable to develop and present a psychological defense).

18

The complaint reflects that defendant Rios documented his relationship with Lutsky in his own handwriting. Although he had not met her until in or about January 1996, when she was assigned to his part, in June of that year he wrote on his desk calendar, "Meryl Monday." An undated, handwritten to-do list that he made stated, "Meryl 1 PM." That entry still remains legible, although he crossed it out at some point. He also wrote "Meryl " on top of the list. Copies of the calendar entry and the to-do list are annexed as Exhibits "D" and "E" to the complaint.

The complaint relates that defendant Rios wrote "M" next to two dates - July 12 and 13 - on a 1996 calendar kept by him. Next to the dates immediately preceding those entries, he wrote "K." The complaint states that it appears that the "M's" stood for Meryl Lutsky and that the "K's" symbolized Kathleen Pizarro (who currently is his wife). A copy of this calendar is annexed as Exhibit "F" to the complaint.

Although, in his memorandum of law, defendant Rios' counsel suggests an innocuous alternate explanation for this one writing and insists that any other interpretation is absurd, the standards applicable to the determination of Rule 12(b)(6) motions do not permit the allegations of the complaint to be disregarded simply because the defendant has offered some other interpretation of the facts; they require that the allegations of the complaint must be taken as true. Further, as shown herein, that one writing is far from the only fact stated in the complaint indicative of an inappropriate relationship between defendant Rios and Lutsky. The complaint even specifically states that Lutsky herself made many statements to plaintiff that appeared to acknowledge that she was having an inappropriate relationship with defendant Rios. Accordingly, even if that one writing did not exist, the remaining facts in the complaint would be ample for pleading purposes to establish the existence of such an inappropriate relationship and plaintiff's good faith belief that such an inappropriate relationship existed. The idea that such a relationship could not have occurred simply because one of the alleged participants was a New York State judge is not worthy of any consideration. Defendants are not entitled to have allegations against them rejected merely because of the office or title that they hold.

19

The complaint recites that, inasmuch as the inappropriate relationship that apparently developed between defendant Rios and Lutsky was not disclosed to the defendants who appeared before him; they had no opportunity to request recusal. This situation so grossly compromised their rights that to ignore its existence would have been unethical. Due to the importance of that matter, which clearly was of grave public concern (and did not relate to any personal interest of plaintiff), in or about late-1996, plaintiff telephoned Lutsky in an attempt to discreetly persuade her to seek a transfer to a different part. The complaint relates that, during that discussion, plaintiff stated that, if Lutsky was not willing to end the conflict of interest by so doing, then plaintiff would speak to Lutsky's supervisors about the matter.  Although, in a subsequent conversation, Lutsky clearly implied to plaintiff that she and defendant Rios were having an inappropriate relationship, and many earlier remarks made by her to plaintiff also appeared to acknowledge that fact, her immediate response during that telephone conversation was to deny it.  The complaint recounts that, soon after that conversation ended, Lutsky entered the courtroom with her supervisor, A.D.A. Kenneth C. Holder, and another male employed by the Queens District Attorney's office.  Although Holder and his co-worker could not have made any effort to investigate the matter, they quietly approached defendant Rios. He exited the courtroom with the two of them, so that they could speak in privacy. They informed him that plaintiff had told Lutsky that she should request a transfer to a different part because it was obvious that she had been engaging in an inappropriate relationship with him.  After providing that information to defendant Rios, Holder and his co-worker returned to the courtroom, where plaintiff had remained.  Other court personnel also were present. Instead of attempting to speak to plaintiff privately, Holder and his male co-worker stayed in the courtroom. As they stood alongside Lutsky, Holder loudly proclaimed that she had told them that plaintiff had accused defendant Rios and her of having an affair, and, that plaintiff had stated that she should stop appearing before him due to that relationship.  He demanded to know whether plaintiff had made such statements to her. The complaint states that the demeanor of Holder and his male co-worker so blatantly revealed that they were intentionally

20

jeopardizing plaintiff's employment in retaliation for her statements that, after hesitating, plaintiff ultimately replied that there must have been a misunderstanding.

The complaint notes that, In a subsequent telephone conversation with plaintiff that occurred in or about early-December 1996, Lutsky stated that she and defendant Rios had recently had "a long chat" in her car.

The complaint also notes that Lutsky retained her assignment in Justice Rios' part until early-January 1997.

The complaint reflects that defendant Rios apparently planned to take a trip to San Diego with A.D.A. Lutsky in February 1997. It states that two pages of handwritten notes that were made by him detailed the trips that he intended to take during that year. He wrote the name "Meryl" in the middle of the first page amidst car rental information. At the top of that page, he wrote, "2/12 - 2/17." On the second page, he indicated that the destination for that trip was San Diego. At the bottom of the second page, he referred to the relevant year: 1997. The complaint notes that, after February 17, 1997, without identifying any person he had intended to accompany, defendant Rios asserted to plaintiff that he ultimately had cancelled his trip to San Diego. Copies of his notes are annexed as Exhibit "G" to the complaint.

The complaint states that, in May 1997, A.D.A. Lutsky appeared before defendant Rios and commenced jury selection in the trial of *People v. Orlando Diaz, William Mendez & Juan Colon* (Queens Ind. No. 3164/96). Due to the death of her father, a mistrial was declared and the case was assigned to another prosecutor. She did not appear in Justice Rios' part thereafter.

The complaint recounts that, in early-June 1998, defendant Rios told plaintiff to enter his office. After she did so, he closed the door and angrily asserted that members of the screening committee for the Appellate Division had instructed him to withdraw the application that he had submitted to them inasmuch as they believed that he had engaged in inappropriate "womanizing." The accusatory manner in which he related this occurrence appeared to reflect

21

that the inappropriate "womanizing" consisted of his conflict of interest concerning A.D.A. Lutsky, and, to indicate that he blamed plaintiff for the screening committee's knowledge of that situation. In a letter dated June 5, 1998, he withdrew his application for the position of Associate Justice - Appellate Division, First Department. A copy of said letter is annexed as Exhibit "H" to the complaint.

The complaint reflects that other events that occurred in 1998 also played an important role in motivating the agreement to terminate plaintiff's employment that was later made by defendants. Those occurrences involved the abrupt and final end of plaintiff's association with the Continental Regular Democratic Club.

The complaint reflects that, until then, plaintiff had remained active in the Continental Regular Democratic Club although she had been excluded from the inner circle of that club as of January 1995. As set forth above, the complaint states that plaintiff was excluded from its inner circle by defendant Koslowitz due to said defendant's desire to ameliorate Michael Cohen's rage over the fact that plaintiff had not lost her employment as part of the political vendetta he launched after his loss to Melinda Katz in the special election for the New York State Assembly in 1994. He was particularly outraged that, instead of losing her job, plaintiff was hired for a better position.

The complaint recounts that, in or about January 1998, defendant Manton, defendant Koslowitz and Michael Cohen publicly professed that their political feud with then-City Comptroller Hevesi finally had ended. That supposed cessation of hostilities was due to a deal: defendant Manton, defendant Koslowitz and Cohen endorsed Katz in the 1998 Congressional race for the seat that was open due to the election of Charles Schumer to the U.S. Senate, and, also endorsed Hevesi's son for the State Senate seat that was vacant as a result of the retirement of Senator Emanuel Gold. Hevesi and Katz endorsed Cohen for the Assembly seat that she vacated to run for Congress.

That deal was discussed in an article published in the New York Times on January 25,

22

said defendants was personally involved in the acts related to the termination of plaintiff's employment. Direct evidence is not required.

As time went by, the various aspects of the circumstances set forth in the complaint began to coalesce. From the facts set forth in the complaint, it may be inferred that defendants Rios and Newsome believed that they could exploit the "private" defendants' anger at plaintiff's involvement in Katz's campaign to obtain the approval of those defendants for defendant Rios to terminate plaintiff's employment. It may be inferred that defendants Rios and Newsome adopted the "private" defendants' political animus against plaintiff because it appeared to create an opportunity for defendant Rios to request such approval (which defendants Rios and Newsome had long desired due to their religious and racial bias against plaintiff and defendant Rios' anger about the statements that plaintiff had made regarding his relationship with Lutsky). They did not get that approval overnight, but the complaint reflects that they ultimately obtained it, when, due to the budgetary concerns of OCA, it appeared that there might be a loss of law clerk positions available to be filled by those who had the political support of Manton's machine. From the facts set forth in the complaint, it may be inferred that defendants Rios and Newsome adopted the political animus of the "private" defendants in approximately May 1998, when defendants Koslowitz, Manton, Sweeney, Reich and Higgins began to engage in retaliatory conduct against plaintiff in reaction to plaintiff's involvement with Katz's political campaign. As noted above, the retaliatory acts committed by the "private" defendants at that time are not included in the complaint because they are actionable in themselves, but rather to demonstrate the intent of these defendants regarding the acts related to the termination of plaintiff's employment.

A stated above, the complaint recites that, in early-June 1998, while the "private" defendants were engaged in retaliatory conduct in reaction to plaintiff's participation in Katz's campaign, defendant Rios informed plaintiff that he had been instructed by members of the screening committee of the Appellate Division to withdraw his application for a position on that court because they believed that he had been involved in inappropriate "womanizing." The

accusatory manner in which he related this occurrence appeared to reflect that the inappropriate "womanizing" consisted of his conflict of interest concerning A.D.A. Lutsky, and, to indicate that he thought that plaintiff's statements had led to the screening committee's knowledge of that situation. In a letter dated June 5, 1998, he withdrew his application for the position of Associate Justice - Appellate Division, First Department.

It may be inferred that, when he sought the approval of the "private defendants" to discharge plaintiff, defendant Rios did not keep his anger about her statements regarding his apparent conflict of interest involving Lutsky to himself and that, when the "private" defendants and the "state" defendants ultimately entered into an agreement to terminate plaintiff (after a pretext was created for her to be fired), their shared motives were both political animus and a desire to retaliate against plaintiff for making statements about matters of public concern regarding defendant Rios. Additionally, the facts clearly demonstrate that defendants Rios and Newsome were motivated by their religious and racial prejudices against defendant. The complaint reveals that defendant Rios had exhibited such bias long before plaintiff made any such statements. The complaint shows that he had even posted a job listing designed to attract Hispanic applicants to replace plaintiff months before plaintiff made her statements regarding the apparent conflict of interest created by his relationship with Lutsky.

The complaint reflects that, on or about September 1998, after Michael Cohen became the nominee of the Democratic party for the aforementioned Assembly seat and Anthony Weiner defeated Katz in the primary for the Congressional seat, defendant Rios approached plaintiff as she was walking in the hallway between chambers and the courtroom, and tauntingly whispered to her,

> From now on, you'd better watch what you say. I know every
> word you say here - - this place is wired. Try telling anyone
> and I'll tell them they should ignore lunatics. Go ahead, prove it.

The complaint states that, on May 10, 1999 in *Matter of O'Grady*, 255 A.D.2d 91, the Appellate Division, Second Department suspended John O'Grady, the principal law clerk to Justice Joseph Rosenzweig, from the practice of law for a period of five years.   The complaint

597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). If an employee
is discharged for making statements concerning a matter of
public concern, the employee's freedom of speech may have
been violated. See *Rankin v. McPherson*, 483 U.S. 378, 384,
107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987); *Connick v.
Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d
708 (1983) . . .

The complaint demonstrates that this ruling was treated as a matter of great concern by New York State judges. The need to challenge it was discussed at one or more meetings of the Association of the Justices of the Supreme Court of the State of New York. That discussion involved their perception that a response should be coordinated by OCA, the state judges' association and the city judges's association. Their position was that a state judge should be able to fire a principal law clerk for any reason whatsoever, including statements involving matters of public concern such as judicial misconduct. They saw a coordinated effort as necessary because, unlike the judges associations, OCA possessed the resources to assign an attorney to do the legal work pertaining to the action that had been commenced by the discharged principal law clerk. The complaint herein reflects that defendant Lippman was personally involved in that coordinated effort.

As shown in the complaint, on December 20, 1995, in a decision issued on remand in *Sheppard v. Beerman,* 911 F.Supp. 606 (E.D.N.Y.), the district court dismissed the former law clerk's claim that he had been wrongfully discharged in retaliation for his exercise of free speech in confronting Justice Beerman about the judge's alleged misconduct. The court found that his speech involved a matter of public concern, and that he had demonstrated a prima facie case of unconstitutional discharge, but it also determined that Justice Beerman had qualified immunity from liability.

The complaint in the instant action reflects that an *amicus* brief was submitted upon behalf of the Chief Administrative Judge of New York State in opposition to the discharged law clerk's appeal of that dismissal. The complaint reflects that, by that time, defendant Lippman held that title, and, that he directed OCA's counsel, Michael Colodner, to prepare that brief.

31

As set forth in the complaint, on September 6, 1996, in *Sheppard v. Beerman,* 94 F.3d 823, the Second Circuit reversed the dismissal. In remanding the matter for a second time, the Second Circuit held that the district court had erred in finding that Justice Beerman's actual intent in discharging his law clerk was irrelevant, and, in not allowing his former principal law clerk to conduct discovery to support the claim of unconstitutional motive.

That ruling mandates that, based upon the facts set forth in the complaint herein, the instant motions for dismissal must be denied inasmuch as the intent for plaintiff's discharge is clearly in issue, no discovery has been conducted and all discovery has been stayed pending the adjudication of defendants' Rule 12(b)(6) motions.

Although, after extensive discovery was conducted, the District Court granted summary judgment to the defendant on remand and the Second Circuit affirmed that decision in *Sheppard v. Beerman*, 317 F.3d 351 (2d Cir. 2003), the ultimate dismissal of that action did not change the determination that the plaintiff's allegations had warranted discovery. It did nothing to abrogate the Second Circuit's prior ruling that if a principal law clerk to a New York State Supreme Court justice is discharged for making statements regarding a matter of public concern, that employee's freedom of speech may have been violated.

Based upon the facts set forth in the complaint, it may be inferred that defendants' agreed that a pretext should be established prior to plaintiff's predetermined discharge, that they engaged in a highly coordinated effort to manufacture such a pretext (including, *inter alia,* the creation of atypical damaging documents to be included in plaintiff's personnel file) and that in so doing they were guided by a desire to circumvent the effect of the Second Circuit's rulings in the action brought by Justice Beerman's former principal law clerk.

As stated above, from the facts set forth in the complaint, it may be inferred that the explanation for the very lengthy delay between the formation of the agreement that plaintiff would be terminated and her actual discharge was that, in the interim, defendants were engaged in the orchestration of that pretext.

As shown above, the facts set forth in the complaint demonstrate that, as early as

meeting with defendant Fisher, and the other facts set forth in the complaint, it may be inferred that the "state" defendants and the "private" defendants were in the process of orchestrating a pretext for plaintiff's predetermined discharge. Those events must be viewed together to evaluate the totality of the circumstances.

The complaint reflects that, on March 5, 2003, one week after that meeting was scheduled to be held, defendant Higgins (who as noted above is defendant Koslowitz's daughter) came to defendant Rios' chambers and joined defendant Newsome in harassing plaintiff while she was working. Defendant Rios was present and observed their behavior.

While the childish behavior that defendants Higgins and Newsome exhibited would be not actionable in itself, it cannot be viewed in a vacuum. It must be considered as part of the circumstances from which a jury may make reasonable inferences.

The complaint states that defendants Newsome and Higgins both met alone with defendant Rios after that occurrence and that loud laughter could be heard emanating from his office while they did so. While such an event would appear harmless if viewed in isolation, it must be considered as part of the totality of the circumstances.

The complaint recounts that, during the same day that he had met alone in his office with defendants Higgins and Newsome, defendant Rios later approached plaintiff and, in an exaggerated tone of voice, disingenuously proclaimed to her, "I'm concerned about you." He ludicrously asserted to plaintiff, "You make noises." Plaintiff replied that - - as defendant Rios obviously knew - - there was no basis whatsoever for the statement that she made "noises." Plaintiff also noted that - - as he clearly was aware - - she had been subjected to extreme hostility by defendants Higgins and Newsome, who had been openly mocking her in chambers while she was working. Plaintiff stated that it was impossible to avoid noticing their behavior.

The complaint relates that defendant Rios stated that he agreed with plaintiff. At that time, he also said that defendant Higgins should not spend her time in his chambers because she did not work there. He asserted that he would tell defendant Newsome to instruct defendant Higgins to refrain from doing so in the future.

The complaint recounts that plaintiff also stated that, on numerous occasions during the past several years, when plaintiff walked past the door to Justice Spires' nearby chambers, defendant Higgins had raised her voice and commented that plaintiff was "disloyal." Plaintiff noted that those comments clearly seemed to be related to the fact that plaintiff had left defendant Koslowitz's political club. Plaintiff stated that she had not responded to those remarks, but that, by entering into his chambers while plaintiff was working and childishly mocking her, defendant Higgins had become extremely disruptive. Defendant Rios reiterated that he would direct defendant Newsome to tell defendant Higgins not to spend her time in his chambers.

The complaint states that plaintiff informed defendant Rios that, earlier that year, defendant Newsome screamed uncontrollably at plaintiff because she mistakenly thought that plaintiff was accusing her of breaking the lock on plaintiff's closet. Plaintiff recounted that, when she attempted to reply, defendant Newsome shouted that she did not want to hear anything that plaintiff had to say about the matter.

The complaint notes that plaintiff also accurately stated to defendant Rios that defendant Newsome repeatedly arrived very late, took long lunch breaks that lasted for hours and left early. Plaintiff stated that, as a result of defendant Newsome's frequent absences from chambers, plaintiff often assumed her duty of answering the telephone, while also performing her own work on motions, jury instructions and other matters related to pending cases. Defendant Rios replied that plaintiff could avoid answering the telephone during defendant Newsome's absences by relying on the voice mail system. Plaintiff pointed out that to do so might result in urgent messages not being received in a timely fashion, including telephone calls from his family members. Defendant Rios again stated that he would speak to defendant Newsome.

The complaint relates that, during the course of that conversation, defendant Rios expressed his satisfaction with the high quality of plaintiff's work.

The complaint states that, the next day, defendant Newsome arrived at approximately

36

10:00 a.m. Soon thereafter, she spent approximately one hour in Justice Spires' chambers talking to defendant Higgins. During much of that time, defendant Rios also was present in that chambers, speaking to Justice Spires. When plaintiff entered Justice Spires' chambers to deliver a message to defendant Rios, they all reacted by giggling. Before defendant Rios left for the day he told plaintiff that he had not spoken to defendant Newsome about the matters that he had discussed with plaintiff the previous day.

The complaint recounts that, on the morning of March 7, 2003, defendant Rios told plaintiff that he would be attending a meeting at OCA's office that afternoon at 2:00 p.m. Newsome did not arrive in chambers that day until 12:40 p.m. At approximately 2:33 p.m., defendant Rios telephoned defendant Newsome in chambers and they had a lengthy discussion. Throughout the course of that conversation, defendant Newsome was laughing. At approximately 5:00 p.m., defendant Rios returned to chambers. He claimed that, on the preceding day, he had not had any time to talk to defendant Newsome regarding the matters that plaintiff had raised with him. That claim was so blatantly false that it could it only be interpreted as an intentional demonstration that, during his conversation with plaintiff two days earlier, he had been acting out a farce.

The complaint notes that defendant Rios' conduct, during this sequence of events, represented an escalation of the hostile work environment to which he was subjecting plaintiff. It also demonstrated that any attempt by plaintiff to raise complaints with him would not just be futile, but also would be likely to result in retaliation.

In light of the surrounding circumstances as set forth in the complaint, it may be inferred that OCA was coaching defendant Rios regarding the orchestration of a pretext for plaintiff's predetermined discharge (both at his meeting at OCA's office on March 7, 2003 and prior thereto) and that defendants Newsome and Higgins were heavily involved in that coordinated effort. From the participation of defendant Higgins in the events on March 5, 2003 (one week after defendant Koslowitz's scheduled meeting with defendant Fisher), the role defendant Higgins played as defendant Koslowitz's eyes and ears in the courthouse, her other efforts to

37

retaliate against plaintiff for plaintiff's involvement in Katz's campaign, her conversations with defendant Newsome commencing in September 2002 about the fact that it already had been decided that plaintiff would be discharged, the extremely lengthy period of time that elapsed between the making of that decision and the actual termination of plaintiff's employment, as well as other facts set forth in the complaint, it may be inferred that the "private" defendants and the "state" defendants had reached an agreement that plaintiff would be discharged and that they would jointly orchestrate a pretext for that discharge. Further, it may be inferred that defendant Higgins was included in that coordinated effort because she worked in close proximity to defendant Rios' chambers and she also could serve as a link between the other "state" defendants and the "private" defendants due to her familial relationship with defendant Koslowitz (a powerful figure in the courts-politics nexus in Queens who is closely allied with defendants Manton, Sweeney and Reich).

The complaint reflects that on May 27, 2003, defendant Newsome changed the screen saver on her court-issued computer so that it displayed the statement, "On Christ the solid rock I stand!!"

The complaint states that, on about May 29, 2003, defendant Rios instructed plaintiff to enter his office. It was to be the scene of an ill-willed reprise of his farcical performance of March 5, 2003.

The complaint recounts that, on about May 29, 2003, defendant Rios instructed plaintiff to enter his office. Repeating his performance of March 5, 2003, in an affected tone of voice, he claimed, "I'm concerned about you." The complaint reflects that, in the days following the prior conversation, his conduct revealed that his unwarranted expressions of "concern" were part of an act staged for the purpose of setting up plaintiff to be discharged. From the facts set forth in the complaint, it may be inferred that OCA had been coaching him on steps to be taken to establish a pretext to terminate an employee and that it was doing so at the direction of defendant Lippman pursuant to an agreement between the "state" defendants and the "private defendants" which called for plaintiff to be discharged, after such a pretext was created in an

38

attempt to circumvent the effects of the aforementioned rulings of the Second Circuit.

The complaint reflects that plaintiff responded to defendant Rios' new disingenuous and scripted claim of "concern" by raising the issue of discrimination. Plaintiff recounted that, during the year that defendant Newsome began working for him, she had made the anti-Semitic comment to plaintiff that, "I have a problem with your religion because you don't accept Christ." Defendant Rios angrily replied by shouting, "Everyone hates everyone!"  Plaintiff also noted that, on a recent occasion, when defendant Newsome entered chambers and saw that plaintiff had picked up a copy of the New York Law Journal, which another clerical secretary had placed on defendant Newsome's desk, she violently pulled it out of plaintiff's hands and screamed at plaintiff. Plaintiff stated that defendant Newsome's religious bias clearly was the cause of the hostility that she had demonstrated toward plaintiff throughout the course of their working relationship. Defendant Rios defended defendant Newsome, dismissing plaintiff's complaints out of hand. Without any explanation, he also reversed the position that he previously had announced to plaintiff regarding defendant Higgins. He suddenly denied that plaintiff had raised any valid complaints about defendant Higgins' behavior. Before leaving for the day, plaintiff reminded defendant Rios that when he learned that Martin Ritholtz was one of the candidates for Civil Court that the Queens Democratic organization was supporting in the election to be held the year after defendant Rios commenced his term as a Supreme Court justice, he had shouted, "That rabbi is getting my vacancy!" in the presence of plaintiff.

The complaint relates that, on June 19, 2003 at approximately 1:00 p.m., A.D.A. Kenneth C. Holder accompanied defendant Rios to his chambers. They entered defendant Rios' office and remained there for several minutes. Holder did not have any pending cases before defendant Rios. A lengthy period of time had elapsed since he had been present in defendant Rios' part for any reason.  As described above, the complaint herein reflects that, in or about late-1996, after plaintiff had attempted to persuade then-A.D.A. Meryl Lutsky to transfer to a different part, Holder intentionally jeopardized plaintiff's employment in retaliation for her statements. From the facts set forth in the complaint, it may be inferred that Holder

came to defendant Rios' chambers while defendant Rios was involved in creating a pretext for the termination of plaintiff's employment because defendant Rios was concerned that when he discharged plaintiff, she might make public statements about his relationship with Lutsky.

The complaint recounts that, on June 20, 2003, plaintiff saw written evidence that a pretext to fire her was being contrived. Defendant Rios left notes in plain view on his desk that indicated that the pretext, which he clearly had discussed with officials of OCA, included the demonstrably false allegation that plaintiff wasted time, as well as specious claims aimed at disparaging plaintiff's mental status (obviously intended to ensure that, when plaintiff was terminated, any statements that she might make about defendant Rios and matters of public concern, such as discrimination and judicial misconduct, would be rejected out of hand). The notes indicated that defendant Rios intended to take notes regarding plaintiff in furtherance of the effort to fabricate a pretext to terminate plaintiff's employment. The complaint states that the individuals at OCA that he contacted and/or intended to contact included Lisa Flom, Diedre McKenzie and defendant Lauren DeSole, Esq.

The complaint states that on June 27, 2003, a week after plaintiff saw the aforementioned notes on defendant Rios' desk, defendant Rios met with defendant Lippman. The complaint also states that this highly unusual meeting occurred in defendant Lippman's chambers in White Plains.  As shown above, the complaint reflects that defendant Lippman was personally involved with the coordinated efforts of the judges' associations and OCA to provide additional resources, including the assignment of an attorney, to support Justice Beerman in the lawsuit that had been brought by his discharged principal law clerk. The complaint relates that, at some point, defendant DeSole was assigned to guide defendant Rios through the process of orchestrating plaintiff's predetermined discharge. From the facts set forth in the complaint, a jury may reasonably infer that defendant Lippman was personally involved in the agreement between the "state" defendants and the "private defendants" which called for plaintiff to be terminated after a pretext was established for her termination and that he assigned defendant DeSole to that task in furtherance of that agreement.

The complaint states that, throughout the course of her employment by defendant Rios, defendant Newsome habitually arrived late to work and left early. On many occasions, defendant Newsome took lunch breaks that lasted two hours or more. Defendant Newsome routinely violated the Unified Court System's internet access policy by using her court-issued computer to access the internet for personal purposes. She also inappropriately used that computer to write resumes and cover letters for others, as well as to write material for her own commercial purposes. Many times, she failed to answer the telephone while she was engaged in personal phone calls. The complaint relates that plaintiff's performance was exactly the opposite. Despite the existence of numerous serious shortcomings in defendant Newsome's job performance and plaintiff's outstanding job performance, defendant Rios treated defendant Newsome in a manner that was vastly favorable to her (including but not limited to falsely praising her to others and encouraging her to waste time) while he attempted to destroy plaintiff's professional reputation and manufactured reasons to discharge plaintiff.

A jury may reasonably infer that, if defendant Rios actually had any non-pretextual concern about plaintiff's mental status, there would not have been an extremely long delay between the time that he decided to discharge her and the date of her actual termination from employment. From the facts set forth in the complaint (including the fact that he posted an ad designed to attract Hispanic candidates to replace plaintiff as early as 1996), a jury may reasonably infer that his actual motives to discharge plaintiff consisted of his racial and religious bias against her, his desire to retaliate against plaintiff for making statements of public concern including those regarding the apparent conflict of interest that was created by his relationship with Lutsky and his desire to retaliate against plaintiff for reasons based upon partisan politics.

The complaint states that, on July 18, 2003, a note in defendant Rios' handwriting that was on his desk stated, "Judy looking through recycling." That evening, he entered plaintiff's office and placed on her desk a sheet of paper upon which was typed the name, title and office address of Kay Ann Porter, OCA's Managing Inspector General for Bias.  A telephone number was handwritten under that information.  He asserted that he had telephoned Porter and told

41

her that plaintiff had complained of discrimination.  He also informed plaintiff that, based upon the version of plaintiff's complaints that he had presented to Porter, she had supplied him with a brochure regarding a mental health program, and, instructed him to give it to plaintiff. He gave plaintiff such a brochure. He stated that, if plaintiff wanted to do so, she could call Porter.  He also told plaintiff that he was not concerned about defendant Newsome's behavior, and that he was solely interested in plaintiff's conduct.  He made the patently false assertion that defendant Newsome always was at work at 9:30 a.m. and left at 4:30 p.m.  He smirked and proclaimed, "There's only the three of us here."  He emphasized the latter pronouncement by twice repeating it. In so doing, he clearly implied that he and defendant Newsome would support each other in lying about the conditions in the workplace. Plaintiff responded by asking, "So, you aren't concerned that she told me that she has a problem with my religion because I don't accept Christ, you aren't concerned that she sometimes acts like she thinks that she has a no show job and you aren't concerned that she screamed at me and violently grabbed the New York Law Journal from my hands?" At first, he did not reply. Moments later, he denied that defendant  Newsome ever acted like she thought that she had a no show job.  He said that she denied having made the comment about plaintiff's religion (although, on a prior occasion, he had said that defendant Newsome claimed that plaintiff misunderstood the same comment). During the course of the conversation he inquired, "Do you think I don't like you because you're Jewish?"  Plaintiff looked directly into his eyes to confirm that she was making that complaint. He angrily remarked that plaintiff was, "treating him like shit." As the conversation continued, plaintiff asked defendant Rios why he was taking notes about her. Initially, he claimed that he did not understand why plaintiff had asked that question. Plaintiff said, "I'll show you," and began walking toward his office. Defendant Rios followed her. Plaintiff pointed to the note on his desk that he had written, which stated, "Judy looking through recycling."  He became extremely flustered, and, maintained that he had written it because defendant Newsome had made that statement to him earlier in the day.  Plaintiff asked him why defendant Newsome was speaking to him about a matter that was so innocuous - - all three of them occasionally had

42

looked in the recycling to determine whether they had inadvertently discarded something in it. He agreed that they all had done that and professed that he did not know why defendant Newsome had made the comment to him. He repeated his declaration that he had written that statement because it was a remark that defendant Newsome had made to him. Plaintiff asked him if he was taking such notes because he was setting her up to be fired. He replied that plaintiff was, "paranoid." He told plaintiff, "you're loved." He represented that he did not intend to fire plaintiff. He stated, "Get any such idea out of your head - - just forget it!" Looking shaken, he ripped up the note and discarded it. As he did so, he instructed plaintiff to forget everything that he had said during the last thirty minutes. Inasmuch as that period of time clearly encompassed his assurance to plaintiff that he did not intend to fire her, she asked, "Everything?" He started to say something, then stopped himself. He told plaintiff to have a good weekend. His comments that evening demonstrated that, in addition to dismissing plaintiff's complaints out of hand, he was enlisting defendant Newsome in his efforts to fabricate a pretext to discharge plaintiff and maliciously publishing defamatory statements about plaintiff in an effort to injure plaintiff in her profession.

The complaint relates that, on July 28, 2003, speaking to plaintiff in the histrionic manner that he had adopted in addressing her earlier that year, and for no apparent reason (other than the improper motives set forth therein), defendant Rios repeatedly asked plaintiff, "Are you okay? How are you feeling?" Subsequently, he also asked plaintiff, "How was your weekend?" Plaintiff replied that it was, "great," and related that she had seen the movie classic, "Gaslight." He claimed that he had never seen that movie and asked plaintiff to describe it. Plaintiff said that it was about a psychotic man who had murdered a woman, married the victim's niece and unjustifiably attempted to depict his wife as mentally disturbed to others, as well to deceive her into believing that she actually was insane. Plaintiff stated that, ultimately, he was exposed and his wife confronted him with evidence that proved that she had been set up by him. Plaintiff concluded that, in the ending of the movie, the truth was borne out and the villain got his just dessert. Later that day, a note in open view on defendant Rios' desk, in his

43

handwriting, stated, "The truth will be borne out and they'll find out about him and he'll get his just dessert." The note demonstrated that defendant Rios was maliciously attempting to create a pretext for plaintiff's predetermined discharge. In that note, he omitted the fact that plaintiff had been describing the plot of a movie. He also deliberately misquoted plaintiff to make it appear that she was not speaking in the past tense. From the fact that he was apparently so desperate to find reasons to fire plaintiff that he would not only write a note about words that she had spoken in describing an old movie, but he would actually distort those words to disguise the context, it may be inferred that he was creating a pretext to mask his unlawful motive for his preplanned termination of plaintiff's employment.

The complaint states that, throughout the last week of July 2003, a note in defendant Rios' handwriting, in open view on his desk, stated "Friday <u>conf</u> S + R."  That note apparently referred to a meeting to be attended by defendant Rios, defendant Sandra Newsome and others at a location other than his chambers.

The complaint notes that New York State Supreme Court Justice Frederick D. Schmidt passed away in July 2003. Subsequently, defendant Rios told plaintiff that he had informed defendant Fisher that he would be amenable to transferring from the Kew Gardens courthouse to the Jamaica courthouse and taking over Justice Schmidt's civil term part.  When he first spoke to plaintiff about the transfer, he stated that defendant Fisher had decided to keep Leonard Livote, the principal law clerk who had been assigned to Justice Schmidt, on OCA's payroll.  Defendant Rios asserted to plaintiff that defendant Fisher had directed that Livote would be "available to us as resource." He added that defendant Fisher had stated that he "hoped that at the end of the year, the politicians would take care of," Livote (thereby demonstrating the continued control of defendants Manton, Sweeney and Reich over employment decisions regarding principal law clerks in Queens). Plaintiff asked defendant Rios where Livote would be situated physically until the end of the year. He gruffly retorted, "Not at your desk!"  Although plaintiff had not raised the subject at that time, defendant Rios represented to her that, "You're not being fired." The transfer to Jamaica ultimately did not

44

occur until November 2003.

The complaint states that, in or about August 2003, defendant Rios directed defendant Newsome to create and maintain a file consisting of copies of the Appellate Division decisions that he received in connection with the appeals of matters over which he had presided. Previously, that task had been performed only by plaintiff. His instruction to defendant Newsome to assume that duty constituted an adverse employment action against plaintiff that was motivated by his religious and racial animus against plaintiff. It also reflected that plaintiff was being subjected to a hostile work environment.

The complaint relates that, on August 21, 2003, defendant Rios entered plaintiff's office and removed files with pending motions that had been sent to his part during the previous week. His unprecedented measure in taking such work away from plaintiff constituted another adverse employment action that was motivated by his religious and racial animus against plaintiff. It also demonstrated that plaintiff was being subjected to a hostile work environment.

The complaint states that on August 27, 2003, Justice Rios returned one of the pending motions that he had removed from plaintiff's office. The determination of that motion in *People v. Edward Levy a/k/a Ezro Leviyev* (Queens Ind. No. 736/03), a medicaid fraud action that had been commenced by the New York State Attorney General, required the review of more than 500 pages of Grand Jury minutes, as well as the affirmations and additional papers submitted by the parties. Plaintiff drafted a decision and an order in connection with that motion. The next day, she presented the drafts to defendant Rios. He signed them as written. The fact that he returned a motion of that nature to plaintiff and signed the decision and order that she had drafted, without making any changes, demonstrated that he actually believed that he could rely upon the high quality of plaintiff's work, and, that he been creating pretextual reasons to discharge plaintiff to disguise his improper motives.

The complaint recounts that, in or about August 2003, defendant Rios began routinely closing the door to his office while he was inside of it and plaintiff was present in chambers. On numerous occasions, he deviated from that pattern when defendant Newsome

issued a note. Plaintiff and George Plunkett both read the note in the courtroom immediately after it was delivered there by a court officer. Although he was aware that defendant Rios had not arrived, Plunkett placed a telephone call to defendant Newsome, who was in chambers, and told her about the note. After that conversation ended, plaintiff asked him why he called the clerical secretary to discuss a jury note when the law clerk was present. Plunkett replied that defendant Rios had instructed him to call defendant Newsome if a note was issued by the jury. Plunkett said that defendant Newsome knew where defendant Rios could be located. In so instructing Plunkett, defendant Rios obviously acted in a manner likely to damage plaintiff's professional reputation by showing that he was informing only defendant Newsome of his whereabouts while the jury deliberated, and, that he did not even want plaintiff to tell defendant Newsome that she should telephone him if a note was issued. In so doing, he demonstrated that plaintiff was being subjected to a hostile work environment.

The complaint states that on October 16, 2003 at approximately 1:20 p.m., a court officer placed a telephone call to chambers in which he stated that defendant Newsome had parked her car in a street spot that was reserved for a judge. Inasmuch as defendant Newsome was not in chambers, plaintiff related the information to defendant Rios and asked him whether he had defendant Newsome's cell phone number. He denied that he had that information, but said that he would "take care of it."  In sharp contrast to the manner in which he routinely treated plaintiff without any justification whatsoever, rather than criticizing or demeaning defendant Newsome, Justice Rios later offered to give his own parking spot to her.

The complaint relates that, on October 24, 2003, defendant Newsome told defendant Rios that defendant Lippman was telephoning for him. She then raised the volume on her radio. Plaintiff, who was packing for the move to Jamaica, exited her office to retrieve a box from the anteroom. As plaintiff did so, defendant Newsome raised the volume on her radio even louder. Defendant Newsome then opened a drawer in a filing cabinet and moved objects around, in a transparent effort to create additional noise. Immediately after defendant Rios ended his telephone conversation with defendant Lippman, defendant Newsome closed the drawer. She

47

answered the call. Defendant DeSole asked to speak to defendant Rios. He had been in his office with the door closed. After plaintiff answered the telephone, he emerged. Plaintiff informed him that defendant DeSole wanted to speak to him. He told plaintiff that he would be in his office during the lunch hour, and, instructed her that he would answer the telephone during that time. He closed his door and took defendant DeSole's call. Contrary to his earlier pronouncement, at approximately 1:30 p.m., he informed plaintiff that he was going out. He returned at approximately 1:45 p.m. and removed the drafts and the files from the basket on plaintiff's desk. He asked plaintiff where the law department was located. Plaintiff provided him with that information. Smirking, he brought the drafts and the files into his office. At approximately 2:05 p.m., he stated that he was going to the law department. When he left, his arms were filled with various motions and files. He returned at approximately 2:25 p.m. without them. Approximately three days later, he so ordered the draft in *Miguel Hernandez v. New York City Transit Authority* (Queens Index No. 19354/01). He directed plaintiff to change the draft in *James Williams v. New York City Transit Authority* (Queens Index No. 27553/02) to deny the motion based upon a technical defect that he stated existed in the affidavit of service. Plaintiff prepared the revised draft, in compliance with his instructions. Based upon the totality of the circumstances, it may be inferred that, in the course of guiding him through the process of creating a pretext for plaintiff's predetermined discharge, defendant DeSole had advised him to bring the drafts to the law department in an attempt to find some flaw in plaintiff's work (regardless of its triviality or whether the supposed imperfection merely suggested that the court exercise its power to overlook defects in form), as well as to damage her reputation among her colleagues by creating the false impression that plaintiff was not trusted to perform her duties as a principal law clerk. The complaint states that it was unprecedented for him to do so.

The complaint recounts that, on December 4, 2003, the door to defendant Rios' office was open when plaintiff arrived for work. He was not present. Plaintiff entered his office to skim the New York Law Journal. As she began to do so, defendant Newsome loudly exclaimed, "I don't think the Judge wants anyone hanging out in his office!" Plaintiff replied that he had never

49

told her that she was not allowed to review the New York Law Journal in his office (in the days immediately following the move to Jamaica, plaintiff set up the library in defendant Rios' office; on several occasions, he entered and observed her performing that duty - - never once did he object to her doing so). Defendant Newsome raised her voice and insisted, "Well, he told me." In view of defendant Newsome's unprofessional and abusive conduct, plaintiff firmly but quietly responded, "Well, I haven't heard it from the Judge and you conveyed your message - - if he wants to tell me that, he can tell me that, but you are not my boss." Defendant Newsome put her hands on her hips, glared at plaintiff and shouted over and over again that, "The Judge doesn't want anyone hanging out in his office." She continued to do so until plaintiff completed reviewing the law journal and exited - - a process that took approximately two minutes. Defendant Newsome's claim that plaintiff was "hanging out" in Justice Rios' office was inappropriate, insulting and specious. Plaintiff was performing a routine duty of a principal law clerk. Defendant Newsome was interfering with plaintiff's work. As plaintiff left defendant Rios' office, she stated what had been obvious for so many years - - that defendant Newsome was acting toward plaintiff in a demeaning manner due to plaintiff's religion and race.

The complaint reflects that, after that occurrence, Dennis Miller, the clerk of defendant Rios' new part, telephoned chambers. He spoke to defendant Newsome.  From defendant Newsome's part of the conversation, plaintiff learned that a case had been sent to the part. Defendant Newsome did not speak to plaintiff about it. Apparently, Miller did not seek to discuss the matter with plaintiff. Their conduct in that regard was highly unusual. When a case is sent to a part, it is the function of the law clerk to go to the courtroom, review the file, speak to the attorneys for the parties and subsequently return to chambers to brief the justice. Plaintiff went to the courtroom to perform her duties. When she returned, defendant Rios was sitting at his desk.  Defendant Newsome was seated in a chair in front of his desk. Without saying, "Good morning," he raised his voice and demanded that plaintiff tell him what had happened. Plaintiff asked to speak to him alone. He angrily shouted that he wanted defendant Newsome to remain. Plaintiff related the events of that morning. He hollered, "I don't want anyone in my office!"  Far

from finding any fault with defendant Newsome's conduct, he blamed plaintiff for not following her orders. His reaction was an extreme example of the hostile work environment and disparate treatment that existed in the workplace. Plaintiff noted that he had never told her that she was not allowed in his office.  She asked him whether she was prohibited from entering it to retrieve any of the volumes on his bookshelves to do research. He pretended not to understand the question and, instead of answering it, falsely declared that plaintiff was "ranting." He again shouted, "I don't want anyone in my office!"  Plaintiff stated that it had become very clear that, in every situation, he was automatically siding with defendant Newsome and that, although he was dismissing out of hand all of the complaints that plaintiff had made about defendant Newsome's behavior, he was adopting every criticism that defendant Newsome had made with regard to plaintiff.  Plaintiff asserted that those circumstances indicated that plaintiff was being treated in a discriminatory fashion.  He responded by yelling at plaintiff, "Bring all of the motions that you think that you are working on and put them on the table in here, then go home for the day." Defendant Newsome gleefully giggled. Plaintiff asked defendant Rios whether she was being fired.  He repeated the same instruction. He directed plaintiff to return the following morning. Plaintiff complied.  Before leaving for the day, plaintiff attempted to brief him regarding the case that had been sent to the part. He screamed that she should leave and return the next day. When plaintiff returned the following morning, she found that work been placed on her desk in the interim.  From the fact that moments after plaintiff had complained of discrimination, defendant Rios ordered her to, "Bring all of the motions that you think that you are working on and put them on the table in here, then go home for the day," and the other facts set forth in the complaint, it may be inferred that he ordered plaintiff to do so in retaliation for her complaints about discrimination. It also may be inferred that, in acting against plaintiff, while favoring defendant Newsome in the situation, he was discriminating against plaintiff due to religious and racial animus. Additionally, based upon his use of the phrase, "the motions you think you are working on," a jury may reasonably infer that it had been planned in advance that plaintiff would be terminated soon after the transfer to Jamaica. Defendant Rios' actions on December 4, 2003

had responded by supplying it to him and instructing him to give it to plaintiff. It was apparent that defendants Rios, DeSole and D'Angelis were simply acting out a rehearsed precursor to a predetermined discharge. It also was clear that the brochure was being used as a prop. It was being given to plaintiff so that they could point to that fact in an effort to create a false impression about plaintiff. Defendant DeSole proclaimed that a judge could fire a member of his staff at will, and, that it was very unusual for defendant Rios to offer plaintiff the option of taking annual leave. The facts set forth in the complaint reflect that it was "unusual" because, until the Second Circuit made its rulings in the aforementioned lawsuit that was brought by a former principal law clerk in Queens, defendants saw no need for the creation of a pretext prior to the discharge of such an employee - - they believed that a principal law clerk could be fired for any reason whatsoever, including retaliation for statements about matters of public concern such as judicial misconduct and discrimination.

The complaint states that, in response to defendant DeSole's assertion that a judge could fire a member of his staff at will, plaintiff replied that it was her understanding that even Supreme Court justices are prohibited from discharging an employee for unconstitutional reasons such as discrimination or retaliation for complaints of judicial misconduct. Plaintiff also stated that she would like to speak to defendants DeSole and D'Angelis about acts of misconduct committed by defendant Rios and anti-Semitism in the workplace. Although, as recently as September 2003, another New York State Supreme Court justice in Queens (Justice Luther V. Dye) had been censured, *inter alia,* for his anti-Semitic conduct - - and defendant DeSole previously had never met plaintiff or been present in plaintiff's workplace - - she derisively mimicked, "anti-Semitism!" and giggled. Defendant Rios stated that defendants DeSole and D'Angelis did not want to hear any of plaintiff's complaints. DeSole immediately agreed with him, declaring, "Yes - - we are only here to support the Judge." Defendant Rios rose and shouted that he was rescinding his "offer" because plaintiff had dared to say that he had committed misconduct. He screamed that, if plaintiff did not apologize to him in front of defendants DeSole and D'Angelis, he would fire her immediately. Although his threat to

55

escalate the adverse employment action, for no other purpose than to retaliate against plaintiff for her statement that she wished to report acts of judicial misconduct, clearly was unconstitutional and unlawful in and of itself, neither defendant DeSole nor defendant D'Angelis objected to it, attempted to intervene or ceased to support his actions. In view of the coercive circumstances, plaintiff said, "I'm sorry," and signed the document. Defendant DeSole laughed and said that plaintiff could try calling Porter. The futility of any such attempt was so apparent that the suggestion could only have been designed to communicate that plaintiff had no meaningful recourse. Plaintiff asked defendant Rios whether she should simply return to work when the annual leave time specified in that document expired. He answered, "No," and stated that plaintiff would have to telephone him, "after Martin Luther King's Birthday," and that he would let her know whether she would be permitted to return to work. He instructed plaintiff to surrender her employee identification card and key to chambers to defendant D'Angelis. He directed defendant D'Angelis to ensure that plaintiff took her personal property, and, to escort her out of chambers. Before leaving, plaintiff offered to inform defendant Rios of the status of motions that she had been handling. He replied that he did not want to hear anything further from plaintiff.

Defendant DeSole laughed; plaintiff left.

The complaint states that defendant DeSole's unusual involvement in plaintiff's employment relationship obviously must have been authorized by defendant Lippman, the Chief Administrative Judge of New York State. The complaint demonstrates that defendant Lippman previously had directed OCA's counsel, Michael Colodner, to prepare and submit an *amicus* brief in the lawsuit that had been commenced by a former principal law clerk in Queens against the New York State Supreme Court justice who had discharged him. The complaint also reflects that, in that action, OCA had unsuccessfully argued that a state judge should be able to discharge a principal law clerk for any reason whatsoever, including retaliation for statements involving matters of public concern, such as judicial misconduct. The complaint reflects that the Second Circuit's ruling rejecting that position was seen as a major concern by judges statewide.

56

From the facts set forth in the complaint, it may be inferred that defendants decided to establish a pretext for plaintiff's discharge in an attempt to defeat the constitutional rights that the Second Circuit had recognized, rather than to respect that court's determination.

Other facts set forth in the complaint that demonstrate that defendant Lippman was personally involved in the orchestration of a pretext for plaintiff's predetermined discharge include the unusual meeting that defendant Lippman had with defendant Rios at defendant Lippman's chambers in White Plains. The complaint demonstrates that their meeting occurred just one week after defendant Rios left notes in plain view on his own desk that indicated that he was in the process of establishing a pretext to discharge plaintiff and that he had contacted and/or intended to contact officials at OCA to consult with them about it. Additionally, as detailed above, when defendant Lippman telephoned defendant Rios on October 24, 2003, defendant Newsome reacted by suddenly making a great deal of noise throughout the duration of that telephone call, then ceasing to do so as soon as the call ended. In view of the facts set forth in the complaint, it may be inferred that defendant Lippman was contacting defendant Rios because defendant Lippman was personally involved in the orchestration of a pretext for plaintiff's predetermined discharge, that defendant Newsome had been enlisted by defendant Rios to participate in the orchestration of that pretext and that defendant Newsome was aware that defendant Lippman was telephoning defendant Rios in conjunction with the orchestration of that pretext.

The complaint also reflects that defendant D'Angelis' immediate supervisor was defendant Fisher, who was the Administrative Judge of the Supreme Court, State of New York, 11th Judicial District at the time.

Based upon the facts set forth in the complaint, it may be inferred that defendants Lippman, Fisher and Gardner (as well as defendants Manton, Sweeney, Reich and Koslowitz to whom defendant Rios had surrendered his decision-making authority regarding the employment of his principal law clerk) had granted their approval for the plan to coerce plaintiff into using annual leave. Additionally, it may be inferred that the plan also involved the assignment of court

57

officers for the sole purpose of creating a spectacle that would be incorrectly construed by plaintiff's co-workers and others as meaning that plaintiff had done something that had caused a security concern and resulted in plaintiff's lengthy absence. As shown in the complaint, defendants were completely aware that there was no security concern, and, that the only reason that plaintiff took the annual leave was their use of unlawful threats against her which were motivated by improper purposes. From the facts set forth in the complaint, it may be inferred that, in an effort to create a pretext for plaintiff's predetermined discharge and to destroy her professional reputation, defendants falsely represented to her co-workers and others that she had taken sick leave and was undergoing treatment for a mental condition, although they knew that plaintiff had simply agreed to go on vacation as the result of their unlawful threats, and, they also knew that plaintiff was not undergoing any such treatment whatsoever as was reflected by the use of annual leave time rather than sick leave. There is no title or position of power that accords anyone the right to engage in such an unconscionable effort to take a wrecking ball to the career and life of another individual.

The complaint states that defendants' utilization of coercion to force plaintiff to use accumulated annual leave clearly constituted an adverse employment action and reflected that she was being subjected to discriminatory disparate treatment, as well as a hostile and retaliatory work environment.

The complaint reflects that plaintiff had never before been required to execute a form to use her accumulated vacation time. On prior occasions, whenever defendant Rios had requested a writing, he had instructed plaintiff to prepare a brief memo for him to sign. The coerced use of an atypical form represented another adverse employment action; its purpose was to generate a paper pretext for the predetermined discharge of plaintiff. The form also was utilized to act as a red flag in plaintiff's personnel file so as to severely damage her professional career. Although defendant Rios was present when plaintiff was given a copy of the form that she had signed, the original was subsequently altered so that, above his signature, a box was checked - - it followed the preprinted statement, "Recommendation for Discretionary Leave D -

58

H," and preceded the preprinted remark, "Approve all." Reflecting his own personal involvement in this adverse employment action against plaintiff, defendant D'Angelis added his signature to the original form after he gave plaintiff a copy of it that did not bear his signature. Other additions later made to the original memorialized the personal involvement of defendant DeSole in the adverse employment action undertaken against plaintiff: a handwritten notation was added that stated, "Annual Leave credits to be used per L. DeSole," (above the initials "ML) and the signature of Deputy Chief Administrative Judge Joan B. Carey, in a box underneath the checked-off preprinted statement, Discretionary leave granted as recommended by N.Y.C. Chief Clerk, Executive Assistant or Asst Deputy Chief Administrator." The augmentations to the form constituted additional adverse employment actions that were used in the fabrication of a pretext for plaintiff's predetermined discharge and for the purpose of irreparably harming plaintiff's ability to earn a livelihood. Copies of the "Application for Leave" provided to plaintiff on December 11, 2003 and the version of that form disclosed by OCA, pursuant to a FOIL request made by plaintiff, are annexed as Exhibits "N" and "O" to the complaint.  Plaintiff's social security number has been redacted from those documents.  Copies of the writings signed by defendant Rios, when he approved the vacation requests submitted to him by plaintiff on February 16, 2000 and April 24, 2002, are annexed as Exhibit "P" to the complaint.

The complaint relates that there simply is no requirement that anyone other than a state supreme court justice authorize his or her principal law clerk to go on vacation. It may be inferred that defendant Rios involved other defendants in this situation not because he was following some officially required procedure, but rather because they agreed to act jointly with him to create a pretext for plaintiff's predetermined discharge, through the preparation of atypical and unnecessary documents for inclusion in plaintiff's personnel file, as well as by other means. It may be inferred that the answer to the question, "Why are all of these people involved in this case?" is that defendant Rios decided to involve them in his employment relationship with plaintiff and they agreed to become a part of the plan.

The complaint relates that, although as the immediate supervisor of defendant D'Angelis,

59

defendant Fisher clearly would have been informed that defendant Rios had unconstitutionally threatened to discharge plaintiff in retaliation for her attempt to raise complaints about discrimination and judicial misconduct, he provided additional resources to facilitate defendant Rios' unlawful actions against plaintiff. Defendant Fisher appointed Louise Conway, who had been assigned as a court attorney in the law department, to a referee position that he created for the purpose of taking away from plaintiff a substantial portion of the duties that are routinely performed by the principal law clerk assigned to a state supreme court justice.  Conway began conferencing cases for defendant Rios, conferring with him about pending matters in his part and working on many of the motions that were assigned to him.

The complaint notes that the coercion that was exerted to force plaintiff to use her annual leave time prevented her from attending a Legal Update Program for Court Attorneys in January 2004. Through attendance at such programs, law clerks keep informed of developments in various areas of law and earn the continuing legal education credits required of them without incurring any personal expense.  The elimination of plaintiff's ability to attend that seminar constituted an adverse employment action.

The complaint recounts that, on January 23, 2004, plaintiff telephoned defendant Rios, pursuant to his instructions. After putting the call on hold for approximately one minute, he asked plaintiff how she felt about returning to work for him.  From that question and the other facts set forth in the complaint, it may be inferred that, in addition to creating a pretext for plaintiff to be discharged, defendants' acts against plaintiff were intended to drive plaintiff to quit. Plaintiff replied that she had been "treated in a manner that was outrageous and unfair and . . . inexplicably so for any proper reason," and that she was "quite upset about that," but that it had not been her "idea to not be there." Defendant Rios falsely claimed that she had been subjected to that treatment because she had been disrespectful toward him. Plaintiff accurately responded, "Judge, I have always shown you the respect."  He stated that, "I'm willing to . . . put that behind us, because, you know, after 10 years, people are entitled to have differences of opinion," and announced that it would be necessary for plaintiff to do the same. Plaintiff asked

60

whether he was requiring her to withdraw the complaints that she had expressed about discrimination. He asked her whether she had filed a written complaint. Plaintiff responded that she had been referring to the complaints that she had raised with him. He asserted, "That's not what I asked you," and again asked whether plaintiff had, "filed a complaint." Plaintiff recounted that she had attempted to raise her complaints with defendants D'Angelis and DeSole. Defendant Rios declared that he was not talking about that occurrence. Plaintiff stated to defendant Rios that he was her supervisor, and, that she had complained to him about the discrimination. He abruptly dropped that topic and told her that he would be out of the office from January 29 until the following Tuesday. He told plaintiff that she could either report to work on Thursday, January 29 or take "three additional vacation days," and return the next Tuesday. Plaintiff selected the latter option. He commented that he would send a memo to defendant D'Angelis about the extension of her vacation.  Plaintiff noted that she did not have a key to chambers or an employee identification card.  He stated that, when plaintiff arrived at the courthouse, she would have to see defendant D'Angelis and retrieve those items from him. His statements evidenced the continuation of defendant D'Angelis' unusual entanglement in the relationship between a state supreme court justice and his principal law clerk. Inasmuch as defendant D'Angelis reported directly to defendant Fisher, defendant Rios' remarks also revealed that defendant Fisher's unique involvement in that relationship persisted.

The complaint states that, although defendant Rios had given plaintiff the option of either returning to work on January 29 or waiting until the following Tuesday, in a letter to her dated January 26, 2004, he declared that, ". . . since I will be out of the office on January 29, 30 and February 2, 2004, it is understood that you will be granted three additional annual leave days and return for duty on Tuesday, February 3, 2004." The wording tended to create the false impression that plaintiff would not have been permitted in chambers until he returned.  Further, contrary to his statement, plaintiff was not being "granted three additional annual leave days," she was being authorized to utilize accumulated vacation time that she had earned. His letter reiterated that plaintiff would be required to report to defendant D'Angelis' office to retrieve her

61

identification card.  It thereby documented the adverse employment action of plaintiff's forced surrender of her identification card, and, the demeaning treatment to which she was being subjected in connection with her return, which obviously was part of a hostile work environment designed to drive plaintiff to quit. The complaint notes that principal law clerks ordinarily are not compelled to surrender their identification cards when they go on vacation. Defendant Rios' gratuitous mention of that requirement in the letter, and, the letter's inclusion in plaintiff's personnel file constituted adverse employment actions designed to aid in the unconstitutional orchestration of plaintiff's predetermined discharge and to damage her career.

The complaint also relates that, on February 3, 2004, plaintiff appeared at defendant D'Angelis' office to retrieve her employee identification card and key.  When she asked him for those items, he reacted by laughing loudly. He tauntingly asked her, "How do you feel?"  In light of his conduct, plaintiff stated that the only reason that she had come to see him was that defendant Rios had told her that she must do so in order to recover the items that she had requested.  He again questioned plaintiff, "How do you feel?" He repeated that question several times and continued to laugh, while he handed the items to her. After initially ignoring his derisive demeanor, plaintiff finally remarked that, by returning to work, she was not waiving any claims that she had based upon the manner in which she had been treated.  Immediately thereafter, she exited his office.  As plaintiff walked away, defendant D'Angelis' exploded in laughter.

That complaint recounts that, on the same day, when plaintiff returned to chambers, she was unable to log onto her computer. As plaintiff was telephoning the computer department, defendant Rios arrived. He informed her that to use her computer, she would have to enter an additional password: "Victor" (which was the first name of senior p.c. analyst Martinez, who worked at the courthouse).  Immediately thereafter, defendant Rios instructed plaintiff to enter his office. Contrary to the representations that he made during their telephone conversation on January 23, 2004, in which he had stated to plaintiff, "I'm willing to put things behind us and move forward in the same cooperative manner in which we had," as soon as she sat down, he

62